NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2823-16

PHOENIX PINELANDS
CORPORATION, a New
Jersey Corporation,

       Plaintiff-Respondent,

v.

HARRY DAVIDOFF, also known
as Frederic Vail, GIDEON
CRANMER, JAMES NALE,
Administrator of the Estate of
Gideon Cranmer, JAMES BODINE
and CORNELIA C. BODINE, his
wife, JOB CORLIS and ELIZA
CORLIS, his wife, JAMES
BODINE, CORNELIA BODINE,
JOHN HOLMES and EMMOR R.
WILLS, Administrator of the
Estate of JAMES BODINE,
CORNELIA COLLINS HOLMES,
ANNIE HOLMES BODINE,
JOSEPH PREDMORE, ADELE
PREDMORE, MARGUERITE
NEWTON, PREDMORE COX,
CHARLES ROY COX, ELLIE
BODINE COX, ELLA M.
CLAYTON, EDGAR LESLIE
BODINE, ALMA BODINE
BAKER, ALMA BODINE
BAKER ESTATE IN TRUST
f/b/o Four Children of
CHARLOTTE FIELDER

> APPROVED FOR PUBLICATION
>
> **April 29, 2021**
>
> **APPELLATE DIVISION**

WADE, ARTHUR BAKER, CHARLOTTE FIELDER WADE, BENJAMIN WADE, ELLIE BODINE, JOSEPH RODGERS NEWTON, ISABEL KINSELL, JESSUP GARRON, LEON V. GARRON, EDWARD C. JESSUP, MARGUERITE NEWTON, SAMUEL NEWTON, HELEN NEWTON, NANCY JOURDAN, DONALD MUSSER, NICHOLAS NEWTON, ASHTON BODINE, HATTIE E. SURRAN, FLORENCE NEWTON McCALL, RACHEL NEWTON, THEODORE L. CHRISTOPHER, CORNELIA BODINE, HAROLD BODINE, JOHN R. BRINKERHOFF, ISAIAH ADAMS and MARY M. ADAMS, his wife, WILLIAM A. SHEPARD, NATHAN HALL, WILLIAM A. SHEPARD and CAROLINE M. SHEPARD, his wife, HENRY SHAW, CENTRAL TRUST and TITLE COMPANY by George H. Deller and H.M. Shaw, President, MEYER BEYER and MATHILDA BEYER, BERMAN HERRMAN and LEON KOLMER, SOFIE HERRMAN, LOUISA KOLMER, GEORGE ORLOV, VERA ORLOV, LYDIA ORLOV, VICTOR ORLOV, MARTHA ORLOV, JENNIE ORLOV, DAISY ORLOV, RAYMOND ORLOV a/k/a RAYMOND LOVE, ELIZABETH ORLOV, MARIE ORLOV, SAM GAINES, ISAIAH ADAMS,

2

MEYER BEYER, ISADORE MILKENSTEIN and ROSA MILKENSTEIN, WOLF HERSKOWITZ, SAMUEL SHELL, LOUISA SCHELL, SAMUEL N. SCHELL, SAMUEL R. SCHELL, ANNA SCHELL, WILLIAM M. SCHELL, MARJORIE SCHELL, WILLIAM R. SCHELL, DENISE SCHELL, MARIANNE SCHELL KID, EILEEN SCHELL BENKOVIC, CHRISTOPHER SCHELL, JACQUELINE SCHELL GALLO, WILLIAM SCHELL, MICHAEL SCHELL, JOSHUA W. CORLIS, LYDIA A. CRANMER, HARVEY CORLIS, ELLIS CRANMER, ANNA K. ACKER and JAMES R. ACKER, h/w, CHARLES RUSSELL, HELEN HORN LINDGREN, EDITH WARREN KUEPPERS and ROBERT KUEPPERS, her husband, WARREN STEVENS, BARBARA R. STEVENS, h/w, J&M LAND COMPANY, CHARLES DeSORTE, VIOLET DeSORTE, his wife, BARNEGAT RIFLE AND PISTOL CLUB, INC., CONTINENTAL SEARCHERS, INC., ESTATE OF WOLF HERSKOWITZ, WILLIAM GIBBS, trustee, SAMUEL HALPERN and PAULINA HALPERN, his wife, ANNIE SAPERSTEIN and HARRIS SAPERSTEIN, her husband, HYMAN ROSENSOHN,

BERTHA BOEHM,
BURLINGTON CONCRETE CO.,
MOUNT LAUREL CONCRETE
COMPANY, their heirs, devisees
and personal representatives,
and his, their or any of their
successors in right, title and
interest, unknown claimants,
and their heirs, devisees and
personal representatives, and his,
their, or any other successors in
right, title and interest, and
FIRST AMERICAN TITLE
INSURANCE COMPANY,

       Defendants,

and

STATE OF NEW JERSEY,
DEPARTMENT OF
ENVIRONMENTAL
PROTECTION,

       Defendant-Appellant.

_____

> Argued January 30, 2019 - Decided April 29, 2021
>
> Before Judges Accurso, Vernoia and Moynihan.
>
> On appeal from the Superior Court of New Jersey,
> Chancery Division, Ocean County, Docket No.
> C-000246-11.
>
> Jennifer L. Moriarty argued the cause for appellant
> (Gurbir S. Grewal, Attorney General, attorney;
> Melissa H. Raksa, Assistant Attorney General, of

4

counsel; Joan M. Scatton and Jennifer L. Moriarty, Deputy Attorneys General, on the briefs).

Michael R. O'Donnell argued the cause for respondent (Riker Danzig Scherer Hyland & Perretti LLP, attorneys; Michael R. O'Donnell, of counsel and on the brief; Jorge A. Sanchez, on the brief).

The opinion of the court was delivered by

ACCURSO, J.A.D.

The State of New Jersey, Department of Environmental Protection, appeals from a final judgment in this quia timet and ejectment action divesting it of its title to seven parcels of land in the Preservation Area of the Pinelands National Reserve, consisting of over 250 acres, and granting title to those properties to an adjoining landowner, plaintiff Phoenix Pinelands Corporation, operator of a grandfathered sand and gravel mine. Desirous of expanding its mining operation and believing the State would be "a reluctant seller," Phoenix made no attempt to purchase the State's lands. Instead, Phoenix mounted a surreptitious two-decade-long quest to undermine and cloud the State's title to the properties and establish its own competing chains of title. Phoenix spent over $1 million hiring searchers, surveyors, genealogists and lawyers to exploit potential defects in the State's titles that, regrettably, are not uncommon in land titles in the Pinelands. It tracked down putative heirs and

purchased their fractional interests, sometimes for sums approximating actual value, by way of omnibus quitclaim deeds it drafted for the purpose.

Then, in an effort to establish a presumption of peaceable possession of the State's lands, the statutory prerequisite to a quiet title action, N.J.S.A. 2A:62-2, Phoenix, without notice to the State, presented the tax assessor for Little Egg Harbor Township with its newly drawn deeds and chains of title for the State's properties and asked to be allowed to pay taxes on them. Little Egg Harbor, also without notice to the State, and while continuing to accept the State's PILOT (payment in lieu of taxes) fees for the properties, redrew its tax map at Phoenix's behest, erasing the State's parcels and replacing them with a single lot and block designation listing Phoenix as the assessed owner. Phoenix then instituted this action in the Chancery Division seeking equitable relief in the form of the voiding of the State's recorded deeds.

Critically, Phoenix held no interest whatsoever in any of the State's seven properties when it began its quest to undermine the State's record title and divest it of ownership of all seven parcels. Those actions, which Phoenix readily owns, are anathema to the principles undergirding New Jersey's land title laws and brand it a "title raider," one "who seeks technical flaws in title in order to upset existing equities and clearly vested rights," Palamarg Realty Co.

A-2823-16

v. Rehac, 159 N.J. Super. 287, 297 (App. Div. 1978), vacated on other grounds, 80 N.J. 446, 453 (1979), and in whose "activities" our courts "find no social value or contribution," O & Y Old Bridge Dev. Corp. v. Cont'l Searchers, Inc., 120 N.J. 454, 458 (1990) (citing Bron v. Weintraub, 42 N.J. 87, 95 (1964)).

Phoenix's nefarious actions permit it no relief in a court of equity. And allowing this judgment to stand risks destabilizing marketable titles in the Pinelands and does not "best support and maintain the integrity of the recording system," Palamarg, 80 N.J. at 453. Phoenix also did not succeed in establishing its title to six of the seven parcels "free from all reasonable doubt," Shotwell v. Shotwell, 24 N.J. Eq. 378, 387 (Ch. 1874). We therefore reverse the judgment and remand for reinstatement of title to all seven properties in the State, imposing a constructive trust on the "title" Phoenix acquired in one of the State's parcels to which the State is equitably entitled on payment of the sum Phoenix expended in acquiring it, plus simple interest.

For ease of reference, we offer a guide to our opinion. We begin our discussion with a brief description of the Pinelands and the federal and State efforts to protect and preserve it, leading to the State's purchase of these seven parcels. We next detail Phoenix's efforts to locate and exploit defects in the

7

State's titles, Phoenix's purchase of competing interests, and its successful effort to have the Little Egg Harbor tax map redrawn to erase the State's parcels and consolidate the lots under one lot and block listing itself as the assessed owner.

We then recap the history of the litigation, specifically addressing the 2013 order by which the first judge to handle the matter granted the State's motion to dismiss Phoenix's claim for quiet title but denied the State's motion to dismiss Phoenix's quia timet claim,[1] and summarizing the second judge's two opinions vesting title to all seven properties in Phoenix. We next outline

---

[1] "[T]he ancient bill quia timet, to remove a cloud from a title, in which the complainant sets forth his own title and the defendant's title, and starts out affirmatively with the burden of proof upon him to demolish the defendant's title or claim" is distinguished from a statutory action to quiet title

> in which the object of the bill is to compel the defendant to take the affirmative, to bring a suit at law or in equity, to set forth any demand of any kind which he sees fit to set forth, and to give the complainant the benefit of a decree relieving the land of which he holds peaceable possession from all claims of the defendant, or establishing those claims and rendering them definite so as to inform the complainant precisely what their character and extent in fact are.
>
> [Fittichauer v. Metro. Fire Proofing Co., 70 N.J. Eq. 429, 436 (Ch. 1905).]

the parties' arguments on appeal. Finally, we address the law and apply it to the facts, which are now largely undisputed.

The Pinelands and the State's Purchase of the Properties

Congress established the 1,000,000-acre Pinelands National Reserve in the National Parks and Recreation Act of 1978, Pub. L. No. 95-625, 92 Stat. 3492 (codified at 16 U.S.C. § 471i), making the Pinelands the first natural resource to be protected under the "national reserve" program. See Gardner v. N.J. Pinelands Comm'n, 125 N.J. 193, 198-99 (1991). "A 'wilderness' of pine-oak forests and wild and scenic rivers, the Pinelands harbors a 'wide variety of rare, threatened and endangered plant and animal species.'" Id. at 199 (quoting S. Energy and Env't Comm. Statement to S. 3091 (L. 1979, c. 111) (June 28, 1979) and John McPhee, The Pine Barrens 4-5 (1981)). It also "overlies the vast, seventeen-trillion gallon Cohansey aquifer, 'one of the largest virtually untapped sources of pure water in the world.'" Ibid. (quoting S. Energy and Env't Comm. Statement to S. 3091).

Declaring the protection and preservation of the Pinelands to be in the national interest, Congress in 1978 authorized federal funding to assist New Jersey in the development of a comprehensive plan for its management and for

the acquisition of lands within the Pinelands National Reserve having "critical ecological values which are in immediate danger of being adversely affected or destroyed." 16 U.S.C. §§ 471i(b)(1) to (b)(3), (h)(1)(A). New Jersey enacted the Pinelands Protection Act, N.J.S.A. 13:18A-1 to -58, the following year, creating the Pinelands Commission to implement the law and assume primary responsibility for planning in the Pinelands, N.J.S.A. 13:18A-4.

In that Act, the Legislature singled out "a certain portion of the pinelands" it determined to be "especially vulnerable to the environmental degradation of surface and ground waters . . . occasioned by . . . improper development or use," which degradation "would result in a severe adverse impact upon the entire pinelands area." N.J.S.A. 13:18A-2. It established this "Preservation Area" within the Pinelands National Reserve with the goal of preserving "an extensive and contiguous area of land in its natural state, thereby ensuring the continuation of a pinelands environment which contains the unique and significant ecological and other resources representative of the pinelands area." N.J.S.A. 13:18A-9(c)(1); see also Uncle v. N.J. Pinelands Comm'n, 275 N.J. Super. 82, 84 (App. Div. 1994). In addition to determining the Preservation Area should be subject to "more stringent restrictions on the development and use of land," the Legislature also identified it as the area

where the State should concentrate "public acquisition of land or interests therein." N.J.S.A. 13:18A-2.

In its 1980 Comprehensive Management Plan, the Pinelands Commission determined the State needed to acquire roughly 97,000 acres throughout the Pinelands in order to meet the Act's goals, complementing the 240,000 acres of conservation land the State already owned. New Jersey Pinelands Commission, New Jersey Pinelands: Comprehensive Management Plan 217, 251 (Nov. 1980). The State's acquisition of land in the Pinelands is managed cooperatively between the Commission and the Department of Environmental Protection, with the Commission planning acquisition projects for which the Department acts as the acquisition agency. Id. at 214; see also N.J.S.A. 13:18A-4.

Acting on the Commission's recommendation, the Department in 1986 authorized State funds, including restricted bond funds, and federal monies for acquisition of 8,400 acres of ecologically significant land in connection with the "East Plains — Stafford Forge" project, including lands located in the Preservation Area within Little Egg Harbor Township. The seven parcels at issue here were all purchased by the State as part of that effort.

11

After identifying the block and lot designations of the properties it was interested in purchasing in the project area on municipal tax maps, the Department used the tax rolls to identify the owners of the land and sent them letters advising of the State's interest in acquiring their land for preservation in the Stafford Forge project. Interested landowners were invited to public meetings for information on the project and the steps necessary for the State to purchase qualifying properties.

The Department contracted with third-party surveyors, title companies and appraisers to review each parcel. The Department relied on the title companies to perform the searches and assure the State it was acquiring good title. It further engaged a surveyor to survey each parcel, and a surveyor's description was included in each deed.

For each parcel identified, the State obtained two independent appraisals of fair market value "as an entire taking." Department policy in the Preservation Area was to have the appraisals reflect pre-Pinelands-regulation land values, thereby disregarding any reduction in value occasioned by State and federal regulation. See New Jersey Pinelands Commission, New Jersey Pinelands: Comprehensive Management Plan: A Progress Report on the First Three Years of Implementation IV-2 (Dec. 1983). The two appraisals were

then evaluated by a review appraiser in the Department of Transportation's Division of Right of Way and Access Management, who certified to the value on the basis of the appraisals. The Department would offer to buy the parcel at the certified fair market value.

Through depositions of several retired State employees who were involved in this process on behalf of the Department and the Attorney General's office, the parties established the Department was aware the Pinelands is a "very complicated area" in which to search title. In addition to the properties being mostly uninhabited, all of the properties at issue here were originally located in Burlington County prior to an 1891 adjustment in county boundary lines, which thereafter placed the properties in Ocean County.[2] Accordingly, the proper venue for recording deeds and other land title documents for these seven parcels changed from Burlington County to Ocean County in that year. Reference to the municipal tax map block and lot designations offers searchers only limited assistance because many municipalities in the Pinelands did not have tax maps until well into the

---

[2] L. 1891, c. 138, p. 538-40 (an act to annex the township of Little Egg Harbor, in the county of Burlington, to the county of Ocean); see also John P. Snyder, The Story of New Jersey's Civil Boundaries 1608 – 1968, 19, 44 (1969).

twentieth century.  Little Egg Harbor did not create its own municipal tax map until 1959.

Further, and perhaps most significant, the original warrants from which these properties derived contained thousands of acres which overlapped county lines, and the older deeds often contain vague, inaccurate, or incomplete property descriptions, often with multiple exceptions.  The remoteness of the area and its limited development — attributes which make it unique and spurred the State and federal governments to take steps to preserve it intact for future generations — also resulted in relatively few land transactions since the

first severances from the Proprietors,[3] and thus few opportunities to address and resolve problems created by the descriptions in those initial surveys.[4]

As an example, our former colleague, Judge Wells, while sitting in chancery, described the Isaiah Adams tract, the genesis of four of the seven

---

[3] "New Jersey was a proprietary colony from the time of its capture from the Dutch as part of New Amsterdam by the forces of Charles II in the early fall of 1666 until the proprietors surrendered all governmental prerogatives to the crown in 1702." Graham v. Edison, 35 N.J. 537, 540 (1961). In 1664, before the Dutch surrendered, "Charles II formally granted the whole territory to his brother, James, Duke of York, with full powers of government and complete ownership of the land." Ibid. James shortly thereafter "conveyed that portion which is now New Jersey . . . to Lord John Berkeley and Sir George Carteret, their heirs and assigns forever, as sole proprietors." Id. at 540-41. "Lord Berkeley sold his interest in the granted lands in 1674, and New Jersey was divided into the provinces of East Jersey and West Jersey, the boundary between the two being established by the famous Quintipartite Deed of July 1, 1676." Jackman v. Bodine, 43 N.J. 453, 481 (1964) (Haneman, J. concurring). Justice Haneman went on to explain that even after the provinces were united in 1702, "sharp contrasts" remained. Id. at 482 (quoting McCormick, New Jersey from Colony to State, 1609-1789 56-57 (1964)). The population of West Jersey with its widely dispersed farms was smaller and less heterogeneous than that of the more compactly settled towns of East Jersey. Ibid. East Jersey was also "much more seriously divided by internal quarrels, arising out of the peculiar complexities of the dispute between the early townsmen, with their quit rent obligations, and the proprietors. There was no comparable source of contention in West Jersey." Ibid. (quoting McCormick, at 56-57).

[4] For background on the proprietors' use of warrants and surveys for the purpose of "severing" title, see Normanoch Ass'n v. Baldasanno, 40 N.J. 113, 120-22 (1963); Gen. Proprietors of E. Div. of N.J. v. Force's Executors, 72 N.J. Eq. 56, 62-66 (Ch. 1896).

A-2823-16

properties at issue here, as encompassing "8,525.80 acres in a 23-course description which expressly excluded 26 surveyed exceptions returned to others leaving a net acreage of 4,662.89" when it was surveyed by the Proprietors of West Jersey in 1859. Hyland v. Kirkman, 204 N.J. Super. 345, 353 (Ch. Div. 1985). When Adams' successor-in-title conveyed the same land over thirty years later in four transactions ranging in size from 1,750 to 2,797.7 acres, he ignored the exceptions. Ibid. As Judge Wells explained, whereas

> workable protractions of the descriptions give some idea as to where the parcels are in relation to one another and to the outbound description of the return to Isaiah Adams[,] it is impossible to locate, with any accuracy, where the tracts are on the ground or the exact extent to which each is affected by one or more of the 26 exceptions.[5]
>
> [Ibid.]

During the course of discovery, the State produced its acquisition files for each of the seven properties at issue and offered former employees involved in the transactions for deposition. Those individuals, however, could only offer general information about the process by which the State went about

---

[5] Illustrating that point, Phoenix relied on an historic "mapping error" in locating the easterly line of the Adams tract, first discovered by its surveyor in the course of preparing Phoenix's lot consolidation subsuming the State's properties, in attacking the State's title to Properties IV and V.

acquiring lands for preservation in the Pinelands. They had very little memory

of the actual real estate transactions, all of which had taken place twenty-five

to thirty years before.

The State's purchases of the seven properties at issue, which it funded

through a seventy-five percent federal contribution, see 16 U.S.C. §§

471i(b)(3) and (h)(1), and twenty-five percent State funds through the New

Jersey Green Acres Bond Fund Act of 1983, L. 1983, c. 354, and holds in trust

for the benefit of the public, are summarized here. For each property, the State

produced its appraisal, title report, survey report and deed description. All the

purchases were by bargain and sale deed with covenants against grantor's acts

and title insurance was in place for all but Property I, for which Department

records reflect a title commitment but not a title policy.[6]

---

[6] Chicago Title insured the State's title to Properties II, III and IV. The
company defended the State's title to those lands in this action for two years
before electing to pay the policy limits on all three policies, thereby ending its
obligation to further defend the State. First American Title Insurance
Company insured the State's title to Properties V, VI and VII in 1994 when it
acquired those parcels. The company subsequently insured Phoenix's title to
all seven of the Properties. First American was a defendant in the proceedings
in the trial court. The State settled its claims against First American for the
full amount of its policies. The court bifurcated Phoenix's damage claims
against First American, and Phoenix voluntarily dismissed those claims
without prejudice after prevailing at trial. First American, which is

17

Properties I, II and III all spring from an 1835 conveyance from the Proprietors of West Jersey to Gideon Cranmer.[7] Properties IV, V, VI and VII trace their origin to the 1859 Isaiah Adams tract.

Property I (Block 2, Lot 11)

The State purchased Property I, Block 2, Lot 11, a slightly over fifty-five-and-a-half-acre parcel, part of a larger wooded tract, from Continental Searchers, Inc. by deed recorded on September 26, 1989, for $75,451.[8] As

representing Phoenix pursuant to a reservation of rights, is not a party to this appeal.

[7] Although Phoenix and its experts refer to Properties I, II and III as the "Bodine tract," and thus we sometimes do as well, the parcels are not contiguous. These properties were all part of a 152.63-acre tract of land conveyed to Gideon Cranmer by the Council of Proprietors of West New Jersey in 1835. Although recorded in the West Jersey Proprietors' "Return Book," the deed is not found in the records of any County Clerk's office. Instead, it is a part of the West Jersey Deeds collection maintained in the State Archives. Properties I, II and III are not contiguous because at the time the Council made its conveyance to Cranmer, it had already granted land to William Watson in 1808, which the conveyance to Cranmer overlapped. The conveyance to Cranmer was made subject to the lands previously conveyed to Watson. That seventy-three-acre overlap, sometimes referred to as the Watson exception, dissected the Cranmer tract, separating the easterly portion, which became Properties II and III (Block 4, Lot 8 and Block 4, Lot 8A), from the westerly portion, which eventually became Property I (Block 2, Lot 11) and reduced the net acreage to Cranmer to 79.47 acres.

[8] This purchase price was for the entire eighty-acre tract, which also included Lot 10 conveyed by the same deed. Phoenix's surveyor contends Property I

with Properties II and III, the State traces its title to Property I through an unbroken line back to the West Jersey Proprietors' 1835 deed to Cranmer.

Following Cranmer's death, James Bodine acquired the Cranmer tract at an Orphan's Court sale in 1860. Bodine and his wife, Cornelia, conveyed the tract to Job Corlis, a local farmer, several months later. Following Corlis' death, his heirs, who were still living in the area, conveyed the tract to Frederick Vail in 1914.[9] Vail died in 1941. He was listed as the assessed owner when Pyramid Investment and Herbert L. Pickell acquired a series of tax sale certificates for unpaid taxes on the property in 1965 and 1966. The property was assessed to Pyramid and Pickell until entry of final judgment in a tax sale foreclosure in 1978, vesting title in Elizabeth Anne Merring and American National Bank and Trust, co-executors of Pickell's estate.

In 1979, Merring and American National conveyed the property to Betty Simon, Trustee UDT of Richard Simon. Simon conveyed the property, along

---

(Block 2, Lot 11) encompasses only approximately fourteen acres. Another deed purporting to convey the same property states it consists of slightly over twenty-six acres, more or less. The tax bill to Phoenix puts it at slightly over twenty-four acres. We take the acreage figure in the text from the State's 1989 purchase offer and deed, without any determination as to which figure is accurate.

[9] Vail was apparently a pseudonym used by Harry Davidoff, a New York resident who speculated in Pinelands properties.

with Lot 10, as well as additional lands, to Continental Searchers in 1988, the entity from which the State obtained title in 1989.

Property II (Block 4, Lot 8)

The State purchased Property II, Block 4, Lot 8, a nearly forty-two-acre tract, from Barnegat Rifle and Pistol Club, Inc. by deed recorded on April 9, 1990, for $68,000.  As with Properties I and III, the State traces its title to Property II in an unbroken line through Vail, Corlis and Bodine back to the West Jersey Proprietors' 1835 conveyance to Cranmer.

Vail was listed as the assessed owner of Property II in 1963 when Lincoln Oil Corporation acquired a tax sale certificate for unpaid taxes on the property that it assigned to Warren W. Stevens in 1967, who subsequently filed a complaint to foreclose the certificate.  Stevens acquired title to the property, along with four other lots in Little Egg Harbor, upon entry of final judgment in the tax sale foreclosure in 1969.  Property II was conveyed three more times before the State acquired it from the Barnegat Rifle and Pistol Club in 1990.

Property III (Block 4, Lot 8A)

The State purchased Property III, Block 4, Lot 8A, an almost three-acre parcel, from Edith Warren Kueppers and Robert Kueppers, husband and wife,

20

by deed recorded on May 8, 1990, for $11,525. As with Properties I and II, the State traces its title to Property III in an unbroken line through Vail, Corlis and Bodine back to the West Jersey Proprietors' 1835 deed to Cranmer.

Vail conveyed Property III to Charles Russell in 1915. Russell conveyed the property to Helen Horn Lindgren in 1935, who conveyed it to Edith Warren Kueppers in 1955. Kueppers and her husband Robert conveyed the property to the State in 1990.

Property IV (Block 3, Lot 18)

The State purchased Property IV, Block 3, Lot 18, an approximately seven-and-a-half-acre parcel, from the Estate of Herbert L. Pickell by deed recorded on March 24, 1994, for $34,745.[10] As with Properties V, VI and VII, the State traces its title to Property IV to the 1859 grant from the West Jersey Proprietors to Isaiah Adams.

Adams conveyed the entire 4,662.89-acre tract (8,525.80 acres less exceptions) to William Shepard in 1860, who conveyed it to Nathan H. Hall. Hall conveyed the entire tract back to Shepard in 1893. Shepard conveyed the entire tract to Henry Shaw, president of Central Trust & Title Co., who

---

[10] This sum also includes the price paid for an almost sixteen-acre tract known as Block 5, Lot 2 conveyed by the same deed.

conveyed it several days later to his company. In September 1893, Central Trust & Title conveyed a 6/10ths interest in the entire 4,662.89 tract to Meyer Beyer by deed recorded in Ocean County. The following year Central Trust & Title, without mention of its prior conveyance to Beyer, conveyed "the easterly 2,797.74 acres of a tract of 4,662.89 returned to Isaiah Adams" to Beyer in a deed recorded in Burlington County over a year later in 1895. The State, like Phoenix, traces its title to Properties IV, V, VI and VII to the Meyer Beyer deed, which notably contains no metes and bounds description.

Meyer and Mathilda Beyer conveyed a fifty-acre tract, described by metes and bounds with reference to the Adams tract, to Sam and Paulina Halpern by deed recorded in Ocean County on June 18, 1894. This conveyance was one of several the Beyers made of lots, each one thirty chains wide, running down the easterly line of the Beyer tract. The parties refer to these several lots as "the corridor lots" from their appearance on a map.

Two months after acquiring the property from the Beyers, the Halperns conveyed it to Annie and Harris Saperstein. The Sapersteins conveyed the property to Hyman Rosensohn in 1896 by deed recorded in Ocean County. Rosensohn subsequently conveyed twenty-six acres to Bertha Boehm in 1897 by deed with a metes and bounds description, recorded in Burlington County

22

that same year.  That deed was recorded in Ocean County in November 1970.

Boehm's interest in Property IV, which was described in a 1976 tax sale

complaint as "being 7.71 acres, more or less, known as Lot 18, Block 3, as

shown on Little Egg Harbor Tax Map, Sheet #2," was foreclosed by way of a

1978 tax sale judgment in favor of Elizabeth Anne Merring and American

National Bank and Trust, co-executors of the Estate of Herbert L. Pickell.  The

State acquired the property from Pickell's estate in 1994.

The surveyor who appeared for the State at trial, Barry Jones, testified

the State's survey and description from the 1994 deed from Pickell contained

"an error in the beginning call coordinate values."  Although the deed recites

that it begins "at the northerly corner of Lot 18, Block 3," the coordinates did

not match the call.  Jones testified that plotting Lot 18 "in accordance with the

deed for Lot 19, as the two parcels abut each other, and then go abut the

county line," made clear the coordinates for the beginning call were incorrect.

Allowing the call to control the point of beginning made "the bearings and

distances match going around and up the county boundary line with . . . this

survey by the same surveyor [of] the adjoining lot" 19.  Making the adjustment

and overlaying the Little Egg Harbor tax map on an aerial photograph of the

area, using three roads to "get it in the right place on the face of the earth," made clear it coincided with the location of Block 3, Lot 18 on the tax map.

Property V (Block 3, Lot 19)

Property V, Block 3, Lot 19, consists of less than one-half acre. It is located directly across Cervetto Road to the west of Block 4, Lot 13 (Property VII). It is one of the three tracts the State purchased by deed from Continental Searchers and the Estate of Wolf Herskowitz, recorded on July 8, 1994, for $95,388. As with Properties IV, VI and VII, the State traces its title to Property V through Meyer Beyer to the 1859 Adams grant.

The State's title expert, Joseph Grabas, asserted that Property V was created as a result of an error in the Little Egg Harbor tax map, which placed the easterly line of Block 3, Lot 19 west of its actual location, thereby creating a small triangular lot on the west side of Cervetto Road. Grabas claimed Property V is actually part of the 150-acre tract that includes Block 4, Lot 13 (Property VII). Phoenix's title expert at trial, Erwin Apell, agreed.[11]

_____

[11] Apell issued a report in this case agreeing that Property V "was intended to represent the western edge of the Milkenstein tract (Block 4, Lot 13) [Property VII]." He asserted that because "[t]he Milkenstein tract devolved as an entire tract[,] . . . the owner of the Milkenstein tract would own both Block 4, Lot 13 [Property VII] and Block 3, Lot 19 [Property V]."

Meyer and Mathilda Beyer conveyed a 150-acre tract (50 chains x 30 chains), described by metes and bounds coinciding with the boundaries of Block 4, Lot 13 (Property V) and Block 3, Lot 19 (Property VII) to Isadore Milkenstein by way of deed recorded in Burlington County in 1894 and in Ocean County in 1971. Milkenstein conveyed the same tract to Wolf Herskowitz two months later by deed recorded in Burlington County in 1900 and in Ocean County in 1971 on the same date as the Beyer deed.

Little Egg Harbor records show Meyer Beyer as the assessed owner of Property V and Property VII until 1969, likely the result of the Milkenstein and Herskowitz deeds being originally recorded in Burlington instead of Ocean County. In 1969, Robert Kaufman, trustee of the K&D Land Trust, obtained two deeds from the heirs of Meyer Beyer in an apparent effort to acquire whatever interest remained vested in Beyer as a result of the 1893 deed transferring 6/10ths of the entire 4,662.89 tract to him, and the assessed owner changed to Robert Kaufman/K&D Land Trust.

In July 1983, Continental Searchers obtained a final Chancery Division judgment by consent against the Estate of Wolf Herskowitz vesting title in Continental Searchers of an undivided fifty percent interest in Property V (Block 3, Lot 19) and Property VII (Block 4, Lot 13), which was recorded in

25

Ocean County. In 1993, Continental Searchers and the Estate of Wolf Herskowitz obtained a quitclaim deed from Robert Kaufman, individually and as trustee of K&D Land Trust, conveying their interests in the same lands described in the 1894 Milkenstein to Herskowitz deed, "known and designated" on the Little Egg Harbor tax map as "Lot 19 in Block 3 [Property V] and Lots 11 [Property VI] and 13 [Property VII] in Block 4." In 1994, the State took title to Property V by way of deed from Continental Searchers and the Estate of Herskowitz.

Property VI (Block 4, Lot 11)

Property VI, Block 4, Lot 11, is part of the land the State purchased from Continental Searchers and the Estate of Wolf Herskowitz by deed recorded July 8, 1994, consisting of a little over sixty-six acres. As with Properties IV, V and VII, the State traces its title to Property VI through Meyer Beyer to the 1859 Isaiah Adams grant. Property VI, however, does not appear to have been a part of the lands conveyed from Milkenstein to Herskowitz in 1894, notwithstanding the specific reference to Block 4, Lot 11 in the 1993 quitclaim deed from Kaufman and K&D Land Trust to Continental Searchers and the Estate of Herskowitz and its explicit conveyance to the State by Continental Searchers and the Herskowitz Estate in 1994. The State defended its title to

Property VI on the basis that Continental Searchers was the assessed owner, and a reasonable search at the time the State purchased the parcel would not have revealed Phoenix's chain of title to this tract; in other words, that it was a bona fide purchaser for value without notice of Phoenix's chain of title.

Property VII (Block 4, Lot 13)

Property VII, Block 4, Lot 13, also part of the land the State purchased from Continental Searchers and the Estate of Wolf Herskowitz by deed recorded July 8, 1994, consists of almost fifty-three acres. As with Properties IV, V and VI, the State traces its title to Property VII through Meyer Beyer to the 1859 Adams grant. It is the same chain of title the State asserts to Property V (Block 3, Lot 19).

Phoenix's Efforts to Locate and Exploit Defects in the State's Titles

Phoenix acquired the sand and gravel mine adjacent to the State's properties out of the bankruptcy of its former owner, Herbert Pickell, in 1993. David C. Denise, president of Phoenix, testified at deposition that when Phoenix purchased the mine, the former owner, Pinelands Materials & Supplies, Inc., formerly known as Mt. Holly Concrete, was mining land to which it lacked clear title. In the mid to late 1990s, Phoenix began efforts "to

27

clear up the titles to . . . surrounding properties" and acquire an additional one or two thousand acres to expand the mine.

Denise approached General Land, a subsidiary of First American, the title insurer for three of the State's properties, about insuring the titles Phoenix hoped to acquire in order to expand its sand mine. Denise testified at deposition the only way General Land would consider writing the title insurance was if "they would have their fellow Gene, Mr. Sharkey, do the searching." Denise claimed Gene Sharkey, a searcher of many years' experience, was paid by both General Land and Phoenix to search the entire Isaiah Adams tract including its "26 or something exceptions and . . . multiple chains of title through wild deeds and tax foreclosures." Denise explained that the Adams tract was the "subject of a very large case that the State prosecuted, Hyland v. Kirkman," and that the principal part of Sharkey's work, which took "years and years," was directed to "trying to establish the paramount chains of various parcels that the Adams tract was either divided into or the exceptions to."

To that end, Phoenix employed Sharkey, as well as other title searchers and surveyors in a two-decade long quest to research the title to "[a]ll 8,000 acres" of the Isaiah Adams tract as well as the tract the West Jersey Proprietors

conveyed to Gideon Cranmer in an effort Denise characterized as one to ascertain "[p]aramount title for adjacent lands."  Asked at deposition as to whether anyone considered contacting the record owners of the properties Phoenix was interested in acquiring, those owners currently in title, Denise claimed Sharkey wasn't interested in the current record owners.  According to Denise, Mr. Sharkey believed "that it was his job to cut through all that as he believed everybody was directed by Hyland v. Kirkman and get to the paramount owner and acquire title through the paramount."

Accordingly, instead of starting with the record owners and searching backward for sixty years, as is customary, see Palamarg, 80 N.J. at 460, Phoenix's searchers began their searches with the original grants to Gideon Cranmer and Isaiah Adams from the West Jersey Proprietors and attempted to trace the titles forward.  Thus, in its quest to acquire lands adjacent to its mine, Phoenix ignored the current record owners of those properties, especially the State of New Jersey, which it surmised would be "a reluctant seller."[12]

---

[12]  Phoenix's surmise was likely correct.  The State's lands in the Preservation Area are subject to restrictions on use and alienability.  See N.J.S.A. 13:8A-13(b); N.J.S.A. 13:8A-48; N.J.S.A. 13:8C-35(a).  In addition, the agreement providing the State with the federal grant money used to purchase these properties, included in the State's appendix, requires approval by the

When Phoenix's searchers established what they deemed was "the paramount title" to any parcel Phoenix was interested in acquiring, Phoenix would turn the information over to a self-trained genealogist, Jordan Auslander,[13] who performed a search for descendants of the former record owner in an attempt to identify any living descendants from whom Phoenix could acquire the property. Counsel for Phoenix would then contact those individuals and offer to buy their interests. With the exception of families already involved in prior title disputes over lands in the Pinelands, none of the individuals he contacted was aware they possessed any putative interest in the lands at issue.

Once counsel for Phoenix contacted the identified heirs and negotiated the purchase of their interests, he drafted quitclaim deeds in favor of Denise. These deeds contained both the Little Egg Harbor tax map reference to the lot and block Phoenix was purporting to purchase as well as a description of the property copied from the original grants from the Proprietors or old deeds that

---

Department of the Interior for any changes in use or management of properties acquired with the funds, including any changes in ownership.

[13] Counsel for Phoenix advised the trial court in 2015 that its genealogist was under investigation in New York relating to his procurement, in connection with this case, "of death certificates from the New York City Board of Health by representing that he was a relative of the deceased, when he was not."

A-2823-16

could be traced thereto, "together with all of the right, title and interest of the grantor herein in and to any lands situate in the Counties of Ocean or Burlington to which the grantor may have an interest or claim by virtue of being one of the next of kin and heirs at law" to the ancestor in Phoenix's "paramount title." So, for example, the nine deeds Phoenix's counsel prepared to permit Denise to acquire what Phoenix asserted was "paramount title" to Properties I (Block 2, Lot 11), II (Block 4, Lot 8) and III (Block 4, Lot 8A) contained both a block and lot designation referencing the Little Egg Harbor tax map (although not to the same lot and block as Properties I, II and III)[14] and a description beginning "at a pine tree marked with four blazes and four crosses standing south eighty-five degrees west twenty chains and eighty-five links from a stone in the west side of the road on the top of the first hill going from the Joshua Warren place to Tuckerton."

Phoenix's genealogist initially performed only a strict descendance search for potential heirs. Phoenix did not ask its genealogist to search the

---

[14] The tax map reference in the deeds to Denise from the Bodine heirs is to Block 3, Lot 15 and Block 4, Lot 10 in Little Egg Harbor and to "part of Block 115, Lot 26" in Bass River. Phoenix contends each deed also conveys Properties I, II and III as a result of the representation that the deed conveys the same lands as described in the 1861 deed from Corlis to Bodine and any lands the grantor owns in Ocean County by virtue of being one of Bodine's "heirs-at-law."

A-2823-16

probate records of any of the descendants he identified until after it instituted this action. Phoenix also admits its genealogist initially misidentified the descendants of Samuel Schell, a former record owner in Phoenix's chain of title to Property VII (Block 4, Lot 13), causing it to obtain quitclaim deeds from individuals having no interest in that parcel. Thus, Phoenix necessarily concedes it induced the tax assessor to list Denise as the assessed owner of Property VII (Block 4, Lot 13) and filed suit to quiet title to that parcel without any colorable claim of ownership.

Phoenix continued its efforts to acquire quitclaim deeds from descendants of record owners its searchers deemed held "paramount title" to the State's seven Properties well after it instituted this suit, supplying additional deeds from purported heirs up until the time of trial. As Denise explained his and Sharkey's strategy, "[t]he paramount chain ruled. [Sharkey] was first to cross the post in New Jersey. You had the paramount chain and you were the first to file, you own the property."

Phoenix claims title to the seven Properties at issue by way of the following deeds to Denise, which Denise subsequently transferred to Phoenix by way of warranty deed and largely consolidated with its sand and gravel mine.

A-2823-16

Property I (Block 2, Lot 11); Property II (Block 4, Lot 8); and Property III (Block 4, Lot 8A)

Phoenix claims to have obtained title to Properties I through III in 1999 and 2000 for $23,500 through a series of nine quitclaim deeds, representing 66.67 percent of the outstanding interests, from purported heirs or legatees of James Bodine, who died in 1874.[15] Whereas the State traces its title to these three properties to a deed from Bodine and his wife to a local farmer, Job Corlis, in 1860, Phoenix relies on a deed purporting to transfer the same property for the same price from Corlis and his wife, Eliza, back to Bodine some six months later. That Corlis to Bodine deed, however, was not recorded until 1875, a year after Bodine's death some fourteen years later, when it was recorded in Burlington County.

Bodine died without a will. The detailed inventory of his insolvent estate filed by his administrators does not list the property from Corlis as an asset of the estate, even though the deed had been recorded only months before, presumably by those same administrators. Besides a room-by-room accounting of Bodine's 10 room house, as well as his barns and outbuildings,

---

[15] Denise paid Ellie Eichbaum's widower $7,500 for her interest and her brother, Benjamin Cox, $5,000 for his. He paid the remaining Bodine heirs between $1,000 and $2,000 each for their interests.

A-2823-16

businesses, partnerships and interests in boats, the inventory included seventeen other parcels of lands and was later amended to add two additional parcels. The property is also not included in the subsequent inventory of Bodine's wife's estate and was never conveyed by any of his immediate heirs.

Moreover, there are no further conveyances of that property for nearly one hundred years until 1972, when C. Roy Cox, a purported heir, conveyed the property to his children Benjamin S. Cox and Ellie Eichbaum. The property was never assessed to Bodine or any of his heirs after the deed to Corlis. Instead, the State's title expert asserted the Little Egg Harbor tax records from 1895, the earliest available, were consistent with the State's chain of title to Properties I, II and III.

The Corlis to Bodine deed does not appear within the State's chain of title, and there is no dispute that it was not in the State's possession when it negotiated the purchase of Properties I, II and III from the record owners. In the State's file produced in discovery, however, is a letter from Ellie Eichbaum to Jerry Stout, one of the individuals responsible for acquiring Pinelands properties for preservation on behalf of the State. The letter is dated December 6, 1988, several months before the State purchased Property I, and

references the "Stafford Forge WMA Project, Block 3, Lot 15, Little Egg Harbor Township."

In the letter, Eichbaum referred to Stout's "letter of November 29 and your recent telephone call." She expressed an interest in selling Block 3, Lot 15, not in issue in this case, "which we have paid taxes on all these years since 1974, to the state."[16] Eichbaum also, however, enclosed other correspondence referencing a title search (not included with the correspondence) she had obtained "which proved to that (sic) we, as heirs to James Bodine, would have a legitimate claim to about 100 acres of property in the above area." Eichbaum wrote to Stout that "[i]f this will help you in your legal acquisition of this property for the state we will be glad to cooperate."

The attached correspondence, dated almost fifteen years earlier, between Eichbaum and her former lawyer and Eichbaum and the former township attorney for Little Egg Harbor, referred to a title search that showed "James Bodine was the last holder of a deed" to about one hundred acres scattered across several lots in blocks 2, 3, 4 and 7 and specifically referenced her

---

[16] Eichbaum, the assessed owner of Block 3, Lot 15, was presumably responding to a letter from the State expressing its interest in acquiring Lot 15 for preservation as part of the Stafford Forge project, which parcel the State did not ultimately acquire for reasons unexplained in the record.

35

claims to Block 2, Lot 11 (Property I); Block 4, Lot 8 (Property II); and Block 4, Lot 8A (Property III). Eichbaum did not assert any claim to those properties in her letter to Stout. Instead, she noted she and her family had abandoned that quest when their lawyer "just would not move further" in pressing their claim with the Township in 1974.

When deposed, Stout, then retired, testified he only vaguely recalled the letter and could not recall what, if anything, he did in response. Asked what he would have done, Stout testified he thought "we would have worked with the title company for them to do additional research to ensure that we were buying the land . . . from the correct owner." Asked whether he recalled having the title company do further research, Stout could only say he vaguely remembered the issue and could not "recall what happened."

Property IV (Block 3, Lot 18) and Property V (Block 3, Lot 19)

Phoenix filed this action claiming to have obtained title to Properties IV and V, Block 3, Lots 18 and 19, as part of a larger purchase of land in Little Egg Harbor in Ocean County and Bass River in Burlington County from Robert Kaufman, both individually and as trustee of K&D Land Trust. Kaufman traced his title to Lots 18 and 19 to a tax foreclosure in Burlington County. Phoenix recorded quitclaim deeds ostensibly vesting title in Denise to

36                                                                    A-2823-16

Properties IV and V, conveyed the properties to Phoenix, consolidated Properties IV and V with Phoenix's sand mine, induced the Little Egg Harbor tax assessor to erase the State's parcels on the Township's tax map and sued to void the State's title to Properties IV and V, all on the basis of that chain of title through Kaufman.

After the State's title expert issued his report in discovery, however, opining that Kaufman could not have acquired title to property in Little Egg Harbor by foreclosing tax sale certificates issued by Bass River, Phoenix claimed a different basis for its ownership of those properties. Relying on the mapping error discovered in 2003 by its surveyor, John Schweppenheiser, Phoenix next claimed it acquired Lots 18 and 19 from the heirs of George Kudra, who took title in trust in 1974 by deed from Burlington Company Investment Corporation. Because the mapping error is significant, we address it here.

As already noted, the deed into Meyer Beyer conveying the easterly 2,798 acres of the original Isaiah Adams tract lacked any metes and bounds description. As Judge Wells noted in Hyland, when Henry Shaw, president of Central Trust & Title, carved up the Adams tract into four separate parcels and sold them, including the one to Beyer, he ignored all twenty-six exceptions,

making it "impossible to locate, with any accuracy, where the tracts are on the ground." 204 N.J. Super. at 353. Adding to the problem, Judge Wells observed, was that "while the record title to [the other three parcels] remained essentially stable subject to tax liens and the exceptions, Meyer Beyer's grantees multiplied like rabbits creating a title nightmare." Id. at 353-54.

Besides creating the "corridor lots" along the eastern boundary of his tract, Meyer Beyer divided what remained to the west of those lots into two large parcels, conveying the northern 1,200 acres to Adolf Guttman and the southern 1,000 acres to Anna B. Fischer. In the course of surveying the outbound boundaries of Phoenix's consolidated Lot 9.01 subsuming the State's parcels, Schweppenheiser concluded the easterly line of Adams was located further east than historically believed and as reflected on the Little Egg Harbor tax map.

Using the work of three previous surveyors of different parts of the Adams tract and the Watson exception thereto, and after engaging in a "certain amount of engineering," Schweppenheiser located what he believed to be the common easterly line of the Fischer and Guttman tracts, determining it was collinear with the western boundary of the corridor lots and parallel to the eastern line of Adams. By establishing the western boundary of the corridor

lots with reference to the eleventh course of Adams, Schweppenheiser claimed

he was able to conclude the easterly line of the Guttman and Fischer tracts was

thirty chains (1,980 feet) west of the easterly line of Adams, thereby placing

that line east of where it was understood to lie historically.

That mapping error is significant for the parties' competing claims of

title to Property IV (Block 3, Lot 18) and, to a lesser extent, Property V (Block

3, Lot 19).[17] The State traces its title to Property IV through a tax foreclosure

judgment in favor of Pickell's estate through Bertha Boehm and ultimately to

Meyer and Mathilda Beyer's conveyance of a "corridor lot" to Sam and Paulina

Halpern. Schweppenheiser contended that Lot 18, Block 3 was not in the

Meyer Beyer corridor but instead was located within the Fischer tract.[18]

Although continuing to rely on the tax foreclosure judgment in its chain of title

to Property IV, the State concedes it does not trace its title to Fischer.

---

[17] It is less significant for Property V (Block 3, Lot 19), notwithstanding the mapping error affects it as well, as both experts agreed that Property V is properly understood to be a part of Property VII (Block 4, Lot 13).

[18] If generally accepted, this alleged mapping error could have ramifications for other land titles in the area, as it places more of the Fischer tract in Little Egg Harbor and Ocean County, instead of in Bass River and Burlington County than previously understood.

A-2823-16

The State argued, however, that Phoenix could not establish its title to Properties IV or V based on the mapping error, even though it traces its title to those parcels to Fischer. Phoenix's title expert, Apell, traced Phoenix's title to Properties IV and V from Fischer to Phoenix through George Kudra and Kupire Corporation.[19] Phoenix now contends it acquired Lots 18 and 19 from the heirs of George Kudra. It claims it acquired Kudra's interest through a 2005 settlement agreement between Denise and Phoenix on one side and Kupire, Kudra and Kudra's wife and six children on the other, resolving a quiet title action involving property other than Properties IV and V, and quitclaim deeds from two of the five surviving Kudra children executed in July 2016 on the eve of trial, which it took after becoming concerned the settlement agreement and its deed from Kupire were not sufficient to transfer Properties IV and V to Phoenix.

---

[19] As noted, Apell initially claimed Phoenix's title to Properties IV and V arose out of a tax foreclosure conducted in Bass River. Just prior to his deposition in 2014, over two-and-a-half years after Phoenix filed its complaint in this action, Apell produced a hand-written chain of title tracing Phoenix's title to those parcels through Kudra. The State subsequently moved in limine to exclude at trial documents purporting to support the Kudra chain because Apell had not identified it as supporting Phoenix's claim of title to Properties IV and V in either of his two previously served expert reports. The court denied the motion and instead permitted the State limited discovery as to the basis of the claim.

40

At trial, the State's title expert, Grabas, opined that Phoenix could not establish title to Lots 18 and 19 through Kudra. He asserted Phoenix's inability to produce the trust instrument through which Kudra took title "as a trustee according to a deed of trust given on even date herewith" in the 1974 deed from Burlington Company Investment Corporation created "a hole" in Phoenix's title that Phoenix could not fill by quitclaim deeds from Kudra's children.

Phoenix's expert agreed that Phoenix's inability to locate the trust instrument referenced in the deed meant there was "a hole" in Phoenix's title to Lots 18 and 19 created by Kudra having taken title in 1974 "as a trustee." He also agreed Kudra could not delegate his fiduciary powers as trustee, nor could they pass to Kudra's children through intestacy. Phoenix's expert also acknowledged there was no record of anyone having gone to court to have a successor trustee appointed. He nevertheless opined that Phoenix's title was sound, analogizing to defunct corporations, "you then do the next best thing, and that is to get the heirs of the last trustee or the heirs of the last board officer to convey."

41

A-2823-16

Property VI (Block 4, Lot 11)

Phoenix claims to have obtained title to Property VI (Block 4, Lot 11) through George Orlov, who took title to the property in 1908 pursuant to a deed recorded in Burlington County "correspond[ing] roughly to Block 4, Lot 11" on the tax map of Little Egg Harbor, before it was altered at Phoenix's request. The Orlov deed, however, purports to transfer approximately one hundred acres in the Township of Bass River. The deed does not mention land in Little Egg Harbor and does not appear in the Ocean County land records, being recorded only in Burlington County. Further, neither Orlov nor any of his heirs appear as assessed owners of Property VI in the Ocean County tax records going back to 1895, those records being consistent with the State's chain of title out of Continental Searchers. The State's title expert opined Phoenix's chain of title was unsupported in the Ocean County land records prior to 1994 when the State acquired its deed from the record owners.

In a supplemental report, Phoenix's title expert stated that "[u]pon further research," the 1894 deed from Beyer to Kolmer and Herrman, from which Orlov's title allegedly derived, was recorded on July 6, 1971 in Ocean County. Apell, noting that Little Egg Harbor became part of Ocean County eighty years prior in 1891, asserted that fact

42

together with the fact that the Adams tract traces to deeds recorded in Burlington County, . . . further demonstrates that one must search titles in both Burlington and Ocean Counties back to the Board of Proprietors in order to conduct a reasonable search in connection with the properties at issue in this matter.

Phoenix tasked its genealogist with developing a "family tree" for George Orlov, which the genealogist deemed complete through Orlov's seven children and "reasonably believed to be complete" through Orlov's ten grandchildren. The genealogist identified twelve living heirs of George Orlov. Counsel for Phoenix arranged for Denise to take quitclaim deeds from ten of them in 2000 and 2001.[20] Phoenix received the last of the deeds it took from Orlov's living heirs in 2012, after filing this suit. Phoenix represents in its brief it paid the Orlov heirs $65,943 for 97.5 percent of the Orlov interests in Property VI.

Property VII (Block 4, Lot 13)

Phoenix and the State both trace their title to Property VII, Block 4, Lot 13, to the same 1894 deed from Isadore Milkenstein to Wolf Herskowitz

---

[20] Phoenix initially offered the Orlov heirs $18,000 for the approximately eighty acres it believed they owned. In a letter from a representative of the family to counsel for Phoenix, the family rejected that offer. Writing that they did "not want to sound ungrateful, for if it were not for your client, we would never have even found out about the Orlove [sic] property," they stated they would not sell for less than $1,000 an acre.

conveying a 150-acre rectangular tract, part of which lies in Bass River in Burlington County and part in Block 4, Lot 13 of Little Egg Harbor. The deed was initially recorded in Burlington County in 1900. It was not recorded in Ocean County until 1971. Phoenix claims its title to Block 4, Lot 13 derives from a deed Herskowitz gave to Samuel Schell in 1908. Although that deed states no fewer than four times that Herskowitz is conveying only ten acres to Schell, the description in the deed is the same one as in the deed into Herskowitz, which conveyed all 150 acres.

Based on the work of its genealogist, Phoenix initially obtained quitclaim deeds from two individuals eventually determined not to be heirs of the Samuel Schell of the 1908 deed. Phoenix thereafter obtained quitclaim deeds after the litigation was filed from two individuals it contends are the correct Schell heirs at a total cost of $20,000 for their 75.73 percent interest.[21]

Although Gene Sharkey, who performed Phoenix's title searches and who died before trial, had opined that Schell received only ten acres from Herskowitz, and that the State had title to the remaining 140 acres, the expert

---

[21] Although these deeds purport to convey "the same premises conveyed by Wolf Herskowitz to Samuel Schell by Deed . . . recorded on February 28, 1910," the quitclaim deeds differ significantly from the 1910 Schell deed by omitting the statement repeated four times in that deed that it only conveyed ten acres.

who testified for Phoenix at trial, Erwin Apell, opined that the references to conveying only ten acres had "very little significance" because "it doesn't indicate where the ten acres is."  Apell testified "under the rules of construction . . . if there are two types of descriptions, one being a metes and bounds and the other being an approximate acreage, that the metes and bounds would control."

The State's title expert opined the language of the deed from Herskowitz to Schell conveying "a tract of ten acres" coupled with the description in the deed which begins by referring to "[a]ll ten acres of the 150 acres of land, situated, lying and being in the Township of Bass River, in the County of Burlington" make clear Herskowitz conveyed ten acres to Schell in Bass River, not 150 acres in Little Egg Harbor.  The State's expert opined Herskowitz's ten-acre conveyance to Schell is corroborated by the deed Herskowitz gave to his brother-in-law, Abraham Perlman, two years later conveying the same described 150 acres as security for a loan, but explicitly "excepting ten acres of said parcel or tract of land heretofore sold and conveyed by the parties of the first part to Sam Schelies."  The same exception is included when Perlman conveyed the property back to Herskowitz the following year.  Based on an examination of all four deeds, the State's expert opined that Phoenix possessed

no title to Block 4, Lot 13, and, at best, has an interest in an undescribed ten-acre tract in Bass River.

Phoenix's Efforts to Establish Peaceable Possession of the State's Properties

Neither Denise, Phoenix, nor any of the individuals from whom they obtained quitclaim deeds was ever in possession of any of the seven State Properties at issue here. In an attempt to establish the peaceable possession necessary for a quiet title action, see N.J.S.A. 2A:62-2, counsel for Phoenix surreptitiously, without any notice whatsoever to the State, approached the tax assessor for Little Egg Harbor with its purported "paramount" chains of title to the State's properties, asking that Denise be listed as the owner. Because we find the request from counsel so extraordinary, we reprint the letter in full.

Martin J. Conroy, Esq.
c/o Phoenix Companies
777 Alexander Road
Princeton, New Jersey 08540
Telephone 908-468-xxxx
Facsimile 609-734-xxxx

April 10, 2001

Mr. Joseph Sorrentino
Tax Assessor
Township of Little Egg Harbor
7 Gifford Road
Little Egg Harbor, NJ 08087

46

RE: Block 4, Lot 11
Block 2, Lot 11
Block 3, Lots 11 and 12
Block 4, Lots 8 and 8A
Block 7, Lot 6

Dear Mr. Sorrentino:

Enclosed are various recorded Deeds pursuant to which Mr. David Denise has acquired the interests of most of the heirs of Gorge Orlov in property that includes Block 4, Lot 11 [Property VI] on the Little Egg Tax Map. Also enclosed is the 1908 Deed from Herrman and Kolmer to George Orlov that follows an unbroken chain of title from the original Isaiah Adams severance from the Board of Proprietors. Our title searchers have advised that this land was never conveyed by George Orlov and that record title remained in George Orlov. Enclosed is a copy of our searcher's report.

We recognize that the State of New Jersey Department of Environmental Protection claims title to this property by virtue of a Deed from Continental Searchers, Inc. (believed to be affiliated with J&M Land) and the Estate of Wolf Herskovitz. That Deed purports to convey Block 4, Lot 11 [Property VI], Block 4, Lot 13 [Property VII], and Block 3, Lot 19 [Property V] on the Little Egg Tax Map. We have plotted the description in the 1894 Milkenstein to Herskovitz Deed. This Deed would be the basis of any title the State may have. It describes by metes and bounds Block 4, Lot 13 [Property VII] and Block 3, Lot 19 [Property V]. Block 4, Lot 11 [Property VI] is not within the description. Enclosed is our title searcher's plotting of the Milkenstein/Herskovitz

47

A-2823-16

Deed. The State's ownership claim is inferior to that of Mr. Denise.

Enclosed is a copy of our title searcher's report on the above matter. Based on this, we request that Mr. Denise be listed as the owner and be assessed for the taxes on Block 4, Lot 11 [Property VI].

You may also recall that last year Mr. Denise obtained title from the heirs of James Bodine. We have recently done additional plotting and title work in connection with Mr. Denise's holdings. It now appears that Mr. Bodine, at the time of his death, owned of record not only the triangular shaped piece described in these Deeds (GG240, corresponding to Block 4, Lot 10 and Block 3, Lot 15), but also the property separately described and known as GG286 containing a net of approximately 79 acres. The lots included within that description are Block 2, Lot 11 [Property I], Block 3, Lots 11, 12, and 14, Block 4, Lots 8 and 8A [Properties II and III], and Block 7, Lot 6. Enclosed is the paramount title report. To make sure of our conclusions, we examined the title claims of the DEP with respect to these properties. Our searcher again concluded that these were inferior chains of title. We have enclosed these reports with respect to Lots 8 and 8A; similar reports were produced for the smaller lots.

Based on this, we request that Mr. Denise be listed as the owner and assessed for taxes on Block 2, Lot 11 [Property I], Block 3, Lots 11, and 12, Block 4, Lots 8 and 8A [Properties II and III], and Block 7, Lot 6 on the Little Egg Harbor Tax Map.

Should you have any questions or need any further information, please do not hesitate to call.

A-2823-16

Very truly yours,
/s/
Martin J. Conroy

MJC:cad
Enc.
cc: Mr. David D. Denise (w/o enc.)

That letter was not copied to the State.  The only person copied was

Denise.  Pursuant to Phoenix's request, first in 2001 and again in 2005, in

another letter not copied to the State, the Little Egg Harbor tax assessor

changed the assessed owner of each of the State's seven Properties to Denise

on the Township's assessment list and removed the legend "exempt – NJDEP"

from each of the State's Properties on the Little Egg Harbor tax map based on

Phoenix's claim that the State's title to those Properties was "inferior" to that

Denise had recently acquired by way of quitclaim deeds from distant heirs of

former record title owners.[22]

---

[22]  Phoenix did not seek to have itself listed as the assessed owner of Property
VII (Block 4, Lot 13) until 2005, after its 2003 lot consolidation.  Although the
testimony on this point is not perfectly clear, it appears as if the assessor added
Denise as an owner of that parcel instead of removing the State, based on
Conroy's assertion that "[a]lthough a solid legal argument exists that the Deed
from Herskowitz to Schell conveyed legal title to the entire 150-acre tract
described in the metes and bounds, the issue is not entirely free from doubt
because of the inconsistent reference to 10 acres contained in the Deed."
Based on Conroy's assertion "that the Schell deed must be given some effect
and that Mr. Denise has an ownership interest in at least a proportion of Block

After Denise conveyed the quitclaim interests he had acquired in the State's Properties to Phoenix by warranty deed, Phoenix executed the penultimate step in its scheme to annex the State's lands. In a deed from Phoenix to Phoenix, Phoenix consolidated its purported title to five of the State's seven Properties with its sand and gravel mine and applied to the tax assessor for a new block and lot designation encompassing 675 acres, including 130 acres belonging to the State.[23] In 2005, Little Egg Harbor issued a revised tax map erasing the State's parcels and consolidating five of the seven with Phoenix's sand mine into new Block 3, Lot 9.01, assessed to Phoenix.

The State deposed the surveyor, John Schweppenheiser, who prepared the boundary survey for the consolidated parcel relying on information supplied by Phoenix. Although undertaking no title research himself,

---

4, Lot 13 [Property VII]," and Conroy's request that Denise accordingly "be assessed as the owner of Block 4, Lot 13," the assessor permitted Denise to pay taxes on the entire parcel.

[23] Phoenix's 2003 lot consolidation did not include Properties I (Block 2, Lot 11) or VII (Block 4, Lot 13). The consolidation deeds also do not reference Property V, although Phoenix's pleadings aver that both Properties IV (Block 3, Lot 18) and V (Block 3, Lot 19) are part of consolidated Block 3, Lot 9.01. The parties agree that Phoenix's consolidated Lot 9.01 includes 130 acres of land titled in the State.

Schweppenheiser testified "[t]here was not a chain of title that we were aware of that would validate [the State's] properties, so we kind of surveyed the boundary around them." Schweppenheiser acknowledged he saw the tax map listing the properties as owned by the Department of Environmental Protection but claimed he was not concerned because Phoenix had advised him it was "buying all those properties."

The State also deposed the Little Egg Harbor tax assessor, who testified he changed the township's tax records without any idea of whether the title information was accurate. He simply accepted the representation of Phoenix's counsel. Phoenix now admits, as it must, that it approached the tax assessor to change the assessed ownership of Properties IV (Block 3, Lot 18), V (Block 3, Lot 19) and VII (Block 4, Lot 13) without any color of title at all, having based its claim of ownership of Block 3, Lots 18 and 19 on tax certificates issued by Bass River and of Block 4, Lot 13 on quitclaim deeds from the wrong Schells.

The tax assessor further testified at deposition that he had been discussing the changes with Phoenix's counsel for over a year before he finally made them, and that the two talked about the properties "becoming taxable." When asked why he didn't notify the State of those discussions or of the Township relisting the State's properties under other ownership, the tax

51

assessor testified that Phoenix's counsel indicated he was notifying the State. The tax assessor also confirmed he was aware the State would not receive any notice of the changes from the township because of its "tax-exempt owner status."

At his own deposition, counsel for Phoenix testified he never notified the State of the changes he sought to the Little Egg Harbor tax map on behalf of Denise and Phoenix. Denise at his deposition likewise testified he never made any attempt to contact the State about his interest in the State's properties. Asked why, he testified, "I don't know." It takes no imagination to guess the reason why Denise, Phoenix and their counsel chose not to advise the State that Denise and Phoenix had the State's properties erased from Little Egg Harbor's tax map. It wasn't enough to establish competing chains of title and work the changes to the tax map; to quiet the title Phoenix also needed to demonstrate that it or Denise had paid the taxes on the State's parcels for five years. See N.J.S.A. 2A:62-2.

The State only learned of the changes Phoenix had worked to the tax rolls and map of Little Egg Harbor when a resident of Warren Grove wrote to the Department's Green Acres Program in mid-2008 about "the newly created Lot 9.01 within tax map Block 3 of the Little Egg Harbor tax map." The

resident explained that "the Cedar Bridge Branch of the East Branch of the Wading [a.k.a. Oswego] River. . . . a locator reference for several properties belonging to the late Job and Eliza Corliss [sic]," was being "enlarged to create a huge artificial lake."[24] He wrote that his "further investigations into the impact [of] this channel alteration . . . as it applies to [his] property or title rights suggest the existence of title conflicts with the newly created Lot 9.01 within Block 3 of the Little Egg Harbor tax map."

Specifically, the resident wrote:

> It appears as though one of those title conflicts is 2 lots having the NJDEP as its owner. My investigations of the public record suggest that these lands situated within the newly created Block 3, Lot 9.01 were known as Block 4, Lots 8 and 8.01 [Properties II and III] on the previous [Little Egg Harbor] tax maps. Examination of aerial photographs circa 1960 indicated the location of the aqua stream channel, which is suitable for graphical plotting of various parcel locations that makes me believe that the Phoenix Pinelands Corporation has entered into these lands for purposes of obtaining title rights by adverse possession. Further investigation suggests that these lands were acquired in Fee Simple Absolute by the NJDEP under the criteria of the Pinelands Green

---

[24] Denise testified at deposition that Phoenix had substantially expanded this waterway, which he named "Lake Wilber," by dredge mining sand. Denise testified he acquired interests in the State's Properties because it makes it "much easier to expand our Lake Wilber, it's adjacent." When asked why it was easier, Denise replied, "Because it's a dredging operation, dredge keeps digging. . . . [m]ineral's defined and it's adjacent, so it's desirable."

Acres Acquisition Program within the National Pinelands Reserve.  In addition, further searching of the public record does not disclose any conveyance from the Department of Environmental Protection to the Phoenix Pinelands Corporation.

. . . .

Another of my concerns is what other titleholders land may be forgotten about because of their title rights have been abandoned in the public record by this tax lot consolidation.  One of those titleholders may be me.  I may be a victim of this recent recording of this "breaking of the record" boundary description.  Is this an attempt to hide real property interest by breaking the chain of title record?  Could this result in the lot consolidator acquiring land titles by the Doctrine of Adverse Possession?  Thus, he avoids the problems of the unwilling seller and related compensation.

The resident enclosed copies of both the old and new tax maps and expressed the hope "that this open and host[ile] act will not necessitate the filing of an action of Ejectment with the Superior Court of New Jersey to [quiet] the adverse possession by the Phoenix Pinelands Corporation and restore historical title interest to those lands being possessed."

Following an investigation into the allegations of the letter, the State wrote to the individual responsible for maintaining the tax map in Little Egg Harbor, copying ten individuals, including the mayor of Little Egg Harbor, Phoenix, its surveyor, the administrator of the Green Acres program, and the

Attorney General's Office, about the errors in the tax maps resulting from the township having "consolidated lots" so as "to eliminate lots previously indicated as State-owned" based on a survey and deed description "in a 'Corrective Deed of Consolidation' recorded in Ocean County . . . from Phoenix Pinelands Corporation to itself."

Specifically, the State noted Little Egg Harbor had consolidated the following State lands into Block 3, Lot 9.01:

> Former Block 4, Lot 8 [Property II] (41.682 acres acquired by the State by deed from the Barnegat Rifle and Pistol Club, Inc. on March 27, 1990 recorded in DB 4826, PG 768);
>
> Former Block 4, Lot 8.01 or 8A [Property III] (2.955 acres acquired by the State by deed from Edith Warren Kueppers and Robert Kueppers, Husband and Wife on April 23, 1990 recorded in DB 4832, PG 931);
>
> Former Block 3, Lot 18 [Property IV] (6.630 acres acquired by the State by deed from Estate of Herbert L. Pickell et als on January 14, 1994 recorded in DB 5147, PG 456);
>
> Former Block 3, Lot 19 [Property V] (0.0439 acre) and Block 4, Lot 11 [Property VI] (65.829 acres, both lots acquired by the State by deed from Continental Searchers et als on July 1, 1984 recorded in DB 5178, PG 776); and
>
> Block 4, two separate parts of Lot 14 (both portions combined contain an estimated 25 acres although the new tax map suggests only 7.17 acres – the entire lot

was 317.57 acres and is now 311.40 acres on the tax map – the entire lot 14 was acquired by the State by deed from David Friedman et als on January 2, 1990 recorded in DB 4809, PG 343).

The writer noted he had plotted the description contained in the consolidated Phoenix deed and "confirmed that it creates a substantial deed overlap and creates a cloud on title of more than 100 acres of State-owned lands." Requesting "that you put the State-owned lots back on the tax map," the State noted it had continuously made PILOT payments since acquiring the Properties, that there was "no valid reason for the lots to have been consolidated," and that it would "have hoped that the Township" would have consulted the Department "before taking such action." The State also noted it would be notifying its title insurers of the claim by Phoenix.[25] Phoenix's counsel responded, disputing "that the State of New Jersey has title to any of the properties," and asking that no changes be made to the Little Egg Harbor

_____

[25] The State represents it spent the next two years "corresponding" with its title insurers, one of which, First American, had insured Phoenix's competing titles, while the companies researched the State's titles. When Phoenix instituted this action in 2011, Chicago Title Insurance Company, insurer of three of the State's titles, initially represented the State alongside the Attorney General, but eventually elected to pay the policies, citing its in-house counsel's conflict of interest.

tax map until Phoenix has had the opportunity to present its title documents for review.  This litigation followed.

The Litigation

Phoenix filed a two-count complaint for quiet title and quia timet in the Chancery Division.[26]  The State answered and filed a counterclaim against Phoenix for quiet title.  After initial expert reports were exchanged but before the conclusion of discovery, the State moved for summary judgment dismissing Phoenix's complaint based on Phoenix's secretive and inequitable conduct in clouding the State's title.  Phoenix cross-moved for partial summary judgment declaring it the owner of Property VI (Block 4, Lot 11).  Judge Buczynski granted the State's motion, in part, and denied Phoenix's cross-motion.

Judge Buczynski began his decision by noting that neither the Legislature nor "the chancellors who have ruled in the past could have quite contemplated the evolution of a case" like this one.  He noted that "[q]uiet title

---

[26]  Although Phoenix named over 100 defendants in its complaint, the State was the only defendant to answer, other than First American.  Phoenix voluntarily dismissed certain defendants, and final judgment by default was entered against all defendants failing to appear, after trial.

actions are intended to clear title when there's a cloud on title for the person in possession." They are not intended "to create title out of whole cloth or shortcut rigorous requirements of the law in making determinations as to actual ownership."

The judge rejected Phoenix's contention it had established the requisite peaceable possession to permit it to quiet title against the State, notwithstanding its deeds and proof of tax payments. See N.J.S.A. 2A:62-2. He found Phoenix could not establish actual possession of the State's lands by its limited activity of cutting fire lanes or erecting signs on the property. He also rejected Phoenix's claim that it was entitled to a presumption of peaceable possession by its payment of the real estate taxes on the parcels for five years. Noting the "extensive research" Phoenix undertook to acquire its competing titles, Judge Buczynski added that Phoenix "caused the Little Egg Harbor Township tax assessor to change the [tax map]. They went on and did certain activity on the property." The judge found Phoenix's acts did not demonstrate "peaceable possession of the property" but instead acts "adverse to somebody who is in peaceable possession of the property."

Although finding the State was entitled to a presumption of peaceable possession of its Properties, Judge Buczynski nevertheless determined the

State could not maintain a quiet title action against Phoenix, because Phoenix's action, including its quia timet claim, which the judge determined could go forward, was already pending when the State asserted its counterclaim. See N.J.S.A. 2A:62-1 (permitting any person in peaceable possession of lands whose title is denied or disputed to maintain an action in the superior court to settle the title "when no action is pending to enforce or test the validity of such title"). The judge accordingly dismissed the State's counterclaim to quiet title, notwithstanding Phoenix had not moved for such relief. Although concluding that neither party could pursue a quiet title action, Judge Buczynski found both could pursue their quia timet claims and could amend their pleadings to add a statutory claim for ejectment, N.J.S.A. 2A:35-1, which would be adjudicated in the General Equity action. See Perlstein v. Pearce, 12 N.J. 198, 201 (1953) (holding suit in chancery to quiet title by one not in possession should not have been dismissed but retained to determine ejectment claim); Boardwalk Props., Inc. v. BPHC Acquisition, Inc., 253 N.J. Super. 515, 526 (App. Div. 1991) (noting "[t]he jurisdiction of the Chancery Division to adjudicate all controversies brought before it and render both legal and equitable remedies").

Judge Buczynski denied Phoenix's motion for partial summary judgment on Property VI. The judge found he could not make a determination as to title

based on the information provided on the motion, but would require expert testimony, concluding "to the extent . . . plaintiff is arguing . . . that they have paramount title to any" property, that "remained a question of fact" for ultimate determination.

Finally, Judge Buczynski "recognize[d] a very valid argument raised by the [State]" in response to Phoenix's quia timet claim, which could also be raised in defense of ejectment, "that, in fact, [Phoenix] may have been heir hunting." Recounting the efforts Phoenix undertook to first research the title to Property VI, finding a 1908 deed into George Orlov, ascertaining and then locating his living heirs, and eventually acquiring "nine different deeds," Judge Buczynski explained

> [t]he reason why the court puts those details on the record is because it is important to make the record clear to the extent to which the plaintiff went in attempting to obtain title essentially out from under the claim of the State of New Jersey who had claimed title for several years prior to [Denise and Phoenix] acquiring these deeds.

The judge also acknowledged Phoenix's argument that its "actions in acquiring the deeds [was] not heir hunting," and "that their heir hunting is nonetheless not prohibited anyway" because "if someone doesn't own title to a specific piece of property at all, [someone else] can still attempt to obtain clear title to

that particular property." Judge Buczynski determined he would address those arguments in the context of further proceedings.

Following Judge Buczynski's retirement, a different judge heard the parties' cross-motions for summary judgment at the conclusion of discovery. Phoenix first argued the State could not be considered a bona fide purchaser for value because of its awareness of certain deeds through which Phoenix traced its title as a result of the State's involvement in prior quiet title actions in the Pinelands and was, at the very least, under a duty to make inquiry as to Eichbaum's claim before purchasing the three parcels making up the Bodine tract. Phoenix further argued that as the State could not trace its title to any of the seven Properties to the Council of Proprietors, and Phoenix could, it was entitled to summary judgment on its ejectment claim.

The State both opposed Phoenix's motion and argued its own entitlement to summary judgment. As to Phoenix's motion, the State argued Phoenix had failed to prove its title free from all reasonable doubt and thus was not entitled to eject the State from its lands. The State pointed out specific errors in Phoenix's genealogical research. It also noted Phoenix had not advised its genealogist it was seeking to acquire title based on his research, resulting in the genealogist undertaking only a straight descendancy search, ignoring wills

A-2823-16

and probate records through which title may have been directed.  The State argued it was thus reasonable to suspect that Phoenix had not acquired the interests of all persons through which it claimed title.  The State further argued there were material facts in dispute, and that the court needed to hear from the parties' title experts as they held different opinions as to what constituted a reasonable title search and what it would have disclosed of deeds in Phoenix's chain of title to Property VI when the State purchased it.

As to its own motion, the State argued it was entitled to summary judgment dismissing Phoenix's claims because the facts of Phoenix's "heir hunting are irrefutable and the law is clear."  The State contended "public policy favors maintaining the integrity and stability of the recording system," and Phoenix's actions undermine that system.  The State claimed it acted reasonably in identifying the record owners of the seven parcels and relying on its title searchers in acquiring their interests.  The State argued it could not reasonably anticipate being subjected — thirty years later — to the "unconscionable efforts of a third-party interloper whose interest is not in protecting the interests, if any, the [State] may have legitimately missed but rather in furthering its own pecuniary gain."  Pointing to the many years and vast amount of money Phoenix spent surreptitiously "searching for defects to

exploit," all the while aware of the State's record ownership and without notice to the State of those efforts or of the changes Phoenix worked to the municipal tax map to erase the State's preserved parcels and annex these environmentally sensitive lands to Phoenix's sand mine, the State argued Phoenix's actions were unconscionable and "destabilizing, as they leave record owners vulnerable to unpredictable attacks on their title."

The new judge dismissed the State's heir hunting claims out of hand, characterizing them as a "contention that [the State] is entitled to a specific or some kind of special status for public policy reasons." The judge found "to apply such a rule would permit a presumption in favor of the State, . . . prior to determination of title," which is "not supported by law." Indeed, the court found "the Constitution provides protections against that very thing," referencing "the due process and taking clauses."[27]

---

[27] While it is true "[t]he New Jersey Constitution provides protections against governmental takings of private property without just compensation, coextensive with the Takings Clause of the Fifth Amendment of the United States Constitution," Klumpp v. Borough of Avalon, 202 N.J. 390, 405 (2010), the State compensated the sellers from whom it purchased these Properties based on appraisals reflecting pre-Pinelands regulation land values. As the State has not engaged in either a physical or regulatory taking here, see ibid., and whatever "title" Phoenix can prove it acquired in the State's lands are impressed with a constructive trust, there has been no constitutional taking of these Properties. Takings doctrine simply has no applicability to this matter.

The judge dismissed the State's "attempts to impute Phoenix's motives as somehow sinister for seeking only pecuniary gain." Although noting the "slightly different context," the judge quoted the Supreme Court's opinion in Simon v. Rando, a tax sale foreclosure case, where the Court stated it was "'not eager to impose a set of morals on the marketplace. Ordinarily, we are content to let experienced commercial parties fend for themselves . . . .' In pursuing their self-interests to maximize their profits, the parties make possible the achievement of socially desirable objectives." 189 N.J. 339, 344 (2007) (quoting Simon v. Cronecker, 189 N.J. 304, 330 (2007)).

Citing Bron, the judge found "[m]ore to the point[,] heir hunters are generally defined as interlopers seeking to dispossess householders," "[a]nd not someone with a bona fide interest in the property," as in Walter v. Sands, 191 N.J. Super. 362, 368 (App. Div. 1983). Because Phoenix was an adjoining property owner, the judge found Phoenix had "a bona fide interest," in becoming the owner of the State's preserved lands, and thus concluded its conduct "cannot be characterized as exploitive," (quoting Walter, 191 N.J. Super. at 368). The judge concluded the State's "heir hunting allegations . . .

Phoenix's argument in its brief urging the contrary is without sufficient merit to warrant discussion in a written opinion. See R. 2:11-3(e)(1)(E).

are without merit in this case and are not dispositive." Instead, he determined "this matter is about who owns paramount title."

In addition to rejecting the State's heir hunting claims, the judge also granted Phoenix summary judgment on Properties I (Block 2, Lot 11), II (Block 4, Lot 8), III (Block 4, Lot 8A), and VI (Block 4, Lot 11), rejecting the State's claim it was a bona fide purchaser for value without notice. As to Properties I through III (Block 2, Lot 11 and Block 4, Lots 8 and 8A), the judge noted there was no dispute that Bodine conveyed the property to Corlis in 1860. The dispute was over the validity of a deed from Corlis back to Bodine the following year, that was not recorded until after Bodine's death fourteen years later.

The judge rejected the State's title expert's opinion that Bodine's failure to record the deed during his life and its omission from the meticulous inventory of his insolvent estate, which included his homestead and 18 other properties to be sold by the appointed administrators, presumably the same individuals who found and recorded the deed from Corlis after Bodine's death, rendered the validity of the deed questionable. The judge found those circumstances cast no doubt on Phoenix's recorded deed, instead agreeing with

65

Phoenix that in the absence of any proof of forgery,[28] the deed's acknowledgment and recording rendered it presumptively valid. The judge further found that the 1861 Corlis to Bodine deed recorded in Burlington County in 1875 "would have been discoverable through a reasonable search," and thus that Phoenix's "chain of title through Bodine is superior."

As to Property VI (Block 4, Lot 11), the judge rejected the opinion of the State's title expert that a reasonable search would not have revealed Phoenix's chain of title when the State purchased that parcel in 1994. The judge instead found that notwithstanding the 1908 Orlov deed on which Phoenix relied refers to the property being in Bass River, Burlington County and was not recorded in Ocean County, "the metes and bounds describes the Little Egg Harbor tract" and "explains why the reasonable search tracing the origins title should have included both [Burlington and Ocean] Counties, particularly in light of the

---

[28] As to the judge's comments regarding forgery, Phoenix apparently did not obtain the original signed deed from Corlis to Bodine from either Benjamin Cox or any of the other Bodine descendants from whom it took quitclaim deeds for their fractional interests, as it is not part of the record. The recorded deed, although in long hand, is, of course, only a copy, almost certainly copied from the original by a scrivener in the county clerk's office. See 3 Patton and Palomar on Land Titles § 700 (Joyce Palomar ed., 3d ed. 2020). There is thus no ability today, 140 years later, for anyone to judge whether the signatures are genuine, and thus muster proof of forgery.

DEP's prior experiences."[29] The judge dismissed as immaterial the State's claim that Phoenix was not in possession of deeds from all the Orlov heirs when it instituted the action, and rejected its objection to the lack of probate records as "mere speculation" insufficient to defeat summary judgment.

The judge declared Phoenix to be "the owner of fee simple title" to Properties I (Block 2, Lot 11), II (Block 4, Lot 8), III (Block 4, Lot 8A), and VI (Block 4, Lot 11), voided the State's deeds, ejected it from the premises and denied the State's motion to stay the judgment.

We granted the State's motion for leave to appeal the stay order and summarily reversed. We remanded the matter to the trial court to promptly issue a stay, thereby "preserving the status quo with respect to this environmentally sensitive Pinelands property, pending the conclusion of the trial court litigation." Although concluding "that the underlying litigation appear[ed] to present a significant legal issue," we nevertheless denied leave to

---

[29] The judge was presumably referring to the Department of Environmental Protection and the Attorney General's role in bringing Hyland v. Kirkman, which the State instituted to "rectify a massive fraud upon the courts and land recordation system of the State," involving land titles in the Pinelands. 157 N.J. Super. 565, 570 (Ch. Div. 1978). Judge Buczynski had previously struck requests for admissions by Phoenix directed at Hyland, finding the State's legal opinions as to whether "something was a wild deed" in that case irrelevant to the matter at hand because those are "legal conclusions that are in the province of the court."

appeal the summary judgment, noting that "novel issues are best decided on the basis of a complete factual record."

Following a three-day trial to determine, in the judge's words, "paramount claims in competing chains of title," at which Phoenix's genealogist, title expert and surveyor testified, along with the State's title expert, surveyor and one fact witness, a Kudra heir who testified on behalf of the State,[30] the judge entered judgment for Phoenix on the remaining properties. As to Properties IV and V (Block 3, Lots 18 and 19), the judge rejected the State's claim that Phoenix's inability to locate the trust pursuant to which Kudra took title from Burlington County Investment Corporation as trustee was fatal to its claim to legal title to those parcels.

The judge accepted the testimony of Phoenix's title expert that the "failure to locate trusts pertaining to deeds was not an uncommon issue. And

---

[30] Ireen Kudra-Miller testified she believed her father was the George Kudra in the 1974 deed from Burlington Company Investment Corp., based on the office address listed in the deed. She had no information about the trust referenced in that deed, however. Asked about the quitclaim deeds she and her sister gave to Phoenix, she testified they initially refused Phoenix's demands in 2015 to sign those deeds because they "had no idea what it was about," or "where the property was located, what block and lot number they were referring to," and that it had been "over 40 years ago that these things were done by [their] father." Kudra-Miller testified she and her sister finally agreed to sign the deeds only after Phoenix's litigation counsel threatened to sue them, and only after they received an indemnification agreement from Phoenix.

A-2823-16

that under those circumstances, it was common, in order to obtain title, that one would generally obtain deeds from the trustee's heirs, which is what Phoenix did."  The judge pronounced himself

> satisfied that as a trustee, Kudra's heirs were beneficiaries of title and it had passed to them.  That is, it was appropriate for Phoenix to obtain title from the heirs of Kudra as a trustee to the property under the circumstances as testified to by [plaintiff's title expert] Apell, and the [c]ourt is in agreement, that would be the appropriate course, and that is consistent with Zabriskie v. Morris & Essex R.R. Co., 33 N.J. Eq. 22, 27 (Ch. 1880).

Phoenix having obtained quitclaim deeds from the Kudra heirs, the court ruled Phoenix "holds legal title to Lots 18 and 19."

The judge also found that Lots 18 and 19 "do not plot within the foundation deeds in the [State's] title."  He concluded that Bertha Boehm, the State's predecessor in title to Lot 18 "never owned Lot 18," notwithstanding her deed, because the deed description does "not describe Lot 18."  The judge also rejected the State's contention that Lot 19 was a part of the Milkenstein tract, as Phoenix's title expert also maintained in his initial report, instead concluding that Lots 18 and 19 are both located further west, outside the Meyer Beyer corridor, and were part of the Fischer tract based on the mapping error discovered by Schweppenheiser.  Because the deed to Fischer predated

69

the deed to Milkenstein, the judge concluded "the subsequent conveyance . . . to Milkenstein as to Lot 19 . . . is therefore a nullity."

The judge declared himself "satisfied that Lots 18 and 19 are in Ocean County and were encompassed in the Kudra deed as trustee," that they were conveyed to Phoenix as part of the Kudra settlement agreement and consolidated into Lot 9.01.  The judge concluded "[a]s a result of the settlement and the subsequent execution of deeds by the heirs of Kudra," that Phoenix had equitable title to Lots 18 and 19, which "is sufficient to award judgment [in] ejectment and quia timet action, as well as legal title consistent with Zabriskie."

As to Property VII (Block 4, Lot 13), the judge found that although Herskowitz's "probable intent" was to convey only ten acres to Schell in the 1910 deed, as stated therein, those ten acres were not specifically described and cannot be plotted.  The judge instead found that Herskowitz's inclusion of a description of the entire 150 acres he had acquired from Milkenstein fourteen years before in an 1894 deed made that metes and bounds description controlling, based on the testimony of Phoenix's title expert Apell that when "there is a conflict between the recital and the operational portion of the deed, the specifics of the operational section controls."

The judge declined to consider the deed from Herskowitz to Perlman two years later conveying the same described 150 acres "excepting ten acres of said parcel . . . heretofore sold and conveyed . . . to Sam Schelies" as further proof that Herskowitz had not conveyed the entire 150-acre parcel to Schell, because it "was not an actual conveyance" but only security for a loan. Specifically, the judge found "[t]he fact that the Perlman deed was a security interest may have some bearing on the value of the language of the deed." The judge observed that "had the Perlman deed actually been a conveyance for property, it's likely that the issue would have been resolved at the time and I think more weight could be given to the language." The judge further found the ambiguity in the deed "should be held against Herskowitz," and "creates an obligation of the subsequent grantees to address the conflict manifest in the deed." Having failed to do so, the judge found "the chain of title created by the conveyance and reconveyance of the Perlman deed is inferior to the Schell deed."

The judge thus found that Herskowitz effectively conveyed the entire 150 acres described in the metes and bounds description to Schell, notwithstanding "his probable intent to convey only ten acres." He also found the deed, recorded in 1910 in Burlington County, almost twenty years after Little Egg Harbor was made part of Ocean County, "was sufficient to provide

notice of all subsequent grantees," and that "[t]o disregard the Schell deed would [be] to work an injustice on the system." Although Phoenix could locate no record of any further conveyance of any part of the 150 acres from Schell, nor the record of his death nor any will, and Phoenix's genealogist initially identified other individuals as heirs of Schell, the judge pronounced himself satisfied "that Phoenix sufficiently proved chain of title through the Schell heirs."

The judge also concluded the State's chain of title as to Property VII "lacked sufficient probable evidence." The judge was not satisfied the State had presented "sufficient proof" that "its grantors were, in fact, descendants of the heirs of Herskowitz." The judge noted the evidence presented by the State "relied on surnames and the recitals in the deeds." Although conceding such would be "sufficient in many cases, this is not sufficient in the case given over 63 years of a gap between conveyances out of Wolf Herskowitz, who was, at best, a remote grantor." The judge concluded "[t]his failure of proof is also sufficient to call into question [the State's] chain of title."

The judge accordingly entered final judgment in Phoenix's favor as to Properties IV (Block 3, Lot 18), V (Block 3, Lot 19) and VII (Block 4, Lot 13), declaring Phoenix the owner of fee simple title to those parcels, voided

the State's deeds and ejected it from the premises. The judge thereafter entered default judgment as to those defendants in the caption who failed to appear in the action and dismissed without prejudice Phoenix's claims against its title insurer, thereby rendering the matter ripe for appeal. The parties entered into a consent order staying the judgment pending a final decision by this court or the Supreme Court. This appeal followed.

The Parties' Arguments on Appeal

On appeal, the State renews the arguments it made to the trial court that Phoenix's campaign to undermine the State's recorded deeds to these "ecologically rare and irreplaceable lands" by exploiting defects in its chains of title discovered by going back to the original grants from the Council of Proprietors and searching forward, ignoring assessed owners and decades-old tax sale judgments and instead taking omnibus quitclaim deeds from the living heirs of long-dead record owners, surreptitiously wiping the State off the municipal tax map in the process, constitutes heir hunting, exceeds all bounds of reasonable commercial practice and is void as against public policy under well-established law. Phoenix counters that as the trial court found, the State "advocates for a 'policy' that its public objectives relieve it of proving that it purchased the properties from the true owners."

73

The State responds by asserting the trial court accepted Phoenix's mischaracterization of the State's argument. It claims it is not seeking "some kind of special status for public policy reasons," as the trial court found, "but instead asks the court to examine whether Phoenix's attempt to usurp [the State's] title is permissible given past precedent and potential future consequences." Phoenix counters, arguing the prohibition against heir hunting "<u>only</u> applies in the context of tax foreclosures where a third-party investor buys an interest in the property after the foreclosure is filed for nominal consideration."

Although we agree that Phoenix's actions here do not fit neatly into the category of heir hunting, because it did not deceive the heirs from whom it took quitclaim deeds and paid them, in most instances, more than nominal consideration, we have no hesitation in holding its conduct was unconscionable and clearly violated public policy, thereby barring it from any remedy in a court of equity. <u>See</u> <u>Bron</u>, 42 N.J. at 95.

Our Analysis

We begin our analysis by noting our agreement with Judge Buczynski's assessment that neither the Legislature nor "the chancellors who have ruled in

the past could have quite contemplated the evolution of a case" like this one.

Phoenix's assault on the State's title here is nothing short of extraordinary.

Fully aware of the State's properly recorded deeds and not having any interest

of its own in any of the State's seven parcels, Denise and Phoenix spent the

better part of two decades and over $1 million to undermine the State's titles

based on the theory of its searcher, Gene Sharkey, "that it was his job to cut

through" the established record titles "as he believed everybody was directed

by Hyland v. Kirkman and get to the paramount owner and acquire title

through the paramount."

After "years and years" of searching "[a]ll 8,000 acres" of the Isaiah

Adams tract including its "26 or something exceptions" as well as the still

earlier Cranmer tract, under the banner that "[t]he paramount chain ruled,"

Denise claimed Sharkey "was first to cross the post in New Jersey." As Denise

explained Sharkey's philosophy: "You had the paramount chain and you were

the first to file, you own the property."

Sharkey died before he could be deposed in this case. Neither of the title

experts who appeared for the parties did any searching of these titles. Both

merely reviewed the work Sharkey performed, undertaking only isolated

research tasks in advance of trial. Accordingly, there is nothing in the record

detailing Sharkey's laborious efforts and no way to learn what deeds and other muniments of title he reviewed, or rejected, in determining what he claimed to be "the paramount chain" to each of these parcels.  It is, however, obvious that his was not the "reasonable search" contemplated by the recording act.  See Palamarg, 80 N.J. at 456 (explaining the recording statutes have been "consistently interpreted to mean" a "subsequent purchaser will be bound only by those instruments which can be discovered by a 'reasonable' search of the particular chain of title"); Glorieux v. Lighthipe, 88 N.J.L. 199, 203 (E. & A. 1915) ("A purchaser may well be held bound to examine or neglect at his peril, the record of the conveyances under which he claims, but it would impose an intolerable burden to compel him to examine all conveyances made by every one in his chain of title.").

Armed with what Sharkey deemed the "paramount" title for each of the State's parcels, Denise and Phoenix deployed their self-trained genealogist to hunt down the heirs.  Only those families who had been involved in prior title disputes in the Pinelands, the Eichbaum and Cox clan and the Kudras, had any idea they may have inherited an interest in these lands.  In negotiating the purchase of those interests, Phoenix's lawyer testified at deposition he couldn't recall whether he mentioned to any of the heirs that the titles to these lands

were then in the State, which had purchased them with federal and State funds for the purpose of preserving them intact for future generations.

Omnibus quitclaim deeds in hand, Denise and Phoenix recorded them in derogation of the State's record title. Then in the most astonishing move, they presented the tax assessor of Little Egg Harbor with their new deeds and searches, without any notice to the State, and asked that the tax bills be sent to them.

The tax assessor, without any idea of whether the deeds were valid but knowing the properties would "becom[e] taxable," made Denise the assessed owner of each of the State's seven Properties on the Township's assessment list and removed the legend "exempt – NJDEP" from each of the parcels on the Little Egg Harbor tax map. Indeed, because Denise at that time staked his title to Properties IV and V on tax sale certificates issued by Bass River and had taken quitclaim deeds to Property VII from the wrong heirs, he had himself made the assessed owner of three of the State's seven Properties with no colorable claim of title at all.

Phoenix then took its final steps to annex the State's lands, without filing a complaint in any court and without any notice to the State whatsoever. Telling its surveyor, Schweppenheiser, to ignore the interior borders of the

A-2823-16

State's parcels because it was "buying all those properties," Phoenix had him survey the outbound boundaries of the State's seven Properties and create a new survey map showing all but two of them as simply part of the same parcel as Phoenix's sand mine. Consolidating the State's parcels with its own in a deed designed for the purpose and armed with Schweppenheiser's new survey, Phoenix applied to Little Egg Harbor for a new lot and block designation. In 2005, Little Egg Harbor revised its tax map to erase the State's separate parcels, incorporating them into a new Block 3, Lot 9.01, assessed to Phoenix.

When the State deposed Schweppenheiser, it asked whether he would "have needed to denote that there was a potential discrepancy of ownership with some of those lots," had Phoenix advised him it had acquired hostile interests in the State's parcels without the State's knowledge and was surveying the outbound for a lot consolidation in anticipation of a quiet title action against the State. Although posed as a hypothetical, Phoenix does not dispute the question was an accurate reflection of the true state of affairs when it engaged Schweppenheiser to prepare the new survey. Schweppenheiser's answer: "The way you put it, it would sound like fraud, I probably wouldn't do the survey under those conditions."

A-2823-16

There is, of course, a very good reason such a scheme "would sound like fraud." As the State's expert surveyor, Barry Jones, testified in explaining why he also would not have performed the survey under those conditions, "You can't combine lands that are owned by two different entities. It has to be the same common owner . . . to combine them."

Although long quoted, the equitable maxim that "[a] suitor in equity must come into court with clean hands," A. Hollander & Son, Inc. v. Imperial Fur Blending Corp., 2 N.J. 235, 246 (1949), is no quaint artifact of an earlier time. It remains "a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945); Borough of Princeton v. Bd. of Chosen Freeholders of Mercer, 169 N.J. 135, 158 (2001).

"[W]hile 'equity does not demand that its suitors shall have led blameless lives,' . . . it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue." Precision Instrument, 324 U.S. at 814-15 (quoting Loughran v. Loughran, 292 U.S. 216, 229 (1934)). The misconduct justifying invocation of the doctrine need not be punishable as a crime or such as would "justify legal proceedings of any character. Any

79

willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor," id. at 815, or an appellate court, Trautwein v. Bozzo, 39 N.J. Super. 267, 268 (App. Div. 1956).

The maxim is based on public policy, Rasmussen v. Nielsen, 142 N.J. Eq. 657, 661 (E. & A. 1948), and assumes greater significance when the litigation concerns the public interest. "For if an equity court properly uses the maxim to withhold its assistance in such a case it not only prevents a wrongdoer from enjoying the fruits of his transgression but averts an injury to the public." Precision Instrument, 324 U.S. at 815. Here, the paramount public interest, even more than the protection of these ecologically sensitive lands, the preservation of which long ago was declared a national priority, is the stability of New Jersey's recording system.

The State argues Phoenix's "heir hunting" undermines that stability and is against public policy. Phoenix denies it was heir hunting. It claims it was simply "an adjacent owner of property looking to acquire more property for its business." Phoenix further claims "[t]he prohibition against heir-hunting is not some catch-all public policy doctrine" and "was never intended to protect 'a competing claimant,' such as the [State], that seeks to divest the true owners of

their title and constitutional rights." Phoenix claims it is the party upholding the recording system by insisting that property be acquired from "the true owners." We reject Phoenix's claims as without merit.

Chief Justice Weintraub attempted to capture the essence of public policy, "the ultimate source of justice," in Bron. 42 N.J. at 93. Quoting an Ohio Supreme Court opinion, Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Kinney, 115 N.E. 505, 506 (Ohio 1916), he emphasized

> [i]n substance, it may be said to be the community common sense and common conscience, extended and applied throughout the state to matters of public morals, public health, public safety, public welfare, and the like. It is that general and well-settled public opinion relating to man's plain, palpable duty to his fellow men, having due regard to all the circumstances of each particular relation and situation.
>
> Sometimes such public policy is declared by Constitution; sometimes by statute; sometimes by judicial decision. More often, however, it abides only in the customs and conventions of the people — in their clear consciousness and conviction of what is naturally and inherently just and right between man and man.

Critically, the Chief Justice underscored that when a party's course of conduct is "shocking to the average man's conception of justice, such course of conduct must be held to be obviously contrary to public policy, even though such

81

policy has never been so written in the bond, whether it be Constitution, statute, or decree of court." Ibid.

Few of our citizens, even those having read Hyland v. Kirkman, would likely believe their neighbor, who had the time and resources to search the land titles forward from Berkeley and Carteret, could turn them out of their home by procuring quitclaim deeds from the far-flung descendants of someone who held record title to the property a hundred years ago and inveigling the local tax assessor to redraw the tax map to erase the lot they lawfully purchased on the claim the neighbor, who wished to expand his own backyard, had acquired the property from "the true owners." We think most citizens of this State would aptly view such possibility as ludicrous because so shockingly "not right." Yet that is essentially what Denise and Phoenix did here in creating their consolidated Lot 9.01 annexing the State's land to enlarge its sand and gravel mine.

Because there is no marketable title statute[31] in New Jersey to protect a record owner from the exploitation of old title defects in her chain by an

_____

[31] Marketable title acts, which exist in about twenty states, operate to invalidate latent title claims that have not been raised in a specified limitations period, typically thirty or forty years. See, e.g., Unif. Simplification of Land Transfers Act §§ 3-301 to 3-309 (1976), 14 U.L.A. 343, 385-92 (2005). "The

adjacent owner such as Phoenix looking to annex its neighbor's land, the tactics Phoenix employed here could be directed against any landowner anywhere in the State.[32]  It is worth noting the lands here involved marketable titles deemed insurable by reputable title insurers.  Although the State was represented by one of its title insurers at the outset of the litigation, that company eventually withdrew, discharging its obligation to defend the State's title by paying it the face amount of the policies.  Title insurance could thus prove cold comfort to a landowner faced with an assault on its title of the type Phoenix unleashed.  Title insurers could decide the better business decision would be to pay the policies than incur the costs of experts and lengthy litigation.  And landowners lacking the State's resources could hardly be

---

purpose is to permit reliance upon the record chain where it is completely linked for the statutory period and, thus to render harmless defects which may exist prior to its commencement."  Hyland, 204 N.J. Super. at 366.  By making very old claims based on record title unenforceable, these statutes "contribute toward elimination of some undeserving claims and reduce some of the avoidable risks — such as stale claims resulting in windfalls — involved with land records."  Charles Szypszak, Real Estate Records, The Captive Public, and Opportunities For The Public Good, 43 Gonz. L. Rev. 5, 24 (2007).

[32]  The risks, of course, are much greater in a remote area such as the Pinelands where the lands are largely undeveloped, making it more difficult to rely on obvious possession to thwart such attacks.  See McGrath v. Norcross, 70 N.J. Eq. 364, 371 (Ch. 1905) (noting actual possession of the land by another will defeat the presumption of possession in the plaintiff in a statutory ejectment or possession of lands action).

expected to endure the costs of this sort of litigation if their insurers elect not to defend.

The point is that the threat to the stability of the recording system posed by Phoenix's actions is real, not imagined, and not limited to land titles in the Pinelands. The State engaged reputable title companies to insure good title to each of the seven parcels and had each surveyed before purchasing. All the purchases were by bargain and sale deed with covenants against grantor's acts and title insurance was in place for all but Property I, for which Department records reflect a title commitment but not a title policy. The State recorded its deeds promptly after purchase. Yet none of those things deterred Phoenix or spared the State from having its holdings wiped off the face of the municipal tax map and having to defend this challenge to its title based on hundred-year-old deeds and an alleged historic mapping error.

New Jersey courts have long deplored the machinations of heir hunters and title raiders, who seek "technical flaws in title in order to upset existing equities and clearly vested rights." Palamarg, 159 N.J. Super. at 297. The Supreme Court has deemed their "activities" to be of "no social value or contribution" as they serve "only to further their own interests rather than the

interests already on hand." O & Y, 120 N.J. at 458 (quoting Bron, 42 N.J. at 95).

The first reference to heir hunting in New Jersey was by Judge Jayne, who described it as a "racket" in which unscrupulous agents reviewed probate records for the purpose of "assisting" non-resident heirs in obtaining their inheritances. Carey v. Thieme, 2 N.J. Super. 458, 464-65 (Ch. Div. 1949). After the beneficiaries were advised of the efforts expended in the investigation "and of their good fortune of which they would not have otherwise learned. . . . [a]ppropriate powers of attorney were solicited to enable the kind and gracious agent to collect" the heirs' share of the estate, from which a stipulated fee, usually calculated on a percentage basis, would be deducted for the services rendered. Id. at 465. Noting there was no "reported decision in our State relative to the pursuit generally known as 'heir-hunting,'" and careful to explain he was "not at present concerned with all patterns" of such enterprise, "but only with the model of it exhibited" before him, Judge Jayne declared the practice "inimical to the public policy of protecting beneficiaries of estates from imposition and unnecessary expense." Id. at 466-67.

Our Supreme Court extended the concept of heir hunting beyond probate proceedings in Bron.  There, Woodbridge sold certain vacant lands for unpaid taxes "and itself was the buyer" at the tax sale.  Bron, 42 N.J. at 88.  The township then foreclosed the tax sale certificates, but unknowingly omitted the last record owner when a searcher missed conveyances in the chain vesting title in one Weintraub.  Ibid.  Twelve years later, Woodbridge sold the property to a developer who built ten homes on the land.  When one of those homes was resold several years later, a title search revealed the failure to foreclose Weintraub's interest.  Id. at 89.

Woodbridge initiated a second tax foreclosure, N.J.S.A. 54:5-86.2, and served notice by publication on Weintraub's unknown heirs to correct the defect.  Ibid.  A third party, Hudson Trading Corporation, saw the published notice, located Weintraub's two sisters in California, and wrote to them about the property in a manner the Court deemed "palpably deceptive," and so acquired their interests for $400.  Id. at 90-91.  Hudson then conveyed a quarter interest to another third party, Frank Altomare, and the two redeemed "[a]t the eleventh hour."  Id. at 89.

In a subsequent quiet title action by the homeowners, consolidated with Hudson and Altomare's suit for possession and mesne profits, the trial court

ordered the homeowners to pay Hudson $19,555.11 to purchase the property

on which their houses stood, that being the value of the land without

improvements, plus mesne profits of $2,856.91.  Ibid.  We affirmed, declaring

that Hudson and Altomare having "seized upon the opportunity to make a

profit is not inherently inequitable merely because they may have known that

appellants lived on the land."  Bron v. Weintraub, 79 N.J. Super. 106, 112

(App. Div. 1963).  The Supreme Court reversed our opinion on public policy

grounds.  Bron, 42 N.J. at 96.

Writing for the Court, Chief Justice Weintraub made clear

> no one disputes the right of the holders of existing
> interests to convey them to third persons if they wish.
> What is challenged is the legality of the intrusion into
> the scene by third persons who seek only to further
> their own interests rather than the interests already on
> hand.

[Id. at 95.]

Acknowledging there was no precedent precisely on point, beyond "the

established hostility toward so-called 'heir-hunting'" expressed in Carey v.

Thieme, the Court had "no doubt the common conscience condemns the

conduct of Hudson and Altomare as an undue interference with the rights of

the householders."  Id. at 96.

The Court held that Hudson and Altomare having acquired the interest of the Weintraub heirs "under 'circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same.'" Id. at 96 (quoting 4 Pomeroy, Equity Jurisprudence § 1053 at 119 (5th ed. 1941)). The Court accordingly ordered the heir hunters to convey the interest to the householders upon their payment of $400, the same sum the heir hunters paid to acquire it, with simple interest. Id. at 95-96.

Although Bron involved tax certificates, Phoenix is incorrect that the public policy against heir hunting is limited to that context. Bron was a quiet title action, not a tax foreclosure. Further, as already noted, Bron extended the "established hostility toward so-called 'heir-hunting'" discussed in Carey v. Thieme to quiet title actions and tax sales. Bron, 42 N.J. at 95; see also Wattles v. Plotts, 120 N.J. 444, 445-46 (1990). Moreover, the Court has since applied the policy in a quiet title case quite similar to this one to thwart "an attempt by an heir hunter, . . . Continental Searchers, Inc. (Continental), to upset title to property . . . owned by . . . O & Y Old Bridge Development Corp. (O & Y)." O & Y, 120 N.J. at 455.

O & Y acquired the property at issue in that case, an approximately forty-four-acre parcel in Old Bridge, in four separate conveyances as part of a much larger 2,600-acre tract it purchased for development. In the course of searching title on a nearby property, Continental learned of a defect in O & Y's title, specifically, an heir omitted from a quiet title proceeding conducted over twenty-five years before. Id. at 457. "Sensing an opportunity, it offered to 'clear up the title' for O & Y." Ibid. Although O & Y had accepted a similar offer from Continental on an earlier occasion when Continental had uncovered another outstanding interest in the 2,600-acre tract, this time O & Y refused to pay. Continental located the heir, acquiring his interest via a quitclaim deed in exchange for $300 and the promise of an additional $2,700 in the event Continental was successful in obtaining title. Ibid.

Continental and O & Y filed cross-complaints to quiet title to the property. Relying on Bron, the Chancery Division determined Continental lacked any protectible interest in the property, and thus entered final judgment declaring "Continental had no interest in the property and that O & Y's title was good." Id. at 456-57. We affirmed, finding "no valid distinction between Bron and [O & Y] based upon the fact that the property in question is undeveloped land rather than residential housing." Id. at 458. We also

rejected Continental's argument, the same one made by Phoenix and accepted by the trial court here, distinguishing <u>Bron</u> on the basis that O & Y was not "a single homeowner" as the householders in that case. <u>Ibid.</u>

The Supreme Court, although noting the quiet title judgment obtained by O & Y's predecessor in title would arguably be invulnerable to Continental's attack twenty-six years later, did not decide the case on that basis as neither we nor the trial court had addressed the issue. <u>Id.</u> at 457-58. Instead, the Court reiterated its holding in <u>Bron</u> that our courts "find no social value or contribution in the 'activities' of heir hunters or title raiders who 'seek only to further their own interests rather than the interests already on hand.'" <u>Id.</u> at 458 (quoting <u>Bron</u>, 42 N.J. at 95).

Acknowledging that O & Y's predecessor's lawyer may have erred in omitting to foreclose all interests in the prior quiet title action twenty-six years before, the Court repeated what it said in <u>Bron</u>, that "'decent men must sense only revulsion in this traffic in the misfortune of others.'" <u>Ibid.</u> (quoting <u>Bron</u>, 42 N.J. at 95). Although affirming our decision in favor of the record-title owner O & Y, the Court modified the judgment to impose a constructive trust on Continental's interest, on the basis that "[t]he most Continental can claim under the <u>Bron</u> principles is the return of its meager investment in exchange

90

for the 'title' it holds." Id. at 459. The Court accordingly held that "[a]ssuming that the 1958 judgment did not extinguish the interest now asserted by Continental, O & Y is equitably entitled to that interest on payment of $300 [the sum it paid the heir] plus simple interest." Ibid.

In addition to erroneously claiming the prohibition against heir hunting is limited to tax sale proceedings, Phoenix also claims the Bron principles are not controlling here because it paid the heirs more than nominal consideration for their interests and acted to acquire the properties for the purpose of expanding its sand and gravel operation, not to extort the State into purchasing the interests. We reject both arguments.

Although the reported heir hunter cases have often, although not always, see Wattles,[33] 120 N.J. at 447-48, involved nominal consideration paid to the

_____

[33] In Wattles, the plaintiff, Gordon Wattles, instituted an action to foreclose a tax-sale certificate on a six-acre parcel of vacant land adjacent to land his family owned in Hunterdon County. 120 N.J. at 446. After entry of default against "unknown owners," but before final judgment, "an heir hunter, National Asset Recovery (National), discovered out-of-state heirs of the last record owner, Edward Plotts." Ibid. National struck a deal with the Plotts heirs that if they "were successful in upsetting the tax foreclosure and in obtaining title, National could sell the property and divide the net profits with the heirs, after reimbursing itself for its expenses." Ibid.

The trial court permitted the heirs to redeem, and we affirmed, rejecting Wattles argument that Bron barred National's claim. Acknowledging Plotts'

missing heirs, and the issue of nominal consideration has very great significance in the tax sale cases, it is not the issue on which the quiet title cases, such as Bron and O & Y, have turned. The reason for that is the public policy concerns in tax foreclosure proceedings and quiet title matters, although related, are distinct.

The tax sale cases actually present competing public policy considerations. On the one hand is the need to encourage tax sale foreclosures in order to assist municipalities in their efforts to collect delinquent real property taxes. Varsolona v. Breen Cap. Servs. Corp., 180 N.J. 605, 618

---

right to redeem under the tax sale law, we "saw 'no reason why the heir of such an owner should be barred from his or her right of redemption simply because their right to redeem was brought to their attention by an heir hunter and they entered into a generous agreement with the heir hunter . . . .'" Id. at 449 (quoting our opinion at 230 N.J. Super. 254, 260 (App. Div. 1989)).

The Supreme Court agreed the heirs could redeem, but imposed a constructive trust in favor of Wattles on National's interest in accordance with Bron. Ibid. Acknowledging that the Plotts heirs stood to gain much more than the nominal sum paid to the Weintraub heirs in Bron, given that the property on which Wattles held the tax sale certificate had been assessed at $162,000, the Court determined that neither that fact nor "the intervening equities, such as were presented by the homeowners in Bron, should make a difference." Id. at 453. Instead, it reasoned that "[f]or all practical purposes, National [was] in the same posture as the heir hunters in Bron. It has insinuated itself into the scene for the sole purpose of furthering its own pecuniary interests." Ibid. Characterizing the case as simply "present[ing] a variation on the Bron theme," the Court determined imposition of a constructive trust on National's interest in favor of Wattles was the appropriate remedy. Id. at 445-46.

(2004). On the other is the need "to protect property owners from the devastating consequences of foreclosure." Cronecker, 189 N.J. at 315. The tax sale law, post Bron,[34] accommodates both concerns by barring third-party investors from redeeming a tax sale certificate "at the eleventh hour" by paying the desperate owner "nominal consideration." N.J.S.A. 54:5-89.1. Allowing third parties to meddle in tax foreclosures in that way would discourage investors from buying tax sale certificates with no corresponding benefit to the landowner. See Wattles, 120 N.J. at 451.

The Court, however, has declined to permit tax sale certificate buyers to invoke the hostility our courts have shown to "heir hunters" and

---

[34] As Justice Pollock explained in Wattles, the Legislature amended the tax sales law immediately after Bron to permit the owner of a single-family residence whose title derives from a defective tax foreclosure, such as the householders in Bron, to obtain the outstanding interest of a previously-unknown owner and thus avoid the interference of intermeddlers of the likes of Hudson and Altomare. N.J.S.A. 54:5-104.100 to -104.103; Wattles, 120 N.J. at 450. A subsequent amendment to N.J.S.A. 54:5-89.1, preventing a third party from intervening in a tax foreclosure or redeeming the certificate if that person acquired her interest in the property after the filing of a foreclosure complaint for a nominal consideration, was made three years later in response to an unpublished decision of this court attempting to limit Bron to its facts. Wattles, 120 N.J. at 450; Walter, 191 N.J. Super. at 369 (explaining same). As the Wattles Court held, nothing in that amended "statute, however, undercuts Bron." 120 N.J. at 452.

"intermeddlers" by treating all third-party investors as such.[35] Cronecker, 189 N.J. at 326-28. Third-party investors in tax sale proceedings who provide real value to property owners facing foreclosure assist "property owners in desperate need of financial assistance" without unduly interfering with the expected returns of those commercial investors who buy tax sale certificates. Id. at 328.

The Court in Cronecker recognized that investors in tax sales, whether they be the buyer of the certificate or the intervenor attempting to purchase the property or finance its redemption, are simply "commercial competitors," who, looking out for their own self-interests in order to maximize their profits, happen to "make possible the achievement of socially desirable objectives." Id. at 330. So long as these investors "comply with the dictates of the Tax Sale Law," the Court has declared itself "loath to intervene in the self-regulating

---

[35] Indeed the Court in Cronecker limited Wattles, "[t]o the extent [it] suggests a violation of public policy when a third-party investor offers more than nominal consideration for the property interest of an owner facing [tax] foreclosure," while still holding an investor who contracts with a defendant to purchase the property and redeem the tax certificate without prior court approval will not be permitted to profit from the transaction, regardless of the sum offered the owner. Cronecker, 189 N.J. at 328, 338. That clarification does not limit the vitality of Wattles in this case, which does not involve a tax foreclosure but instead a scheme by a stranger to the title to purchase hostile interests in his neighbor's property in order to wrest the title from him and annex his lands.

forces of the marketplace, particularly when competition will result in protecting a property owner's interest from forfeiture." Ibid. The Court in Cronecker accordingly refused to apply the Bron principles to bar intervention by third-party investors providing the property owner more than nominal value as permitted by statute, specifically N.J.S.A. 54:5-89.1. Ibid.; see also Rando, 189 N.J. at 344; FWDSL & Assocs., LP v. Berezansky, 452 N.J. Super. 408, 410 (App. Div. 2017).

This case, of course, is not a tax sale proceeding, and the heirs from whom Phoenix acquired quitclaim deeds were not desperate property owners facing tax foreclosure. Most, like the Orlov heirs, had no idea their remote ancestor had ever held title to one of the State's seven Properties. Although Phoenix casts itself and the State as "competing claimants," nothing could be further from the truth. The State was not competing with Phoenix to obtain title to these Properties as the buyers of tax sale certificates compete with third-party investors. The State owned these Properties; it already had title.

Like the householders in Bron and the developer in O & Y, the State purchased these seven Properties "in the bona fide belief that title was good," Bron, 42 N.J. at 90, and like them was forced to defend a challenge to its title, not by the heirs of some former record owner, but by an interloper who

acquired the heirs' interests in the hope of attacking the record owner's title by capitalizing on a defect in the record owner's chain.  The <u>Bron</u> Court condemned that conduct "as an undue interference with the rights of the householders."  <u>Id.</u> at 96.  As Chief Justice Weintraub explained, "no one disputes the right of the holders of existing interests to convey them to third persons if they wish."  <u>Id.</u> at 95.  "What is challenged is the legality of the intrusion into the scene by third persons who seek only to further their own interests rather than the interests already on hand."  <u>Ibid.</u>

The "interests already on hand" in this context are those of the fee owner who purchased the land believing its title was good and that of the heirs of the former record owner whose interest has resulted in the alleged defect in the current record owner's chain of title.  Those heirs, who often are not aware of the property and sometimes are not even aware of the ancestor, are obviously not similarly situated to "a property owner who has not redeemed a tax certificate by the time a foreclosure action has commenced" and is thus likely "vulnerable to the manipulation of overbearing speculators."  <u>Cronecker</u>, 189 N.J. at 320; <u>see also</u> <u>Wattles</u>, 120 N.J. at 446-47.

Likewise, the record title holders are not similarly situated to the "commercial investors," who purchase tax sale certificates in the general

pursuit of "large profits upon small investments and who may fairly be treated as acting at their peril."  Id. at 330 (quoting Dvorkin v. Twp. of Dover, 29 N.J. 303, 324 (1959) (Jacob, J., dissenting)).

The public policy at issue in quiet title cases such as Bron and O & Y is the avoidance of undue interference with the rights of the record title holders, that is, the householders in Bron and the developer in O & Y, by strangers to the title.  There is no competing public policy interest of encouraging tax sales at stake, no statute barring third persons from acquiring the interests of owners facing foreclosure for nominal consideration, and no "self-regulating forces of the marketplace," ibid., with which our courts are loath to interfere as exist in tax foreclosures.  Thus, that Phoenix may have paid some of the heirs more than nominal value for their interests does not bear on the central issue of whether it unduly interfered with the rights of the State as a record title holder.

There is no disputing that Phoenix, a stranger to the title having no interest of its own in any of these seven Properties, sought out "technical flaws" in the State's title "in order to upset existing equities and clearly vested rights."  Palamarg, 159 N.J. Super. at 297.  Like the heir hunters in Bron and O & Y, Phoenix sought to capitalize on alleged defects in the State's record chain of title in order to interfere with the State's ownership for the

purpose of furthering Phoenix's own ends, namely to acquire the land adjacent to its sand mine, which it knew the State would not sell. Only unlike the heir hunters in those cases, who acted opportunistically, Phoenix planned its assault on the State's title, surreptitiously working to have itself substituted as the assessed owner of the State's lands on the municipal tax rolls and to have the State's holdings subsumed into its own on the tax map.

Because Phoenix researched the State's titles, ignored its recorded deeds and surreptitiously acquired hostile interests from the heirs of long-dead record owners for its own purpose of undermining the State's title, thereby interfering with the State's vested rights to these seven Properties, its conduct is aptly characterized as heir hunting or title raiding, without regard to the amounts it paid the heirs to acquire those interests. We accordingly reject its argument that the Bron principles are not controlling here because it paid the heirs more than nominal consideration for their interests. Cf. Cronecker, 189 N.J. at 328 (noting that the interest acquired by a third-party investor after the filing of a tax foreclosure complaint who fails to intervene in the action could be impressed with a constructive trust without regard to whether he paid more than nominal value for the interest); Wattles, 120 N.J. at 454-55 (imposing a constructive trust on heir hunter's right to fifty percent net profits under

contract with heirs entered into after the filing of a tax foreclosure complaint without intervention in the cause under N.J.S.A. 54:5-89.1).

We also find it of no moment that Phoenix acquired those interests for the purpose of expanding its sand and gravel operation instead of for opportunistic resale to the owner as the heir hunters in Bron and O & Y. The salient point is that Phoenix, like the heir hunters in those cases, interfered with the rights of the record title owner for its own pecuniary interests, ignoring "the interests already on hand." See Bron, 42 N.J. at 95. Whether that pecuniary interest is secured by re-selling the property to the highest bidder or sand mining is to us beside the point. That Phoenix sought to annex the State's lands instead of selling them back to the State for a profit might make it more aptly characterized as a title raider than an heir hunter but is otherwise irrelevant to the inquiry. The effect on the record title holder by the "undue interference" with its rights in either instance is the same.[36]

---

[36] We also reject, as without merit, Phoenix's claim that the State seeks to "effectively endorse a policy that divests heirs of their right to sell their own property." As Chief Justice Weintraub made clear in Bron, "no one disputes the right of the holders of existing interests to convey them to third persons if they wish." 42 N.J. at 95. The issue "is the legality of the intrusion into the scene by third persons" looking to further their own interests and not that of the heirs or the record title owners. Ibid.; see also FWDSL & Assocs., 452 N.J. Super. at 413 n.4 (cautioning courts in tax sale matters not to be "swayed

Likewise, we reject the trial court's finding that because Phoenix owned property near the State's parcels it had "a bona fide interest," in becoming the owner of the State's preserved lands, and thus its conduct "cannot be characterized as exploitive," (quoting Walter, 191 N.J. Super. at 368). As already noted, Phoenix's conduct in surreptitiously acquiring hostile interests in the State's lands and convincing the tax assessor to drop the State from the tax rolls, erase its parcels from the municipal tax map and redraw the map to reflect Phoenix's annexation of the State's lands cannot fairly be characterized as anything but exploitive. Further, Walter, another tax foreclosure case, is inapposite and provides no support for Phoenix's conduct or the trial court's findings.

In Walter, the plaintiff purchased a tax sale certificate on lot 21 in Egg Harbor. 191 N.J. Super. at 365. Egg Harbor subsequently auctioned a certificate for adjoining lot 22. Both lots were owned by the same person, who had ceased paying the property taxes. The plaintiff bid at the sale for the certificate on lot 22 but was outbid by Simon. Simon attempted to purchase

_____

or distracted" by a litigant's "attempt to seize the moral high ground" by professing concern "about the municipality's collection of taxes or the property owner's right to freely convey title" because "in reality, the contestants' interests in those matters are secondary at best to what they are truly after").

100

the plaintiff's certificate on lot 21, but he refused to sell. Shortly before the plaintiff filed suit to foreclose the certificate on lot 21, Simon located, in Switzerland, an heir of the record owner of the lots and paid him $100 for his 1.25 percent interest. Ibid.

The trial court permitted Simon to intervene but denied her the right to redeem the plaintiff's certificate because she paid only "nominal consideration for the deed at a time when she knew plaintiff was about to commence foreclosure." In the trial court's view, that was a violation of the spirit, if not the letter, of N.J.S.A. 54:5-89.1, which forbids redemption by an unrelated party who acquired its interest for nominal consideration after the filing of the foreclosure complaint. Id. at 366. We reversed, finding Simon's offer to redeem was "not barred by either the letter or the spirit of the statute." Id. at 367.

We found that regardless of whether Simon knew the plaintiff was about to file his complaint, "she was not an intruder looking for a way to exploit the work of others' by perusing the daily lis pendens filings," but instead was simply another investor attempting, like the plaintiff, to acquire the title to both lots. Ibid. When Simon's attempt to purchase the plaintiff's certificate failed, she found a missing heir of the record owner of lots 21 and 22 and paid

101

him "for his very small interest about what [the] plaintiff paid for the certificate." Ibid.

We wrote in Walter that "Bron's pejorative references to 'heir-hunting' and its potential for exploitation serve to alert a chancery judge to consider exploitation, if it exists, as an overriding factor that would bar redemption in this type of foreclosure suit." Id. at 368. We found Simon's conduct, however, could in no wise be characterized as exploitive. Because Simon had complied with the tax sale law and there were no "compelling equities such as those present in Bron," we found she had as much a bona fide interest in obtaining title to both lots 21 and 22 as the plaintiff, and there was no reason for the judiciary to intervene in the competition between them.

Walter obviously provides no support for the trial judge's finding that Phoenix had a bona fide interest in becoming the owner of the State's lands and that its conduct toward the State could not be considered exploitive because Phoenix was "an adjoining property owner." Walter is a tax sale foreclosure case; the plaintiff and Simon were not "adjoining property owner[s]." They were competing investors who purchased tax sale certificates on adjoining lots owned by the same delinquent taxpayer, with each trying to become the owner of both. We held Simon had a bona fide interest in becoming the owner of lot

A-2823-16

21, not because she "was an adjoining property owner," but because she was a commercial competitor of the plaintiff's, pursuing lawful ends by legitimate means.[37] Phoenix's conduct in this matter bears no resemblance to Simon's in Walter and that case provides no support for Phoenix's annexation of the State's lands.

Simply stated, the trial court was led into error by Phoenix's invocation of tax foreclosure concepts, inapplicable here, to excuse its nefarious conduct in working to undermine an adjoining landowner's title to its lands in order to annex that neighbor's property. Those inapposite arguments were intended to obscure what is otherwise clear — that Denise and Phoenix were legal strangers to the title having no interest in any of the State's seven parcels, who

---

[37] We do not mean to suggest by this discussion that the Bron principles do not apply in tax foreclosures. They certainly can, as demonstrated in Wattles, 120 N.J. at 452-54, and reiterated in Walter, 191 N.J. Super. at 368-69. Our point is only that this case was not a contested tax foreclosure. The law of tax titles, on which the trial court relied, involves two contestants, the tax sale certificate holder and the intervenor, FWDSL & Assocs., 452 N.J. Super. at 413 n.4, "one claiming to advance society's interest in collecting taxes from tax-dormant properties and the other claiming to champion the right of owners to freely sell their properties," whose competition in the self-interested pursuit of their own profits both benefits local governments by restoring a delinquent property to the tax rolls and, at the same time, "protect[s] a property owner's interest from forfeiture," Rando, 189 N.J. at 344 (quoting Cronecker, 189 N.J. at 330). It has nothing to do with Phoenix's attempted annexation of lands adjacent to its sand and gravel operation belonging to the State.

purchased the fractional interests of descendants of long dead former record owners in the State's chains of title in the hopes of exploiting real or imagined defects in those chains for the purpose of wresting title from the State.[38] Denise and Phoenix's inequitable conduct in unduly interfering with the State's right to its lands brings the case squarely within the Bron principles, adopted to prevent such wrong-doers from profiting from their misdeeds. See Bron, 42 N.J. at 95-96.

As we have stressed throughout this opinion, Phoenix held no interest in any of the State's seven Properties when it began its quest to undermine the State's title for the purpose of annexing the State's lands. That the State had properly recorded deeds to each of the seven parcels was no deterrent to Denise and Phoenix based on the theory of their searcher, Sharkey, "that it was his job to cut through" the established record titles "as he believed everybody was directed by Hyland v. Kirkman and get to the paramount owner and acquire title through the paramount." We thus turn to that case and its implications for this one.

---

[38] As noted in Bron, some states bar the types of purchases Denise and Phoenix made here in lands adversely held by another. 42 N.J. at 95 (citing 10 Am. Jur. Champerty and Maintenance § 18, p. 563 (1937)); see also 14 Am. Jur. 2d Champerty and Maintenance §§ 12, 13 (2021).

There are two chancery court opinions in <u>Hyland</u> written by two different chancery judges seven years apart. The first opinion at 157 N.J. Super. 565, written by Judge Wood, addresses the defendants' motion to dismiss the complaint brought by the Attorney General and the Department of Environmental Protection to "rectify a massive fraud upon the courts and land recordation system of the State" by defendants purporting to have obtained title to thousands of acres of land in the Pinelands. <u>Hyland</u>, 157 N.J. Super. at 570. Judge Wood described the action as "a challenge to the fraudulent misuse of the system of recording titles to land and of the legal procedures designed to assure the orderly transfer of such title." <u>Id.</u> at 578.

The defendants urged the court to dismiss the action on several different grounds, including that the injuries alleged in the complaint, if any existed, were only to the private interests of certain individuals and not to the public at large. <u>Id.</u> at 574. They argued there was "no authority in the Attorney General to protect persons involved in private real estate transactions from the fraudulent acts of other private individuals." <u>Id.</u> at 574-75.

Judge Wood disagreed the complaint or the Attorney General's authority could be viewed so narrowly. He explained that

> [t]he complaint asserts that there has been use (or abuse) of the "recordation system" of this State, and

further, that fraud has been perpetrated on the courts by these defendants to the end of perpetrating fraud upon citizens of the State and of appropriation unto themselves rights in real estate previously nonexistent and, in effect, manufactured out of the whole cloth. That such activity threatens the integrity of those institutions and tends to bring them into disrepute seems obvious. It seems to me equally obvious that the integrity of these institutions is of vital public importance, and that an action to protect them is well within the discretion of the Attorney General.

[Id. at 575.]

The second Hyland opinion at 204 N.J. Super. 345, which was written by Judge Wells, details his findings following a fourteen-day trial. In that opinion, Judge Wells explains the "ideas" of Paul Burgess, Sr., "one of the most renowned 'title men' in South Jersey" and the President of Chelsea Title, then one of the largest title insurers in that part of the State, "for acquiring title to what he conceived to be 'abandoned' land in the Pine Barrens and particularly to the Isaiah Adams tract." Id. at 354.

Burgess attempted to obtain title to the entire 4,662.89 acre Adams tract through use of "a 'wild' or 'thin air' deed," that is "a written instrument, in the form of a deed, acknowledged and recorded" but executed by the named grantor knowing he "has absolutely no title of any kind to the premises described therein." Id. at 357-58. Burgess accordingly directed one of his

106

searchers, Richard Tuthill, to execute a deed in 1961 conveying the entire Adams tract to the Pinelands Development Corporation, an entity controlled by Burgess and Elwood Kirkman, a prominent Atlantic City lawyer and Chairman of the Board of Chelsea Title.  Id. at 355-58.

Tuthill acknowledged he never had any interest in the Adams tract.  He testified at trial that Burgess explained "that this was land that was lying for years on the tax rolls" assessed to "unknown owners" and on which nobody had paid taxes for "[p]erhaps a hundred years."  Id. at 363.  "So, it was a case where a chain of title could be established by putting a deed on record."  Id. at 364.  Tuthill explained that the grantee would be assessed the taxes and "over a period of time having paid hundreds, maybe thousands of dollars in taxes, would have more interest than a party who a hundred years ago his great grandfather had a deed.  This made sense."  Ibid.

Tuthill explained that "the chain of title then becoming established," the grantee "would go before the courts [in a quiet title action] and have their blessing.  Everybody . . . with an interest would be notified, served properly.  They'd have their day in Court.  If they wanted to come forth, they could do so."  Ibid.

The Attorney General urged that the Tuthill deed be stricken as a fraud on the recording system. Id. at 364. The defendants argued that wild deeds were essentially harmless and had the legitimate purpose of restoring lands assessed to "unknown owners" to the tax rolls in the name of someone willing to pay the taxes. Ibid. Judge Wells agreed with the Attorney General, holding that New Jersey having a "notice-race recordation system" on which the public is entitled to rely, wild deeds "are an absolute anathema and their use should stop for any and all purposes at once." Id. at 367.

Two chains of title emanated out of the Tuthill deed. One chain consisting of the 3,400 acres of the southwest portion of the Adams tract, after having been "sanitized" through quiet title and tax sale actions, ended in 2,200 acres being vested in Great Notch Development Corporation and 1,200 acres being vested in Robert Kaufman. A second "unsanitized" chain for the remaining 1,200 acres, including those lands conveyed to Meyer Beyer, ended in K & D Land Trust.

Judge Wells declared the Tuthill deed, and the deeds given by his grantee, Pinelands Development Corporation, re-conveying the property were void and of no effect and had them stricken from the record. Id. at 369. The judge also voided the subsequent quiet title and tax sale judgments in the

"sanitized chain" because procured by the defendants through their knowing use of the wild Tuthill deed.  Id. at 369-76.  Despite, however, "striking . . . every single basis of title from under Great Notch," the judge concluded it was a bona fide purchaser for value without notice and that its title could not be disturbed.  Id. at 377.  The judge found Great Notch had no actual or constructive knowledge of the fraud and that a reasonably diligent title search, including an examination of the regularity of the tax sale proceedings, would not have revealed it.

Judge Wells thus concluded that Great Notch was "entitled to rely on the record," noting that holding "comports with the policy" of not disturbing titles to real estate.  Ibid.; see also Palamarg, 80 N.J. at 459.  The judge similarly ruled that Robert Kaufman, who acquired his 1,200 acres of land covered by the Tuthill deed as a result of a settlement with Burgess and Kirkman, was likewise a bona fide purchaser for value without notice, and that his grantees were also protected.  Hyland, 204 N.J. Super. at 377-79.  As to the "unsanitized" chain, the judge stayed the pending action to quiet title to those lands and deferred further rulings to that matter.

Although Great Notch and Kaufman were not divested of title, the judge concluded that Burgess and Kirkman were unjustly enriched.  Id. at 381.

109

Burgess was dead by the time Attorney General Hyland launched his investigation into the use of wild deeds in the Pinelands thirteen years after the Tuthill deed.  Although Burgess's estate was a defendant in the case, the judge concluded it would be inequitable to impose any remedial judgment on Burgess's heirs in 1985.  Ibid.  Kirkman, however, was very much alive.  The judge imposed a constructive trust on the share of the proceeds Kirkman garnered from the inequitable scheme for the benefit of any heirs robbed of their interests and any other claimants to any part of the Adams tract and made the fund available to defray the attorney's fees and costs incurred by the State in bringing the action.

Hyland thus condemned the use of "wild deeds" to establish title to unclaimed lands, voided quiet title and tax foreclosure judgments many years after their entry based on the fraud on the court by the plaintiffs in those actions and, notwithstanding those rulings, determined that bona fide purchasers of the lands affected by such fraud could not be divested of title, although prohibiting Kirkman from drawing a profit from the scheme.  Id. at 377-79.  The decision thus provides no support for the notion of "cut[ting] through" the established record titles to "get to the paramount owner and acquire title through the paramount."

Indeed, mindful of the consistent direction of our Supreme Court that judges are to decide questions of title "in the way that will best support and maintain the integrity of the recording system," Palamarg, 80 N.J. at 453, Judge Wells quite consciously determined to "impose[] the burden of [the] judgment on those guilty of an abuse of the courts," thereby ensuring that "equity will have been served and the broader implications for titles will be limited." Hyland, 204 N.J. Super. at 372. Sharkey and Phoenix's "understanding" of the lessons of Hyland turns the decision on its head.

Plotting and re-surveying the original grants from the Proprietors, searching the titles forward from those grants, ignoring assessed owners and decades'-old tax sale judgments in the process, and taking omnibus quitclaim deeds from the living heirs of long-dead record owners in the hope of establishing "a paramount chain" of title for the purpose of ousting the record title holder in peaceful possession, as Phoenix did here, is simply anathema to the settled laws of conveyancing. New Jersey does not subscribe to the theory attributed to Sharkey and championed by Denise and Phoenix that the "first to cross the post" with "the paramount chain own[s] the property." Hyland certainly does not stand for that proposition, and Phoenix has not brought to our attention any case that does.

111

Again, we cannot stress enough that Phoenix possessed no interest whatsoever in any of the State's seven Properties when it began its quest to cloud and undermine the State's title for the purpose of annexing its lands. This is not, as Phoenix urged and the trial court accepted, simply "a dispute over paramount title" — as if the parties were arguing over ownership of the land along their adjoining boundary traced to a common grantor.

Phoenix is an interloper, a stranger to the State's titles, who launched an unprecedented attack on the State's ownership of its lands based on a novel theory born, apparently, from a misapprehension of the holding in Hyland. The theory is that one can simply acquire another's land by starting with the Proprietors and searching forward for old deeds the recording system has forgotten, or, as likely, a prior generation of searchers, lawyers and title insurers determined were no threat to the chain,[39] take quitclaim deeds from far flung heirs and declare oneself to have the "paramount title" by virtue of having acquired the property from "the heirs of the last true owners."

---

[39]  This from an 1882 edition of the New Jersey Law Journal:  "[u]p to this time our searchers have been preserved from many a mistake by the general acquaintance that the people had with the state of each other's titles.  In the future, with the growth of the state, this cannot be looked for."  Record Title to Land, 5 N.J.L.J. 260, 262 (1882) (quoted in Donald B. Jones, The New Jersey Recording Act — A Study of its Policy, 12 Rutgers L. Rev. 328, 340 (1957)).

Permitting an attack like this one by a complete stranger to title would make it impossible for any property owner anywhere "to purchase and hold title to lands within the State with confidence." Palamarg, 80 N.J. at 453 (quoting Jones, 12 Rutgers L. Rev. at 329-30). It has long been the law that titles do not have to be perfect to be marketable. La Salle v. La Pointe, 14 N.J. 476, 479-81 (1954). As the Court explained in Conklin v. Davi, quoting Justice Cardozo, then Chief Judge of the New York Court of Appeals, writing in an action by a purchaser to cancel a sales contract on the ground the seller could not convey marketable title, "[t]he law assures to a buyer a title free from reasonable doubt, but not from every doubt. . . . If 'the only defect in the title' is 'a very remote and improbable contingency,' a 'slender possibility only,' a conveyance will be decreed." 76 N.J. 468, 473 (1978) (quoting Norwegian Evangelical Free Church v. Milhauser, 169 N.E. 134, 135 (N.Y. 1929)).

If title can be acquired by an interloper with the time and money to search the grants from the Proprietors for defects based on such "very remote and improbable contingencies," no landowner could ever be sure his title was safe. See La Salle, 14 N.J. at 480 (quoting Tillotson v. Gesner, 33 N.J. Eq. 313, 327 (E. & A. 1880) (noting a "purchaser should have a title which shall enable him not only to hold his land, but to hold it in peace; and if he wishes to sell it,

113

to be reasonably sure that no flaw or doubt will come up to disturb its marketable value")). Certainly a sixty-year title search, long customary in New Jersey, see Palamarg, 80 N.J. at 460, would not be nearly long enough to account for all remote and improbable contingencies lurking in the record title from the original grants from the Proprietors. It is worth remembering in this regard that the deeds on which Phoenix relied to establish its "paramount" title were all over one hundred years old or nearly so, often recorded in the wrong county, and that most of the descendants of those long-dead record title holders from whom Denise took quitclaim deeds were not aware they possessed any putative interest in the lands at issue.

Our Supreme Court has provided clear direction in pronouncing that "[g]enerally speaking, and absent any unusual equity, a court should decide a question of title such as this in the way that will best support and maintain the integrity of the recording system." Ibid. Allowing this unprecedented third-party attack by a stranger to the State's title would, in our view, destabilize marketable titles in the Pinelands and elsewhere and undermine the integrity of the recording system by exposing record title holders to unreasonable litigation risk, and possible ouster, based on remote and improbable claims not fairly anticipated or easily defended.

114

Phoenix's claim that it is upholding the recording system by insisting that title be acquired from the "true owners" is nothing more than doublespeak. Phoenix is a title raider whose unconscionable conduct in attempting to annex the State's lands should have barred it from the equitable relief it needed from the chancery court to consummate its scheme.  That the reported heir hunting cases do not provide "precedent precisely in point" is no barrier to our declaring Phoenix's actions against the public policy embodied in the State's recording laws.  See Bron, 42 N.J. at 95.  Bron and O & Y provide clear guidance here.  And, as Chief Justice Weintraub noted in Bron, "public policy is more than a mere summation of its past applications. . . . 'Its virtue and vigor lies in its flexibility of application, and while reported cases furnish guides, they rarely are compelling in precedent.'"  42 N.J. at 95 (quoting Fidelity Union Trust Co. v. Reeves, 96 N.J. Eq. 490, 493 (Ch. 1924), aff'd o.b., 98 N.J. Eq. 412 (E. & A. 1925)).

The Court has instructed that "[i]n the exercise of their common-law jurisdiction, courts should seek to effectuate sound public policy and mold the law to embody the societal values that are exemplified by such public policy." Carr v. Carr, 120 N.J. 336, 350 (1990).  Declaring Phoenix a title raider, or simply a new species of heir hunter, and its unprecedented attack on the State's

115

title a threat to the stability of the recording system without any "social value or contribution" fulfills that mandate. See Bron, 42 N.J. at 95. Withholding equitable relief to Phoenix based on its unclean hands in unduly interfering with the State's rights to these seven parcels in the Preservation Area "not only prevents a wrongdoer from enjoying the fruits of his transgression but averts an injury to the public," Precision Instrument, 324 U.S. at 815, by "support[ting] and maintain[ing] the integrity of the recording system," Palamarg, 80 N.J. at 453.

Having declared Phoenix's attempted annexation of the State's lands as violative of public policy, we turn to the issue of remedy. To the extent that Phoenix has acquired "title" to any of the State's seven parcels, we have no doubt it acquired it under "circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest." Bron, 42 N.J. at 96 (quoting Pomeroy, § 1053 at 119). Thus, imposition of a constructive trust is the appropriate remedy. See id. at 95-96 (noting "the applicability of the concept of a constructive trust 'is limited only by the inventiveness of men who find new ways to enrich themselves unjustly by grasping what should not belong to them'") (quoting Latham v. Father Divine, 85 N.E.2d 168, 170 (N.Y. 1949)).

A-2823-16

Because the most Phoenix can claim under the <u>Bron</u> principles is the return of what it paid the heirs for the "title" it acquired, we turn to consider whether the trial court was correct in finding Phoenix sustained its burden in establishing its <u>quia</u> <u>timet</u> and ejectment claims as to each of the State's seven parcels.

The Law of Quia Timet and Ejectment

"[Q]uia <u>timet</u> is an equitable proceeding of ancient origin which permits the plaintiff to take affirmative action to protect or perfect his title because he fears [<u>quia</u> <u>timet</u>] the claim of the defendant may be injurious to him." 2 Lawrence J. Fineberg, <u>Handbook of New Jersey Title Practice</u> § 9705 at 97-3 (3d ed. 2003, rev. 2012); <u>see</u> <u>also</u> <u>Fittichauer v. Metro. Fire Proofing Co.</u>, 70 N.J. Eq. 429, 430 (Ch. 1905) (discussing "suits in equity under the ancient jurisdiction of the court of chancery classified as bills <u>quia</u> <u>timet</u>, or bills of peace"). As the Court of Errors and Appeals explained, "in cases where an instrument exists which, though really void, has an ostensible validity, and which throws a doubt over the title to real estate, a court of equity will interfere, and relieve against the injustice of such an illusion." <u>Bogert v. Elizabeth</u>, 27 N.J. Eq. 568, 570 (E. & A. 1876).

A quia timet proceeding is broader in scope than a statutory quiet title action because possession, which Judge Buczynski determined Phoenix could not claim notwithstanding its payment of taxes, "is not an essential." Estate of Gilbert Smith v. Cohen, 123 N.J. Eq. 419, 424 (E. & A. 1938). What is required, however, is that the claimant seeking "the cancellation of an instrument . . . on the principle quia timet . . . must show a title to the relief free from all reasonable doubt, and it must also appear that it is clearly against conscience that the instrument should be permitted to remain uncanceled." Shotwell, 24 N.J. Eq. at 387.

A claim for ejectment is similar in both aspects. The claim is typically "brought by one out of possession of land against one who either is in possession thereof or who makes claim thereto, if the land be vacant." Funkhouser v. City of Newark, 182 F. Supp. 15, 17 (D.N.J. 1960) (citing Toth v. Bigelow, 1 N.J. 399, 406 (1949)). Common law ejectment in New Jersey has been replaced by a statutory remedy under N.J.S.A. 2A:35-1, entitling "[a]ny person claiming the right of possession of real property in the possession of another, or claiming title to such real property, . . . to have his rights determined in an action in the Superior Court." See J & M Land Co. v. First Union Nat'l Bank ex rel. Meyer, 166 N.J. 493, 520 (2001).

118                                                                 A-2823-16

It remains, however, that the plaintiff in ejectment "has the burden of establishing his title, and if he fails to establish a good paper title the judgment must go against him." Perlstein, 12 N.J. at 204. "[T]he plaintiff must recover upon the strength of his own title, and . . . cannot rely upon the weakness of that of his adversary." Troth v. Smith, 68 N.J.L. 36, 37 (Sup. Ct. 1902); Brighton Constr., Inc. v. L & J Enters., Inc., 121 N.J. Super. 152, 163 (Ch. Div. 1972). If the plaintiff "fails to support his own title, the defendant will retain possession until he is ousted by someone who has a superior title." Troth, 68 N.J.L. at 37.

We now apply those standards to the seven Properties at issue.

Property I (Block 2, Lot 11); Property II (Block 4, Lot 8); and Property III (Block 4, Lot 8A):  the Bodine Tract

As previously noted, the State and Phoenix both trace their title to these three properties to an 1835 conveyance from the West Jersey Council of Proprietors to Gideon Cranmer, and from Cranmer's estate to James Bodine. Both chains of title also include an 1860 deed from James and Cornelia C. Bodine to Job Corlis encompassing the entire tract. The parties' chains of title thereafter diverge. The next deeds in the State's chain are two 1914 deeds from the heirs of Job Corlis to Frederick Vail, a/k/a Harry Davidoff, for the entire tract. The next deed in Phoenix's chain, however, is a deed from Corlis

and his wife, Eliza, back to Bodine, dated March 13, 1861, acknowledged almost four months later on July 1, 1861, but not recorded until May 29, 1875, over fourteen years after it was signed and a year after Bodine's death. Phoenix's claim to Properties I, II and III rests on the validity of that deed and its being discoverable by a subsequent purchaser conducting a reasonable search of the record.[40]

---

[40] Leaving aside Phoenix's bad faith in acquiring its fractional interests in the State's lands with knowledge of the State's recorded deeds and the surreptitious changes it worked to the tax map, which overarches all else in this case, we might otherwise expect this sort of title dispute to turn on what a reasonable title search would reveal about Phoenix's chains of title when the State purchased its Properties, see Palamarg, 80 N.J. at 456, and thus whether the State was a bona fide purchaser for value without notice, Venetsky v. W. Essex Bldg. Supply Co., 28 N.J. Super. 178, 187 (App. Div. 1953). This case does not turn on that point, for several reasons. Chief among them, as already noted, is that neither title expert testifying at trial actually searched these titles, and there was no testimony about the laborious efforts Sharkey undertook to uncover the deeds supporting Phoenix's chains. Second, the parties clashed repeatedly over the knowledge that should be imputed to the State by its involvement in prior Pinelands litigation, including Hyland. The State, after failing to convince the trial court it was a bona fide purchaser for value of the Bodine tract and Property VI on summary judgment, agreed it would not present evidence at trial on that issue as to the other Properties. The State has renewed its bona fide purchaser claims on appeal, to which Phoenix objects. As noted in the text, we do not think the issue could have been decided on summary judgment. Given this record and because we rest our decision on other grounds, we do not explore what a reasonable search would be, what it would have disclosed, and in the case of the Bodine tract, whether the State's correspondence with Ellie Eichbaum in 1988 would have put it on inquiry notice of the 1972 deed her father made to her and her brother — a claim to

The trial court entered partial summary judgment to Phoenix on its quia timet and ejectment claims as to Properties I, II and III, finding "no material fact in dispute," despite the conflicting reports of the parties' title experts as to what a reasonable search of the record at the time of the State's purchase of these three Properties would have revealed. The judge deemed the State's "primary argument [to be] that the 1861 deed is not valid since it was recorded after Bodine's death which leaves the chain of title running through the heirs of Corlis to Vail and eventually to [the State]." Whereas Phoenix contended "to the contrary that so long as the Corlis signature on the 1861 deed was not a forgery, the deed is valid." The judge agreed with Phoenix, finding "no evidence of forgery, the deed was properly recorded and acknowledged, and is presumed valid."

As already noted, Phoenix's failure to produce the original 1861 deed from Job and Eliza Corlis precluded the court from considering the genuineness of the grantors' signatures on the document, making the test

<hr />

title she represented her family had abandoned fifteen years before, see Francis S. Philbrick, Limits of Record Search and Notice, 93 U. Pa. L. Rev. 125, 131 (1944) (noting "[i]n scores of cases courts have said that [the subsequent purchaser] was put upon inquiry, and that reasonable diligence would have led him to 'the facts,' when no possible inquiry could have led him to anything other than a difficult legal problem").

121

proffered by Phoenix self-serving, at best. Further, the court appears to have accepted Phoenix's argument that the 1861 deed was properly recorded without reference to the law in effect at that time. Indeed, a review of the law governing the recording of the document 145 years ago would suggest the trial court's finding that the 1861 Corlis to Bodine deed was "properly recorded" is in error.

An 1820 supplement to the Conveyancing Act of 1799 made every deed executed after January 1, 1821,

> void and of no effect against a subsequent judgment creditor or bona fide purchaser or mortgagee for a valuable consideration, not having notice thereof, unless such deed or conveyance shall be acknowledged or proved and recorded, or lodged for that purpose with the clerk of the court of common pleas of the county in which such lands, tenements and hereditaments are situated, within fifteen days after the time of signing, sealing and delivering the same; provided nevertheless, that such deed or conveyance shall, as between the parties and their heirs, be valid and operative.
>
> [L. 1820, p. 141-42, § 1.]

The Court of Errors and Appeals explained the effect of a deed recorded after fifteen days on a subsequent purchaser in Sanborn v. Adair, 29 N.J. Eq. 338 (E. & A. 1878). "By the terms of the act of June 5th, 1820, a deed not recorded in fifteen days is made absolutely void as to one subsequently taken

A-2823-16

without notice; the single condition upon which it is to be postponed is a failure to record it in fifteen days." Id. at 341. Reviewing amendments to the 1799 Registry Act, the court found that

> as our law now stands, a deed not recorded in fifteen days loses its priority over one taken subsequently without notice. The statute fixes the status of the subsequent deed, and establishes its priority; priority cannot be regained by the earlier deed by being recorded before the subsequent deed is recorded. The law says that by failure to have it recorded in fifteen days, it shall be void and of no effect against the subsequent deed or judgment or mortgage, and in that position it must remain. The simple act of omission on the part of the grantee to have it recorded within fifteen days, is declared by the statute to make it void against such subsequent deed, judgment or mortgage. The failure to incorporate the second section of the act of 1801 into the act of 1820, manifests a clear intention to change the rule which permitted the earlier deed to retain its priority by getting upon record, after the expiration of fifteen days, before the recording of the later deed.
>
> [Id. at 340-41.]

The 1861 Corlis deed was not recorded within fifteen days, but fourteen years after its execution, presumably by Bodine's administrators who located it among his papers after his death.

We do not suggest by our comments that the 1861 Corlis deed was either forged or without priority over the 1914 deeds from the Corlis heirs to Vail

123

when those deeds were recorded. Although the failure to record the 1861 Corlis deed within the fifteen days mandated by statute would have rendered it void had the Corlises conveyed to a third party without notice, even after its recording in 1875, per Sanborn, the 1820 Supplement to the Conveyancing Act of 1799, by its terms, made the deed "valid and operative" as between the parties to the deed and their heirs. Moreover, in 1883 the Legislature repealed the fifteen-day rule of the 1820 Supplement and decreed that deeds previously lawfully recorded, albeit more than fifteen days after execution, would be deemed duly recorded and valid and operative against all but judgment creditors, mortgagors and bona fide purchasers without notice whose deeds were previously recorded or lodged with the clerk for recording. L. 1883, c. 169, § 3.

Instead, our discussion underscores that attempting to interpret and give effect to deeds evidencing conveyances made over a hundred years ago is often very difficult, involving unfamiliar laws and customs of conveyancing in a world in which copy machines, global positioning systems and paved highways were non-existent. The point is that it may not be enough for the proponent of such an old deed seeking to upend a competing chain of title in place for over one hundred years to simply rely on a presumption of validity of

124

recording and the absence of any proof of forgery, particularly where the proponent's burden is to establish his title "free from all reasonable doubt" and that it appear "clearly against conscience that [his opponent's] instrument should be permitted to remain uncanceled." Shotwell, 24 N.J. Eq. at 387.

The trial court, relying on that presumption of validity and absence of proof of forgery, ruled for Phoenix reasoning that the Corlises, having conveyed the property back to Bodine, "had nothing to convey" or leave to their children, citing Meeks v. Bickford, 96 N.J. Eq. 321, 325 (E. & A. 1924).[41] Relying on the supposed genuineness of the signatures on the Corlis deed and its proper recording, the trial court failed to consider what the record reflects the Bodine and Corlis administrators and heirs understood about ownership of

---

[41] Although the concept of a grantor not being able to convey more than he has is well-established, it is doubtful the case cited for the proposition, Meeks, remains good law. There, the Court refused to give priority to a quitclaim deed given by the grantor after she had conveyed the title to another, who failed to record his bargain and sale deed prior to recordation of the quitclaim deed. Meeks, 96 N.J. Eq. at 324. As subsequently explained by the Court in Baum v. Canter, 104 N.J. Eq. 224, 225 (E. & A. 1929), the rationale of Meeks "was that one who takes title in that manner [by quitclaim deed] is put on notice that he gets only the interest that the grantor at the time possesses, and that he cannot rely on the recording acts for his protection." Our Supreme Court in Palamarg, however, pledged allegiance to the modern rule that "a quitclaim deed passes the same estate to a grantee as does a deed of bargain and sale," 80 N.J. at 452, affording the grantee the same protections under the recording acts as one taking a bargain and sale deed. See N.J.S.A. 46:5-1 to -9.

the property. As the State's title expert, Joseph Grabas, pointed out, both Bodine and Corlis died without wills, and the law of intestate succession at the time made the intestate's children his primary heirs, subject to any rights of dower or curtesy. See Statutes of the State of New Jersey, tit. X, ch. 2 §§ 1, 6 (1847); Bray v. Taylor, 36 N.J.L. 415, 418-21 (E. & A. 1872) (tracing the law governing descent of lands). Looking at how matters stood a hundred to one-hundred-and-fifty years ago, when these conveyances were within living memory, it appears inescapable that the Bodine administrators and heirs believed the Bodine tract was not within their power to convey and did not do so, whereas the Corlis heirs believed they could convey it and did.

As the report of the State's title expert expounded, Bodine, identified as a merchant, living in what is now Waretown, died intestate on March 8, 1874. The estate was inventoried and subsequently declared insolvent the following December. The 1861 Corlis to Bodine deed was recorded six months later in May 1875. Five months after that, the administrators listed seventeen lots for sale, including the Bodine homestead where his widow Cornelia lived, but did not include the Bodine tract as an asset of the estate in the real property inventory. Nor was the property included in a secondary report filed in September 1879 when the administrators included two additional parcels as

assets of the estate. Six years after Bodine's death, a Final Report of Claims, Final Accounting and Decree of Distribution were filed closing the estate on April 21, 1880, without the Bodine tract ever appearing. The property does not appear among the assets of Cornelia Bodine at her death and was not conveyed by any of their children. As Grabas noted, and is undisputed, there was no purported transfer of the land by any of the heirs of Bodine until 1972, ninety-seven years later, when C. Roy Cox, a purported heir, conveyed the property to his children, Ellie Eichbaum and Benjamin S. Cox for no consideration.

Job Corlis, identified as a farmer in national censuses from 1850 through 1880, died intestate in August 1892, leaving his wife Eliza and three children. Eliza died five years later. No record of their estates has been discovered. Grabas documented with reference to the 1872 Beers Atlas that the Bodine tract in Warren Grove, then known as Corlisstown, was located close by Job Corlis' homestead. The tax records for Little Egg Harbor from 1895, the earliest date available, list Job Corlis; and from 1910 through 1917 he is described as the assessed owner of 300 acres of woodland in Warren Grove. Neither Bodine nor any of his heirs appears in the Little Egg Harbor tax records as the assessed owner of the Bodine tract. In 1914, Corlis' surviving

127

children, their spouses and the children of a deceased daughter conveyed Properties I, II and III to Frederick Vail in two deeds, describing the approximately 80-acre tract in the same manner as the prior deeds. All three properties have been conveyed multiple times since, and there are tax sale judgments, which appear regular on their face, in the chains of title to two of them.

Having reviewed those facts, none of which is disputed, we cannot conclude that Phoenix carried its burden to establish its title to Properties I, II and III "free from all reasonable doubt," or that conscience requires the cancellation of the State's deeds. Shotwell, 24 N.J. Eq. at 387. Phoenix's title expert, Erwin Apell, characterized the Corlis to Vail deeds, as "wild deeds," defined by Judge Wells in Hyland as "a written instrument, in the form of a deed, acknowledged and recorded" but executed by the named grantor knowing he "has absolutely no title of any kind to the premises described therein." 204 N.J. Super. at 357-58. But Apell could point to nothing in the record to suggest the Corlis heirs, all of whom were born, lived and died within a mile of this tract, believed anything other than that they had lawfully acquired the property on the death of their parents, and grandparents, and could lawfully convey it to Vail.

128

Indeed, it is precisely those circumstances — the discovery of the 1861 deed after Bodine's death, presumably by his administrators, who recorded it during the probate of Bodine's estate, fourteen years after its making, yet did not include the property in the final accounting of the claims and assets of his insolvent estate and never conveyed it; the failure of Bodine's widow or any of their four children, or their children, to convey it; and that it was conveyed by the Corlis children more than fifteen years after the deaths of their parents, at a time when three of Bodine's four children were still living — that raise doubt as to the validity of the 1861 Corlis to Bodine deed.

Stated differently, simply too much time has passed to allow anyone to say with confidence whether the 1861 deed from Corlis to Bodine was effective to transfer the Bodine tract back to Bodine.

> Whenever a deed or other instrument exists, which may be vexatiously or injuriously used against a party after the evidence to impeach or invalidate it is lost, . . . a court of equity will afford relief by directing the instrument to be delivered up and canceled, or by making any other decree which justice and the rights of the parties may require.
>
> [Shotwell, 24 N.J. Eq. at 380 (quoting Martin v. Graves, 87 Mass. 601, 602 (1863)).]

"Great delay is a great bar in equity." Stout v. Ex'rs of Seabrook, 30 N.J. Eq. 187, 190 (Ch. 1878), aff'd, 32 N.J. Eq. 826 (E. & A. 1880). As Vice

129

Chancellor Van Fleet explained, "[t]he reason of the rule is apparent, and consists in the difficulty and, in many cases, the impossibility, of ascertaining, after a great lapse of time, the facts necessary to enable the court to exercise its power with safety." McCartin v. Adm'r of Traphagen, 43 N.J. Eq. 323, 338 (Ch. 1887), aff'd, 45 N.J. Eq. 265 (E. & A. 1889).

> He who delays asserting his rights, until the proofs respecting the transaction, out of which he claims his rights arose, are so indeterminate and obscure, that it is impossible for the court to see, whether what seems to be justice to him is not injustice to his adversary, should be denied all relief, for, by his laches, he has deprived the court of the power of ascertaining, with reasonable certainty, what the truth is, and thus of doing justice.
>
> [Ibid.]

The long delay by Denise and Phoenix and their predecessors in title in asserting a claim to the Bodine tract bars relief against the State in quia timet. They have waited, by design or otherwise, "until their delay had put them in the best possible position and their adversary in the very worst." Id. at 339. Relying only on the presumption of validity accorded a deed recorded 125 years ago, "[t]hey seek to turn their fault into an advantage." Ibid. Although the circumstances surrounding the recording of that deed raise doubts as to its validity, the "written matter . . . endures notwithstanding the flight of time,"

ibid., while the only witnesses with the ability to explain the making of the deed, the delay in recording it, the reason Bodine's administrators determined it wasn't properly an asset of his insolvent estate, and his wife and children abandoned it, while the Corlis heirs treated it as their own, have all long since passed away. The long delay has simply deprived the court of the facts necessary to determine the truth of the matter, and thus to safely exercise its power to grant Phoenix the equitable relief it seeks.

Because Phoenix has not shown the title it acquired from the Bodine heirs to be "free from all reasonable doubt," much less that conscience requires the cancellation of the State's deeds under the circumstances, Shotwell, 24 N.J. Eq. at 387, the legal and equitable title to Properties I, II and III remains in the State, which has established the validity of its own unbroken title to those lands.[42] Accordingly, no payment is due Phoenix for the interests it acquired from the Bodine heirs.

---

[42] Because we determine Phoenix has not established its title to the Bodine tract free from all reasonable doubt, we need not address the State's alternative argument that it was a bona fide purchaser for value of Properties I, II and III. As already noted, Phoenix contends the State abandoned that claim, a point the State disputes. Because the record is less than clear on the issue and we have otherwise determined that Phoenix failed to prove its claim, we need not resolve their dispute on that point.

<u>Property IV (Block 3, Lot 18) and Property V (Block 3, Lot 19)</u>

Properties IV and V were originally part of the 4,662.89-acre tract (8,525.80 acres less exceptions) the West Jersey Proprietors conveyed to Isaiah Adams in 1859. More specifically, the parcel was part of the easterly 2,797.74-acre portion of the Adams tract conveyed to Meyer Beyer — in a deed lacking a metes and bounds description — in 1894. The State and Phoenix both trace their title to Meyer Beyer. The titles thereafter diverge.

The State traces its title to Property IV to an 1894 deed by Beyer and his wife, Mathilda, to Sam and Paulina Halpern for a fifty-acre "corridor lot" running along the easterly line of the Adams tract. The Halperns conveyed the same land two months later to Annie and Harris Saperstein. In 1896, the Sapersteins conveyed the property to Hyman Rosensohn, who conveyed twenty-six acres to Bertha Boehm in 1897 by deed recorded in Burlington County, subsequently recorded in Ocean County in 1970. Boehm, or her heirs, apparently failed to pay taxes on the property, by then identified as Block 3, Lot 18, which resulted in a tax sale foreclosure judgment in 1978 in favor of Elizabeth Anne Merring and American National Bank and Trust, co-executors of the Estate of Herbert L. Pickell. The State acquired Block 3, Lot 18 from

132

Pickell's estate in 1994. The State's chain of title to Property V is identical to that of its chain of title to Property VII, discussed <u>infra</u>.

Phoenix induced the Little Egg Harbor tax assessor to change the assessed owner of Properties IV and V from the State to Phoenix, consolidated those parcels with other lands belonging to Phoenix, and filed this action to oust the State from possession of those properties based on a 2000 deed to Denise from Robert Kaufman, individually and as trustee of K&D Land Trust. As Phoenix's title expert, Apell, explained in his initial report in this action, Phoenix's claim to Properties IV and V was based on the historic mapping error its surveyor, Schweppenheiser, claims to have discovered whereby the easterly line of Adams was actually east of where it was believed to have been, thereby placing Properties IV and V not in the Beyer "corridor" but within the Fischer tract, which tract Kaufman allegedly acquired in a Bass River tax sale in 1971 and conveyed to Denise by deed in 2000. After the State's title expert pointed out that regardless of any mapping error, Kaufman could not have acquired title to lands lying in Little Egg Harbor based on tax sale certificates

issued by Bass River, Phoenix developed a new basis for its claim to title to Properties IV and V.[43]

Conceding "it was a mistake" for him to have "ascribe[d] title to [Properties IV and V] to the Bass River tax foreclosure," Apell claimed Phoenix's title actually rested on its acquisition of "all property owned by George Kudra and his company Kupire Corp., in Little Egg Harbor via a deed and a settlement agreement with . . . Phoenix." Specifically, Phoenix now traces its title from Beyer's 1894 deed to Fischer through a series of a dozen mesne conveyances to a May 23, 1974 deed from Burlington Company Investment Corp. to "George Kudra, of 999 South Broad Street, [Trenton] as a trustee according to a deed of trust given on even date herewith," recorded in Ocean County on July 19, 1974. The deed states the land is located in Bass River in Burlington County, and the metes and bounds describe the Fischer tract, which, because it pre-dated Schweppenheiser's survey, was not then understood to include Property IV or V. Phoenix took title from Kupire,

---

[43] In its first amended complaint, Phoenix put forth yet another basis of its title to Property IV, claiming it derived from a 1993 deed to Phoenix from Pinelands Materials & Supplies, Inc. It apparently abandoned that claim in favor of one based on the Kupire deed.

without a deed from Kudra to Kupire and without the deed of trust referenced in the 1974 deed into Kudra.

Specifically, in 2005, Kudra entered into an unrecorded settlement of at least four different actions brought by Pine Island Cranberry Company against Kupire in Burlington and Ocean Counties, and one action by Phoenix against Kupire in Ocean, whereby, among other things, Kupire, agreed to convey by deed, without covenants, to Phoenix, or its designee, certain "excluded property" defined as

> [a]ll right, title and interest of Kupire Corporation in and to any lands in the Township of Little Egg Harbor, County of Ocean and State of New Jersey, including without limitation to, any land located within Block 3, Lot 9.01 on the current Tax Map of Little Egg Harbor Township.

Block 3, Lot 9.01 on the 2005 Little Egg Harbor tax map is Phoenix's consolidated lot following its annexation of the State's lands.[44]

That settlement agreement was signed on Kudra's side by his court appointed conservator, Steven P. Rotella; Kudra's wife, Kathryn M. Kudra, and

---

[44] As part of the same settlement agreement, Phoenix agreed to discharge a mortgage Kupire had given to Robert Kaufman on another property north of Properties IV and V and separated from them by another parcel, which Kaufman had assigned to Phoenix, and to dismiss a quiet title action against Kupire, which also did not involve Properties IV or V.

four of the Kudras' six children, Kathleen Kudra, Ireen Kudra-Miller, Karyn Coyne, and Tara Kudra.[45]  In addition to providing that Kupire would convey all the land it owned in Little Egg Harbor to Phoenix, the agreement also provided that Pine Island, Kupire and the Kudras would "execute and deliver to . . . Phoenix and Denise, a release of all liens, claims, encumbrances and rights they may hold or be entitled to assert against the Excluded Property" and to "execute such additional documentation as Phoenix may reasonably require to clear the Excluded Property" of such.  In accordance with the settlement agreement, Kupire provided a quitclaim deed to Denise conveying all the land Kupire owned in Little Egg Harbor, which was recorded on January 25, 2005.

In 2015, ten years after that settlement and more than three years into this case, and following Phoenix's abandonment of its claim of title to Properties IV and V through Kaufman, it demanded the four surviving Kudra children sign quitclaim deeds conveying to Phoenix the lands described in Schweppenheiser's outbound survey of Block 3, Lot 9.01, formerly known as Block 3, Lots 8, 9, 11, 12, 13, 14, 15, 16, 17 and 18 [Property IV], and Block

---

[45]  Kudra died in 2006 with a will leaving his entire estate to his wife Kathryn. Kathryn died in 2012, leaving her estate to five of the Kudras' six children. Kathryn's will appointed her daughters Kudra-Miller and Coyne co-personal representatives.

4, Lots 5, 6, 7, 8 [Property II], 8.01 [Property III], 9, 10, 11 [Property VI], part of 12 and part of 14 and also including former Lot 19, Block 3 [Property V] on the Little Egg Harbor tax maps.

Kudra-Miller testified at deposition that she had never heard of the Fischer tract and believed her father's cranberry farm, which consisted of "thousands of acres" was located in Bass River in Burlington County, not in Little Egg Harbor in Ocean County. At trial, she testified she believed some of the farm may have been located in Little Egg Harbor based on some dealings her father had with Phoenix, but she "had no idea where." While she confirmed her father was the George Kudra in the 1974 deed from Burlington Company Investment Corp. based on the office address listed on the deed, she had no knowledge of the trust referenced therein. She testified she and her sister, Karyn Coyne, only executed the quitclaim deeds because Phoenix threatened to sue them otherwise, and only after Phoenix agreed to indemnify them for any claims or losses arising out of their doing so.

As already noted, the State's title expert testified that, leaving aside the absence of any deed into Kupire, Phoenix could not establish its title to Properties IV and V because its failure to locate the trust instrument through which Kudra took title created a hole in its chain that Kudra's daughters,

137

Kudra-Miller and Coyne, could not fill as they were without authority to convey property their father had taken in his capacity as a trustee. Apell, Phoenix's expert, agreed there was a hole in Phoenix's chain "until we found the settlement agreement, which clearly indicates that Kudra and Kupire and his group and relatives entered into the settlement agreement," which "clearly indicated that Phoenix Pinelands was to get the Kupire property in Ocean County."

Pressed on how the settlement agreement cured the absence of the trust, Apell testified he had "seen many, many trusts and corporations that do not have information that's recited in the deed recorded somewhere." In such cases "[n]ormally what you do" in the case of a corporation is "you get all of the heirs of all the board members, if you can find them . . . . And the same thing would apply to a trust." Apell was forced to concede, however, that Kudra's "authority to convey this property would have been outlined in the trust agreement," and without it one cannot know whether Kudra actually had authority to convey it.

Agreeing with Apell, the trial judge found "as a trustee, Kudra heirs were beneficiaries of title and it had passed to them." He held that Phoenix obtaining title to Property IV and V from the heirs of Kudra "would be the

138

appropriate course . . . consistent with <u>Zabriskie v. Morris & Essex R.R. Co.</u>, 33 N.J. Eq. 22, 27 (Ch. 1880)," and Phoenix thereby holds legal title to Properties IV and V.  The court also concluded Phoenix possessed equitable title to Properties IV and V as a result of the settlement agreement and the deeds from the Kudra heirs, which it deemed "sufficient to award judgment [in] ejectment and <u>quia</u> <u>timet</u>," citing <u>Ferrell v. Strong</u>, 73 N.J. Eq. 242 (Ch. 1907), and <u>Atl. City R.R. Co. v. Johanson</u>, 72 N.J. Eq. 332, 333 (Ch. 1907).[46]

---

[46] <u>Ferrell</u> is a five-line decision by the vice-chancellor suspending "further proceedings in the law court" until "a decree may be had under the present bill in equity" resolving the facts "set forth in the bill disclos[ing] an estate in the lands in question," which could not be resolved in the action at law.  73 N.J. Eq. at 242.  It does not support the proposition for which it is cited, and in light of the merger of law and equity jurisdiction in a single Superior Court in the 1947 Constitution, appears to stand only as a historic artifact of our pre-1947 court system.

   <u>Atlantic City Railroad</u> likewise is a case decided before the 1947 Constitution at a time in which legal and equitable actions were relegated to separate courts in our State.  There, the vice chancellor preliminarily enjoined enforcement of a judgment obtained after trial in the supreme court against the plaintiff railroad, ejecting it from land over which it had operated a steam train for twenty-five years, which judgment had been affirmed by the Court of Errors and Appeals.  <u>Atl. City R.R. Co.</u>, 72 N.J. Eq. at 332.  The preliminary injunction issued based on the railroad's averment that it laid the track over the lands of defendant Johanson's predecessor in title at the predecessor's behest and agreement to deed the land to the railroad, but had never been given the deed.  <u>Id.</u> at 333-35.  Accepting the railroad's averments as true for purposes of the application, the vice chancellor held the railroad stated a claim of equitable title, which would "entitle it to the protection of a court of equity and of which

Based on the Schweppenheiser mapping error, the judge also found the State's predecessors in title never owned Properties IV or V, notwithstanding their deeds or, as to Property IV, the 1978 tax sale foreclosure through which the State's immediate predecessor, Pickell, acquired title to Lot 18, Block 3, Property IV.

Having reviewed the record, we find the trial court clearly erred in finding Phoenix established legal or equitable title to Properties IV and V. This was not a quiet title action in which Phoenix could sit back and rely on the weakness in the State's title it claimed existed as a result of the historic mapping error alleged by Schweppenheiser. See Toth, 1 N.J. at 405-06; Fittichauer, 70 N.J. Eq. at 435-36; McGrath, 70 N.J. Eq. at 364-66. Phoenix's quiet title action was dismissed by Judge Buczynski, an order Phoenix has not

_____

it could not have availed itself as a defence in the action of ejectment" by the owner of the legal title in the prior action in the law court. Id. at 333.

The case thus does not stand for the proposition that equitable title is sufficient to establish title in ejectment — but actually just the opposite. The railroad was ousted from the land to which it claimed equitable title, a decision affirmed by the State's then-highest court, Johanson v. Atl. City R.R. Co., 73 N.J.L. 767, 768 (E. & A. 1906), because "[a]n equitable estate of the character named is not available as a defence to an action of ejectment by the owner of the legal title." Atl. City R.R. Co., 72 N.J. Eq. at 335; see also Jason v. Johnson, 74 N.J.L. 529, 531 (E. & A. 1907) ("It is unnecessary to say that in an action of ejectment the plaintiff must succeed, if at all, upon the strength of his legal title. An equitable title is not sufficient.").

140

appealed. As already noted, Phoenix's burden in its quia timet and ejectment action was to establish its own paper title "free from all reasonable doubt," Shotwell, 24 N.J. Eq. at 387, and to "recover upon the strength of [its] own title," not "rely[ing] upon the weakness of that of [its] adversary," Troth, 68 N.J.L. at 37.[47]

Phoenix conceded there was a link missing in its chain of title from Kudra, who took the 1974 deed from Burlington Company Investment Corp. "as a trustee according to a deed of trust given on even date herewith." Phoenix relies on the 2005 deed to Denise from Kupire to support its claim to title. But there is no recorded deed from Kudra to Kupire. Moreover, without

---

[47] In its brief on appeal, Phoenix asserts the State bears the same burden, setting up a battle over "paramount" title to each parcel. It is certainly true the State pressed claims against Phoenix in quia timet and ejectment and thus bears the burden of proof on those affirmative claims. And although Phoenix is correct that Judge Buczynski also dismissed the State's quiet title claim, he did so because Phoenix's suit was already pending when the State asserted its quiet title counterclaim, see N.J.S.A. 2A:62-1, not because the State couldn't establish its peaceable possession. Those different reasons for the dismissal of the parties' quiet title claims are critical here. Judge Buczynski found Phoenix's acts of attempted dominion over the State's parcels by posting signs and cutting fire lanes, having Denise surreptitiously made the assessed owner and paying taxes on the parcels for five years, did not demonstrate "peaceable possession of the property" but instead acts "adverse to somebody who is in peaceable possession of the property." So even in the event the State could not establish its paper title, which we find is true only as to Property VI, discussed infra, it "will retain possession until [it] is ousted by someone who has a superior title." Troth, 68 N.J.L. at 37.

the deed of trust, there is no way of knowing, as Phoenix's expert was forced to

concede, whether the trust granted Kudra the power to convey the property to

Kupire, or anyone else.  While Phoenix's expert analogized the situation to one

involving a defunct corporation, where statute permitted surviving directors to

act as trustees to convey corporate property in the process of winding up its

affairs, see N.J. Rev. Stat. §  14:13-4, superseded by N.J.S.A. 14A:12-9

(1968), he did not cite any case or statute supporting his position that "the

same thing would apply to a trust," and the case the trial judge relied on,

Zabriskie, does not support it.[48]

In asserting the court should overlook the hole in its chain of title,

Phoenix overlooks it created the gap by its own acts.  Denise ostensibly took

---

[48] Zabriskie involved an implied testamentary trust under the decedent's will. 33 N.J. Eq. at 23.  Following the death of the last survivor of the decedent's executors, the implied trust remained obligated to pay the income to the decedent's children, whether earned through rents or, upon sale of the land, the reinvestment of the proceeds.  Id. at 26-27.  The last survivor having not conveyed the land, the chancellor held "[b]y law his estate therein descended to his heir at the common law, his eldest son," who could thus convey the land, and discharge the continuing obligations to the decedent's heirs.  Id. at 27.  The obvious difference between Zabriskie and this case is there the chancellor's decision that the real property expressly devised to the decedent's children necessarily passed to the trustee in fee, and on his death to his eldest son, in order to carry out the testator's intent, rested on the chancellor's examination of the terms of the trust implied in decedent's will.  Zabriskie provides no guidance for how a trust no one can find should be interpreted.  The case simply has no applicability to the matter at hand.

142

title from Kupire, which never appears to have held title to Properties IV or V. Neither the settlement agreement nor the 2005 deed from Kupire to Denise represented otherwise. Indeed, the settlement agreement did not involve Properties IV or V in any fashion. Phoenix presented absolutely no proof at trial that Kupire possessed title to Properties IV and V in 2005 or at any other time. Certainly a reasonable title search in 2005 would have readily revealed Kupire had no title to either Property when it issued its quitclaim deed to Denise. See Glorieux, 88 N.J.L. at 203 (holding a purchaser "is bound to examine his own title or take the risk of not doing so"). Accordingly, Denise did not, and could not, acquire legal title to Properties IV and V by its 2005 deed from Kupire.

As the settlement agreement did not address Properties IV or V, it is difficult to understand why the trial court found it conferred equitable title on Denise. Our courts have long held that on execution of "an executory agreement for the sale of lands, the purchaser becomes the equitable owner of the lands." Delancey & Stockton Corp. v. Reliable Improvement Co., 134 N.J. Eq. 71, 75 (E. & A. 1943). The "doctrine is an application of the maxim that equity regards as done what ought to be done, Pomeroy, § 368, and on it specific performance mainly depends." Delancey & Stockton Corp., 134 N.J.

Eq. at 75. But Kupire executed and delivered the deed required by the settlement agreement, making Denise not only the equitable owner of the lands Kupire held in Little Egg Harbor, but the legal owner as well. Denise's problem was not that Kupire failed to convey the land it agreed to convey in the settlement agreement, it's that Kupire didn't own Properties IV or V.

Although Apell testified the settlement agreement "indicated that Phoenix Pinelands was to get the Kupire property in Ocean County," Phoenix now claims the settlement agreement also entitled it to any lands the Kudras owned in Little Egg Harbor. But the Kudras and Pine Island only agreed to "a release of all claims, encumbrances and rights they may hold or be entitled to assert against the Excluded Property," defined, not as all lands in Little Egg Harbor, but as "[a]ll right, title and interest of Kupire Corporation" in any lands in Little Egg Harbor, and to "execute such other and further documents as Phoenix may reasonably require in connection with conveyance of the Excluded Property." The "Excluded Property" is plainly limited to Kupire's property in Little Egg Harbor. Further, Phoenix and Denise acknowledged in the agreement that the property descriptions were not prepared by Kupire or the Kudras. Thus, the agreement, by its plain language, only requires the Kudras, like Pine Island, to release any claims they have to property owned by

Kupire in Little Egg Harbor, which, as Phoenix necessarily concedes, did not include Properties IV or V. It did not obligate them to convey land the family might otherwise own in the Township.

Moreover, even if, as Phoenix asserts, the settlement agreement also evidenced an agreement by the Kudras to release any rights they had to any property in Little Egg Harbor, not just to any claims or rights they might have to Kupire's property there, Phoenix would have to establish the Kudras possessed title to Properties IV and V with the power to convey it in order to establish a claim of equitable title. "Specific performance of a contract to convey realty . . . will not be granted where the vendor shows a complete failure of title." Robinson-Shore Dev. Co. v. Gallagher, 26 N.J. 59, 72 (1958). The "rule comes within the general doctrine that a court of equity will not compel a party to a contract to perform that which is impossible." Ibid. Thus, even reading the settlement agreement as Phoenix does, a reading clearly at odds with the document, it does not establish Phoenix's equitable title because Phoenix failed to produce the trust instrument through which Kudra took title to the land in 1974, and thereby failed to establish that George Kudra possessed title to Properties IV and V with the power to convey it.

Significantly, when Phoenix took its deed from Kupire in 2005, Kudra was still living and available to produce the trust under which he took title to the property in 1974 or explain its terms and identify its beneficiaries. Relief could have been sought from the chancery court at that time, if necessary, to establish Kudra's right to convey or otherwise relinquish title to the property. See N.J.S.A. 2A:16-55; In re Trusteeship of Sotnikoff, 34 N.J. Super. 422, 425-26 (App. Div. 1955); R. 4:83. Having failed in its duty of inquiry to confirm Kudra possessed the power to convey or relinquish the property, Phoenix cannot hope to cure its dereliction now by taking quitclaim deeds from indirect heirs of the trustee with no knowledge of the terms of the trust, even if the settlement agreement required the heirs to give such deeds, which it clearly does not.[49] Thus, neither the deeds from the Kudra heirs nor the

---

[49] In his 1957 article in the Rutgers Law Review, "The New Jersey Recording Act — A Study of its Policy," cited by the Court in Palamarg, 80 N.J. at 453, 458 n.8, Donald Jones addressed the problem presented by references in old deeds indicating "the grantee is holding title in a fiduciary capacity" and "there is no recorded instrument in which the powers, duties and restrictions of the alleged fiduciary are set forth." 12 Rutgers L. Rev. at 353-55. Jones argued that putting any purchaser beyond the one taking title from the fiduciary to "the burden of inquiry outside of the record as to the existence, terms, and conditions of an unrecorded trust instrument indicated by a recital in a recorded instrument, would be in direct conflict with the policy of the Recording Act" and "would impose a burden upon purchasers and mortgagees from one generation to the next to make repeated, and often fruitless, inquiries

settlement agreement furthers Phoenix's cause or establishes even a right to equitable title to Properties IV and V under the circumstances, much less legal title to those lands.

Because Phoenix has failed to establish its title to Properties IV and V, the State remains in possession, free from any claim by Denise or Phoenix. See Troth, 68 N.J.L. at 37. We are also satisfied the State has established its title to Property IV and V without regard to the mapping error allegedly discovered by Schweppenheiser in the course of preparing Denise and Phoenix's lot consolidation. Our reasons are two-fold.

First, Phoenix does not dispute that the State presented an unbroken chain of title to Properties IV and V back to the Proprietors. Phoenix's attack

_____

as to the nature and terms of such instrument." Id. at 354. Jones wrote that a buyer taking title from a trustee pursuant to an unrecorded trust instrument could assume his seller "has the power to receive and hold the property as trustee; he cannot, however, assume [his seller] has the power to convey as trustee, and therefore is under a further duty to inquire from [his seller] as to the terms and present status of the trust." Ibid. Jones thus advocated for putting the onus on the purchaser taking title from the fiduciary to make certain his seller had the power to convey as trustee, and letting future bona fide purchasers for value without notice "conclusively presume" in the absence of a recorded trust, "that the first purchaser [from the fiduciary] performed his duty of inquiry; found that [the trustee] was acting within his proper powers in making the conveyance; and that there was no recordable trust instrument in existence." Ibid. The practical policy Jones advocated would not assist Phoenix here, precisely because it failed in its duty of inquiry in taking title in 2005.

on the State's title, and the trial judge's rationale for declaring the State lacked title to Property IV and Property V, the latter of which we will address further in our discussion of Property VII, rested entirely on the mapping error allegedly discovered by Schweppenheiser nearly ten years after the State purchased Properties IV and V.

The State purchased Property IV, a seven-and-a-half-acre parcel, in 1994 from the executors of the Estate of Herbert Pickell, who had obtained the Property in a 1978 tax sale judgment foreclosing the right of redemption of the assessed owner, Bertha Boehm, and all those claiming under her, for failure to pay the taxes on the parcel designated as Block 3, Lot 18 on the Little Egg Harbor tax map. Phoenix claims the interests of its predecessors in title were not extinguished by that foreclosure because the certificate holder, Pickell, failed to name as defendants those persons in the Fischer chain that the mapping error might suggest had an interest in the property. See N.J.S.A. 54:5-91. Leaving aside that collateral attacks on decades-old tax judgments are not generally permitted, see O & Y, 120 N.J. at 457; Reaves v. Egg Harbor Twp., 277 N.J. Super. 360, 364-65 (Ch. Div. 1994), neither Phoenix nor Denise has standing to attack that judgment as we have determined they have no interest in Property IV. See Reaves, 277 N.J. Super. at 366-67.

Further, in asserting the Pickell foreclosure failed to cut-off the interests of those in the Fischer chain of title, Phoenix did not address, and the trial court did not consider, the effect of an after-discovered error in a municipal tax map on a tax title, which is considered "a new and independent grant from the sovereign" that is "established upon the assessment," and thus "[i]n the quantity and character of the property conveyed . . . embraces nothing more or different than did the basic assessment." S.R.H. Corp. v. Rogers Trailer Park, Inc., 54 N.J. 12, 15 (1969) (quoting Metro. Life Ins. Co. v. McGurk, 15 N.J. Misc. 572, 574 (Cir. Ct.), aff'd, 119 N.J.L. 517 (E. & A. 1937)).  Because neither party briefed the issue on appeal, we do not consider whether Schweppenheiser's opinion that the 1959 Little Egg Harbor tax map mis-located Properties IV and V could affect the tax sale judgment vesting title to Block 3, Lot 18 (Property IV), a new and independent grant established on the assessment, in the executors of Pickell's estate.

Second, in declining to consider the issue, we are also mindful of the implications this alleged mapping error, if generally accepted, might have for other land titles in the area, because it places more of the Fischer tract in Little Egg Harbor, and thus in Ocean County, instead of in Bass River and Burlington County than previously understood.  Owners of affected lands not

before the court may have different views. There is also the obvious fact that this survey was done as part of Denise and Phoenix's unlawful efforts to annex the State's lands by surreptitiously wiping the State's holdings off the municipal tax map,[50] and the long history of questionable surveys in the Pinelands.[51] Vice Chancellor Pitney chronicled "the well-known practice" that "prevailed in West Jersey for so many years in making proprietary surveys" in McCullough v. Absecon Beach Land & Imp. Co., 48 N.J. Eq. 170, 191-92 (Ch. 1891).

> It is a matter of history that many of those surveys, when run by the monumental calls, contained several times as many acres as they called for and as their strict courses and distances would include. The proprietors were, by this means, defrauded of vast quantities of land, it being uniformly held by the courts that the monuments must govern. They finally

---

[50] Schweppenheiser, the surveyor who "discovered" the mapping error, testified under oath at deposition that he was aware of the State's ownership of the parcels because they bore the legend "exempt – NJDEP" on the Little Egg Harbor tax map, although he didn't remember that at trial, saying it had "been too long" to recall.

[51] The Director of the State Archives has noted that "[e]arly land descriptions in West Jersey are known to use 'chain' to mean a measure of two rods (thirty-three feet) as opposed to four rods" or sixty-six feet, the typical measure. Joseph R. Klett, Using the Records of the East and West Jersey Proprietors, New Jersey State Archives, 26 (2014), https://www.nj.gov/state/archives/pdf/proprietors.pdf. We have no way of knowing whether Schweppenheiser considered such anomalies in concluding that previous surveys of the Adams tract contained a mapping error.

150

refused to act upon any survey which called for more than one monument, and that must be the beginning point. Instances of these surveys are found in Lippincott v. Souder, 8 N.J.L. 161 (Sup. Ct. 1825); Curtis v. Aaronson, 49 N.J.L. 68 (Sup. Ct. 1886); and Justice Ford refers to them in Corlies v. Little, 14 N.J.L. 373, 374 (Sup. Ct. 1834).

Having considered all these matters, we think it best we withhold any endorsement of Schweppenheiser's mapping error that it might be litigated in the future, if necessary, by parties having a real interest in the controversy.

Property VI (Block 4, Lot 11)

Property VI was originally part of the 4,662.89 acre Adams tract, and a part of the easterly 2,797.74 acre portion conveyed to Meyer Beyer in 1894. The Property is also one of the several "corridor lots" the Beyers created along the easterly line of the Adams tract, although not one affected by the alleged mapping error discovered by Schweppenheiser. The State purchased Properties V, VI and VII in 1994 for $95,388 by one deed from Continental Searchers and the Estate of Wolf Herskowitz, describing each of the three tracts by metes and bounds as well as Block and Lot designations. Specifically, Tract I of that deed describes Property V, Block 3, Lot 19 on Little Egg Harbor's tax map before its alteration at Phoenix's behest, a lot of less than half an acre. Tract II is Property VI, a sixty-six acre lot designated as

Block 4, Lot 11 on that tax map; and Tract III, an almost fifty-three acre lot, is Property VII, designated as Block 4, Lot 13.  In addition to the deed, the State received an affidavit of title from Williams Gibbs, the trustee of the Herskowitz Estate, attesting to the Estate's ownership of all three tracts.

The Estate claimed to have acquired its title by way of an April 27, 1894 deed from the Beyers to Isadore Milkenstein for a 150-acre tract described by metes and bounds.  Milkenstein and his wife, Rosa, conveyed the same property three months later to Wolf Herskowitz, the latter deed being recorded on October 26, 1900, in Burlington County.

Continental Searchers, Inc. obtained its interest in Properties V, VI and VII by way of a 1983 final judgment by consent against the Herskowitz Estate awarding Continental Searchers fifty percent of the same property described in the Beyer to Milkenstein and Milkenstein to Herskowitz deeds to be held as tenants in common.  Ten years later, Continental Searchers and the Estate of Herskowitz took a quitclaim deed from Robert Kaufman, individually and as Trustee of K&D Land Trust for the same property described in the Continental Searchers 1983 final judgment, only excepting that portion designated as

Block 4, Lot 12 in Little Egg Harbor.[52]  The deed further described the

property conveyed as "known and designated on the Tax Map of the Township

of Little Egg Harbor as Lot 19 in Block 3 and Lots 11 and 13 in Block 4."

After suit was filed, however, the State was forced to concede that

notwithstanding the explicit conveyance of Block 4, Lot 11 (Property VI) in

both the Kaufman and Continental Searchers/Estate of Herskowitz deeds,

neither grantor could establish title to Property VI, and thus the State's title to

that Property could not be traced further than those two deeds.  Simply stated,

the metes and bounds descriptions in the Beyer to Milkenstein and Milkenstein

to Herskowitz deeds, while sound as to Properties VII and V,[53] do not include

---

[52]  Block 4, Lot 12 is not, apparently, included in the description, and thus
there was no need to except that parcel.  The State's title expert, Grabas,
posited that Kaufman took deeds in 1969 from the Beyers' heirs in an effort "to
acquire any possible outstanding interest left vested in the Estate of Meyer
Beyer pursuant to the 1893 deed from The Central Trust & Title Co. recorded
in Ocean County" on November 22, 1893, conveying 6/10ths interest to the
entire 4,662.89-acre Adams tract to Meyer Beyer.  The 1993 quitclaim deed
Continental Searchers and the Estate of Wolf Herskowitz took from Robert
Kaufman in Grabas' view "undoubtedly extinguishe[d]" any interests Kaufman
may have acquired by the deeds from the Byers' heirs as well as any rights
Kaufman or K&D Land Trust, the assessed owner of Properties V and VII
since 1970, may have acquired "through payment of taxes and purchase of Tax
Sale Certificates."

[53]  Phoenix's title expert, Apell, explained in his initial report that the half-acre
lot designated as "Block 3, Lot 19 [Property V] was intended to represent the

A-2823-16

Block 4, Lot 11 (Property VI).  The State's experts conceded as much in their

reports and at deposition.  The State defended against Phoenix's motion for

summary judgment in ejectment by arguing it was a bona fide purchaser for

value, and that a reasonable search would not have revealed Phoenix's chain of

title in Ocean County.

Phoenix traces its title to an 1894 deed for a 100-acre "corridor lot" from

the Beyers to Berman Herrman and Leon Kolmer, recorded in Burlington

County after Little Egg Harbor's transfer to Ocean County.  In 1908, Herrman,

Kolmer and their wives conveyed the same property to George Orlov in a deed

---

western edge of the Milkenstein Tract (Block 4, Lot 13) [Property VII]."  He
maintained "[t]he Milkenstein Tract devolved as an entire tract and therefore
the owner of the Milkenstein Tract would own both Block 4, Lot 13 [Property
VII] and Block 3, Lot 19 [Property V]."  Apell asserted that because Phoenix
had title to Property VII by way of the Schell deed, discussed infra, Phoenix
"is also the owner of the lands formerly designated as Block 3, Lot 19
[Property V] on the Little Egg Harbor Tax Map as a result of the conveyance
from the heirs of Schell into David Denise and the Denise deed" to Phoenix.
Apell further contended "[w]hen the eastern boundary of the Meyer Beyer
corridor is properly located" per Schweppenheiser, "the Milkenstein Tract
(Block 4, Lot 13 and Block 3, Lot 19) [Properties VII and V] should have
properly extended west only to Cervetto Road," which "[u]nder those
circumstances, there would have been no need to create a Block 3, Lot 19
[Property V] (as it is only the remainder of the Milkenstein Tract west of
Cervetto Road)."  In that event, Apell claimed Phoenix would have acquired
title to Property V through Kaufman, which, as already explained, he
subsequently abandoned in favor of his contention that Phoenix took title
through Kudra, a claim we have rejected.

likewise mis-recorded in Burlington County. Six months later, in a deed also mis-recorded in Burlington County in February 1911, Orlov and his wife conveyed "the most northerly strip" of the same parcel to Alexander Assuschkovitz divided into 114 lots, twenty-five feet wide by 100 feet deep. The location of the lots is not otherwise identified. Orlov apparently made no further conveyances of the property.

In 2000, well aware of the State's recorded deed to Block 4, Lot 11 (Property VI), Denise began a search for Orlov heirs, none of whom knew of the property, and negotiated to purchase their fractional interests. Phoenix represents Denise paid $65,943 for 97.5 percent of the outstanding interests of the heirs in ten deeds, the last received in 2012, after the filing of this action.

The dispute on summary judgment was whether a reasonable search would have alerted the State to the Herrman and Kolmer chain of title. Although initially agreeing with the State that Phoenix's chain of title was non-existent in Ocean County, Apell in a supplemental report noted "[u]pon further research," that the 1894 deed from Beyers to Herrman and Kolmer was recorded in Ocean County on July 6, 1971. Apell contended that "title searching custom would require a diligent title search be conducted going back to the Board of Proprietors in the records of both Ocean County and

Burlington County with respect to the properties at issue located within the Isaiah Adams tract," and that doing so "would have revealed the title from which Phoenix's chain of title devolves." Grabas acknowledged a search that complete would have revealed the deeds Phoenix relied on but disputed that such a search was reasonable or customary, especially as the State's chain of title was complete in Ocean County for one hundred years when it purchased Property VI. He maintained a search to the Proprietors required complicated title research that is very difficult and prohibitively expensive.

The judge found the State "had notice of Phoenix's title through the Burlington recording," thus presumably accepting Phoenix's position that a reasonable search would have required searching the records in both Burlington and Ocean Counties back to the Council of Proprietors. As the Supreme Court observed in Palamarg, "the art of title searching, upon which so much of our conveyancing practice rests, has been created in very large part without the aid of legislation and has received little attention in judicial decisions." 80 N.J. at 461. Although acknowledging "the custom of title searchers and conveyancers in New Jersey to search a title only for sixty years

and until a warranty deed is found in the chain of title,"[54] the Court declined in that case to "adopt the custom of conveyancers and make the sixty-year search convention a rule of law," recognizing the "potentially far-reaching effects" of doing so. Id. at 460.

We do not believe the question of what would be a reasonable search in this instance should have been decided on summary judgment. The State denied Phoenix's contention that a reasonable search required searching both counties after their separation in 1891. That position is in accord with the general rule that a mis-recorded document does not provide record notice. See Hadfield v. Hadfield, 128 N.J. Eq. 510, 513-14 (E. & A. 1941) ("The recording of an instrument in its proper book is fundamental to the entire idea and scheme of constructive notice through the records."); 1 Fineberg, Handbook of New Jersey Title Practice § 702A at 7-6 n.3 ("Instruments must be recorded in the county where the land they affect is located in order to impart constructive notice."); N.J.S.A. 46:21-1, 46:22-1, repealed by P.L. 2011, c. 217, N.J.S.A. 46:26A-12 (2012).

---

[54] One commentator suggests that because the use of warranty deeds "has been steadily declining in New Jersey, the term 'warranty deed' is best understood in this context as referring to a deed to a bona fide purchaser for value, regardless of the precise form of instrument employed." 1 Fineberg, Handbook of New Jersey Title Practice § 804 at 8-3.

The snippets of expert testimony referenced on the motion and included in the appendix are simply insufficient to allow an understanding of the search a competent searcher would deem reasonable in these circumstances. We are not provided, for example, with the experts' opinions as to whether a competent searcher undertaking a reasonable search of the title to Property VI in 1994 needed to have searched for, or would be on notice of, the 1894 Beyers to Herrman and Kolmer deed that Phoenix's expert found "[u]pon further research" was recorded in Ocean County in 1971.

We note, again, that the record makes clear that neither title expert in this case actually searched these titles. Both only reviewed the title work Sharkey compiled over more than a decade of researching these titles and those of the rest of the Adams tract. Judge Wells deemed the Adams tract, and particularly the 2,797.7-acre easterly portion conveyed to Beyer as "a title nightmare." Hyland, 204 N.J. at 354. The question is not whether these deeds could be found, particularly after someone else had already located them after years of searching, it's whether they would be found by a competent searcher conducting a reasonable search of the title. See Palamarg, 80 N.J. at 456 (noting a "subsequent purchaser will be bound only by those instruments

which can be discovered by a 'reasonable' search of the particular chain of title").

In that regard, we note the self-serving nature of the assertion of Phoenix's expert that "title searching custom would require a diligent title search be conducted going back to the Board of Proprietors in the records of both Ocean County and Burlington County with respect to the properties at issue located within the Isaiah Adams tract." Denise testified at deposition that he'd spent over $1 million searching these titles over the better part of twenty years. Judging from what the State paid for the properties, that would represent several times their market value. We would be loath to endorse a standard that many might deem commercially unreasonable or one that could possibly render vast swathes of the Pinelands either unmarketable or available only to those willing to spend more on searches than on the land.[55] Accordingly, we express no opinion on what would constitute a reasonable

---

[55] See Jones, 12 Rutgers L. Rev. at 330 (noting "[i]nasmuch as [record] title can only be established by a search of the records, it follows that the stated policy [of the Recording Act] requires that this search be one which can be made within the bounds of reason, both as to time and expense, bearing in mind that what is reasonable under the circumstances existing in one generation may be unreasonable under those existing in a subsequent generation").

search of title within the Isaiah Adams tract and do not endorse the trial court's opinion on the issue.

Instead of basing our decision on whether a reasonable search undertaken at the time the State purchased Property VI would have revealed the roots of Phoenix's title, which we believe the record inadequate to determine, we focus on the absence of any root of title to the Property in the State's chain.  A simple comparison of the property descriptions in the two deeds the State took in 1994 from Continental Searchers and the Herskowitz Estate and Kaufman with the Beyer to Milkenstein and Milkenstein to Herskowitz deeds would reveal the Beyers did not convey Block 4, Lot 11 (Property VI) to Milkenstein and he did not convey Property VI to Herskowitz.

We are satisfied the State has no title to Property VI and Phoenix established its title to that parcel free from any reasonable doubt.  But Phoenix "having acquired [that] title under 'circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same.'" Bron, 42 N.J. at 96 (quoting Pomeroy, § 1053 at 119).  Accordingly, the State is equitably entitled to Property VI upon payment to Phoenix of the sum of

160

$65,943, the sum Denise paid to acquire it, plus simple interest at the Cash Management Fund Rate from the date of Phoenix's final payment to the Orlov heirs.

Property VII (Block 4, Lot 13)

Resolving the parties' dispute over title to Property VII involves simply a legal question of the interpretation of the 1910 deed from Wolf Herskowitz to Samuel Schell, which we review de novo. See State v. Quaker Valley Farms, LLC, 235 N.J. 37, 55 (2018) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Both the State and Phoenix trace their titles to Property VII, a fifty-three-acre tract formerly known as Block 4, Lot 13 on the Little Egg Harbor tax map before Phoenix's changes, to the larger 150-acre tract located in both Bass River and Little Egg Harbor that the Beyers conveyed to Isadore Milkenstein in 1894 and Milkenstein and his wife Rosa conveyed two months later to Wolf Herskowitz. They are not only in accord on those deeds, but also agree that Herskowitz and his wife Sarah delivered a deed to Samuel Schell, dated November 1, 1908, and recorded on February 28, 1910 in Burlington County. What they disagree on is whether Herskowitz deeded the entire 150-acre parcel to Schell or only ten acres of it.

The Herskowitz to Schell deed begins by identifying the parties and the one dollar consideration, and then states it conveys "[a]ll ten acres of the 150 acres of land, situated, lying and being in the Township of Bass River, in the County of Burlington, in the State of New Jersey." The deed next immediately reiterates that the conveyance "[c]ontain[s] 10 acres of land." It goes on to explain the land conveyed is "a portion of" the 4,662.89-acre tract returned to Isaiah Adams, "more particularly described" in the survey recorded in the Surveyor General's Office in Burlington County. The deed further states the "[t]ract of ten acres includes usual allowances for highways [b]ounded and contained as follows," and then provides: "To wit: A part of this ground are the ten acres beginning at a point South 28.40 west 28 chains and 40 links[56] from the 16th corner of the original survey," and proceeds to repeat the description in the Milkensteins' deed to Herskowitz conveying the entire 150-acre tract.

The State and Phoenix also agree that in April 1910, two months after the Schell deed was recorded, Herskowitz conveyed Property VII to his

---

[56] The correct distance is 82 chains and 40 links. The parties agree the same transposition error appears in the Milkenstein to Herskowitz deed and is likely a scrivener's error simply repeated in the Schell deed. The error was corrected in the deed Herskowitz gave to Perlman in 1910.

brother-in-law, Abraham Perlman, as collateral for a debt. That deed was immediately recorded in Burlington County and states that it conveys the entire 150 acres, using the same description as in the Milkenstein to Herskowitz and Herskowitz to Schell deeds, "excepting ten acres of said parcel heretofore sold and conveyed by the parties of the first part to Sam Schelies." Perlman and his wife, Pauline, the following year conveyed the 150 acres back to Herskowitz, again "excepting ten acres of said parcel or tract of land, heretofore sold and conveyed by the parties of the first part to Sam Schelies." The Perlman to Herskowitz deed is dated October 5, 1911, and was recorded in Burlington County on January 4, 1912.

Both parties' experts agreed at trial that there is no way to locate the ten acres conveyed to Schell within the larger 150-acre Milkenstein tract and thus no way of knowing whether it is contained somewhere within the fifty-three acres of Property VII.

In interpreting the deed, the trial judge looked for guidance to Bellisfield v. Holcombe, 102 N.J. Eq. 20, 21-23 (Ch. 1927), which involved the construction of an agreement between two brothers — pharmacists — providing for a life insurance policy payable to their wives in lieu of any claim

163

the wives might have had to the partnership property on death of one of the

brothers.  The trial judge quoted the chancellor, who noted

> [i]t is a primary canon of construction of contracts that
> all the rules are subordinate to the leading principle
> that the intention of the parties is to be collected from
> the entire instrument and must prevail, unless it is
> subversive of some established rule of law; and that in
> the case of ambiguity the court may resort to proof of
> the circumstances under which the contract was made,
> to aid in ascertaining such intention.
>
> [Id. at 27.]

The recital in the Bellisfield agreement — that the contract was made for the

purpose of providing for the widow of either brother in case of his death with

the proceeds of the insurance policy — was clear, but the operative part of the

agreement inconsistently stated that on one partner's death, an account of the

partnership was to be made and any sum remaining to the deceased partner was

to be paid to his wife.  Id. at 23.

The chancellor in Bellisfield acknowledged the English rule

> applicable to the construction of instruments of
> writing; that if the recitals are clear and the operative
> part is ambiguous, the recitals govern the construction;
> and that if the recitals are ambiguous and the operative
> part is clear, the operative part must prevail; and if
> both the recitals and the operative part are clear, but

they are inconsistent with each other, the operative
part is to be preferred.

[Id. at 29-30.]

He found, however, that although the operative part of the brothers' agreement

might be considered clear if standing alone, it could only be deemed

ambiguous in context because so "totally foreign to the recitals." Id. at 30-31.

"The result," the chancellor concluded, was that the operative portion "must be

treated as surplusage; and the construction of the instrument according to the

true intent and meaning of the parties must be rested upon the recitals part

only." Id. at 31.

Despite looking to Bellisfield, and finding the Schell "deed describes a

probable intent to convey 10 acres,"[57] the trial judge relied on Apell's opinion

---

[57] The judge explained that "Apell described the conflict within the deed as
one of probable intent versus actual intent." Apell testified the references to
ten acres in the deed in his opinion had "very little significance since it doesn't
indicate where the ten acres is, and we have a metes and bounds description
here." Apell asserted that "all of the real estate treatises, the court cases such
as Jefferson v. Davis, [25 N.J. Super. 135 (Ch. Div. 1953)] and even boundary
books on surveying all clearly indicate that if there are two types of
descriptions, one being a metes and bounds and the other being approximate
acreage, that the metes and bounds would control." He claimed "[i]f you
cannot tie the intent to a specific description, then I think it's probable intent,
not actual intent." He agreed with the statement that Herskowitz's actual
"intent was to convey 150 acres" despite that the deed specifically referenced it
conveyed only ten acres four times.

that the metes and bounds description in the deed, which describes the entire

150-acre tract and not ten acres, "should be given effect over the more general

reference to the number of acres conveyed."  Stating it was applying "the rule

in [Bellisfield v.] Holcombe," the court found it "clear that in the instant case,

the operative part of the deed should control."  The judge reasoned that "even

after consideration of all the surrounding circumstances, neither the 10 acres

nor the 140 acres remaining in Herskowitz could be located and plotted."  The

judge pronounced it "clear, therefore, that the intent expressed in [the] recital

differs from the operative part of the deed, and the two cannot be reconciled."

Acknowledging the Perlman deed, "arguably resolv[ed] the issue of what

was probably intended to be conveyed to Schell," the court declined to give

that deed any significant weight in divining the intent in the Herskowitz to

Schell conveyance, because "the Perlman deed was not an actual conveyance"

but only "a security interest offered as a mortgage to secure a loan from

Perlman to Herskowitz."[58]  The judge further noted the Perlman deed didn't, in

_____

[58] Although use of "defeasible" deeds to secure loans appears a not uncommon
practice near the time when these deeds were exchanged, see Kline v.
McGuckin, 24 N.J. Eq. 411, 413-15 (Ch. 1874), we have not unearthed any
case suggesting the language of such a deed should be construed differently
from that of an absolute deed.  That is, perhaps, not surprising as the
defeasance could be established by parol evidence, see Vandegrift v. Herbert,

any event, resolve the conflict between the recital and "the operational section of the [Schell] deed provid[ing] a metes and bounds description for 150 acres." The judge resolved the conflict by rejecting what he deemed to be Herskowitz's "probable intent" to convey only ten acres, instead relying on Apell's testimony that "the specifics of the operational section controls," and thus that the "Schell deed conveyed 150 acres, and the 10 acres should be discarded." The judge found to do otherwise "would . . . work an injustice on the [recording] system."

Having reviewed the record, it is clear to us the unambiguous intent of the Herskowitz to Schell deed, subsequently reflected in the Herskowitz to Perlman deed, was to convey only ten acres to Schell, not the entire 150-acre tract, and that plainly expressed intent is controlling. See Normanoch Ass'n v. Baldasanno, 40 N.J. 113, 125 (1963) (instructing "the prime consideration in determining the meaning of the basic title instruments is the intention of the parties"). We have no quarrel with the court's reliance on Bellisfield, only we believe applying its holding mandates the rejection of the operative description

---

18 N.J. Eq. 466, 469 (Ch. 1867), making a defeasible deed indistinguishable on the record from an unconditional conveyance, which, of course, it would become in the absence of a deed of reconveyance on satisfaction of the debt.

167

of the entire 150-acre parcel because it is "totally foreign to the recitals." 102 N.J. Eq. at 30-31.

Bellisfield stands for the proposition that "[i]n construing a contract the cardinal rule is to ascertain the intention of the parties." Id. at 26. More modern authority is in accord. See Boylan v. Borough of Point Pleasant Beach, 410 N.J. Super. 564, 569 (App. Div. 2009). As we explained in Borough of Princeton v. Bd. of Chosen Freeholders of County of Mercer, "[T]he court's goal is to ascertain the 'intention of the parties to the contract as revealed by the language used, taken as an entirety, . . . the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain.'" 333 N.J. Super. 310, 325 (App. Div. 2000) (quoting Cruz-Mendez v. ISU/Insurance Servs., 156 N.J. 556, 570-71 (1999)), aff'd, 169 N.J. 135 (2001). The document is to "be read as a whole, without artificial emphasis on one section, with a consequent disregard for others. Literalism must give way to context." Ibid.; Boylan, 410 N.J. Super. at 569 (noting "in the absence of extrinsic evidence, the court must determine a dispute concerning title by construing the deed as a whole, without giving disproportionate emphasis to any individual part of the document"). Finally, and perhaps most important, the interpretation "should 'accord with justice and common sense.'" Borough

of Princeton, 333 N.J. Super. at 325 (quoting Krosnowski v. Krosnowski, 22 N.J. 376, 387 (1956)).

Applying those principles to this legal question, we cannot find Herskowitz deeded the entire 150-acre tract to Schell, instead of the ten acres the deed repeatedly states is all that was conveyed. The cases relied on by Apell and Phoenix, including Jefferson v. Davis,[59] all lay down the same general rules of construction, to wit:

> As far as possible, effect is to be given, in construing descriptions in deeds, to both the general and particular or specific descriptions. Where, however, the general and particular descriptions of the land purporting to be conveyed are conflicting or repugnant to each other, the particular description will prevail over the general description, unless an intent to the contrary is otherwise manifested in the instrument.
>
> [Jefferson, 25 N.J. Super. at 144 (emphasis supplied).]

---

[59] In Jefferson, the question was whether the grantor conveyed the rights to the waters of a mill pond or to the waters and the submerged soil underlying those waters, by language in the deed that the grantors conveyed "all the following described tract of Land Plantation Grist Mill and Mill Pond and the priveleges of raising the Mill Pond and all his rights appurtaining to the raising and flowing of the Mill Pond," followed by a metes and bounds description that did not describe the land under the pond. 25 N.J. Super. at 140-42. "Considering the particular description and the general description" in light of a recital the court termed "clear and unambiguous," and considering "all of the facts actually here present," the court "concluded that the grantor here did not intend to convey a fee to the land submerged by the pond." Id. at 145-46.

Here, the "contrary intent" to convey only ten acres of the 150 acres particularly described is plainly manifested in the instrument. Herskowitz deeded to Schell only ten acres of the 150-acre Milkenstein tract described in the deed; the deed says so four times. Even Sharkey agreed.[60] Schell's ten acres are not described and, as the experts all agree, cannot be located on the ground.[61] While that likely would have given Schell reason to refuse the conveyance, see Kohlrepp v. Ram, 79 N.J. Eq. 386, 389-90 (Ch. 1911) (noting chancery courts will "not force the title upon an unwilling purchaser unless the facts to be established to make his title good were provable by public records, or by other evidence obtainable by a holder of the title at any time thereafter

_____

[60] Sharkey wrote to Denise in January 2003 after reviewing the Milkenstein to Herskowitz, Herskowitz to Schell and Herskowitz to Perlman deeds that "Perlman re-conveyed the 150 acres to Herskowitz, excepting the 10 acres conveyed to Schelle. Samuel Schelle (Schelies) remains vested, in the record, of the ten acres he acquired by deed recorded in DBK [deed book] 458 page 34."

[61] We reject the State's contention that the ten acres are part of the forty-four acres of the Milkenstein tract remaining in Bass River after the 1891 boundary line change. The State relies on the deed's recital of the ten acres being "situated, lying and being in the Township of Bass River." The deed, however, refers to the entire 150-acre Milkenstein tract as lying in Bass River, notwithstanding it was conveyed three years after the boundary line change, putting a part of the parcel in Little Egg Harbor. The deed does not define the location of Schell's ten acres, and thus it is not possible to determine on which side of the county line the Schell ten-acre tract lies, nor whether it is contained somewhere within the fifty-three acres of Property VII.

A-2823-16

when needed"), we find it strains credulity to accept the chancellor hearing that dispute would have ordered Herskowitz to convey the entire 150-acre tract — more than ten times the acreage specified in the agreement — to Schell, see Frenche v. Chancellor of New Jersey, 51 N.J. Eq. 624, 627 (E. & A. 1893) (noting the general rule that when the variance between the acreage the seller agrees to convey varies considerably from what a survey reveals "the party sustaining the loss should be allowed for it, and this rule should prevail when it arises from mistake only, without fraud or deception"); Burns Trading Corp. v. Blue Front Market, 17 N.J. Super. 61, 69 (Law Div. 1951) (noting a court will not compel a purchaser to accept, or a seller to convey, in a manner effecting "a vital change" in their agreement). The cases are legion that it is not the court's place to make a "new and different" agreement for the parties. See Burns Trading Corp., 17 N.J. Super. at 70. We see no reason the passage of more than one hundred years, in which neither Schell nor any heir has done anything to assert their rights, should improve his position.

Accordingly, the trial court erred in relying on Apell's testimony that the metes and bounds description prevailed "over the more general reference to the number of acres conveyed" in the Schell deed. Although in the order of importance in conflicting deed elements, area is generally deemed less

171

important than those parts of a metes and bounds description such as monuments, distance and direction, the Supreme Court has explained those "preferences" are only guides "and will yield to the manifest intent of the grantor if this can be ascertained." S.R.H. Corp., 54 N.J. at 20 (quoting 6 Thompson, Real Property (1962 Replacement) § 3044, pp. 571-76). Apell's view that Herskowitz's "probable intent" to convey ten acres must give way to his "actual intent" of having conveyed the entire tract by metes and bounds is just another way of opining that the description predominates over the grantor's clearly expressed intent, which is contrary to controlling precedent in this State. See Stransky v. Monmouth Council of Girl Scouts, Inc., 393 N.J. Super. 599, 610 (App. Div. 2007).

As Phoenix has only proved its title to ten, indeterminate acres of the 150-acre Milkenstein tract in Bass River and Little Egg Harbor, which its own experts concede cannot be located on the ground, it has failed to establish title to Property VII in quia timet, see Shotwell, 24 N.J. Eq. at 387, or ejectment, see Perlstein, 12 N.J. at 204. Legal and equitable title to Property VII remains in the State, which has established its own unbroken chain of title to the

172

property,[62] free from any claim by Denise or Phoenix.  See Troth, 68 N.J.L. at 37.

Because we are satisfied the State established an unbroken chain of title to Property VII, which is the same chain of title it possesses to Property V, the little lot located directly across Cervetto Road to the west of Property VII, we are also satisfied the State established its title to Property V, notwithstanding the mapping error Phoenix alleges affects that Property.  Both parties' title experts opined Property V was actually part of the 150-acre Milkenstein tract that includes Property VII, meaning, as Phoenix's expert opined, "the owner of the Milkenstein tract would own both Block 4, Lot 13 [Property VII] and Block 3, Lot 19 [Property V]."  Because, as Phoenix's expert explained, "[t]he Milkenstein Tract devolved as an entire tract," the State has established clear title to both Properties V and VII.

---

[62] We reject the trial court's finding that the State did not present proof "sufficient in the case" notwithstanding it would be deemed "sufficient in many cases," that "its grantors were, in fact, descendants of the heirs of Herskowitz" by relying "on surnames and the recitals in the deeds."  No legitimate question was raised as to the identity of the Herskowitz heirs in the State's chain of title, and Phoenix's own research, included in the appendix, confirmed the individuals as Herskowitz's descendants.

<u>Conclusion</u>

To sum up, we reverse the judgment for Phoenix divesting the State of its title to these seven Properties in the Preservation Area of the Pinelands National Reserve. We declare Denise and Phoenix's surreptitious two decade-long quest to undermine and cloud the State's title to those Properties and establish its own competing chains of title, erasing the State's parcels from the municipal tax map in the process, anathema to the principles undergirding New Jersey's land title laws and an undue interference with the State's rights to these lands, thus precluding Phoenix from all equitable relief.

We further find Phoenix did not establish title to six of the seven parcels under its theories of <u>quia</u> <u>timet</u> or ejectment. As to Property VI, the only Property to which Phoenix established its legal title, we hold it acquired title to the outstanding interest "under circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest," <u>Bron</u>, 42 N.J. at 96 (quotation omitted), and thus impose a constructive trust on the property in favor of the State. Accordingly, the State is equitably entitled to Property VI upon payment to Phoenix of the sum of $65,943, the sum it paid the Orlov heirs, plus simple interest at the Cash Management Fund Rate from the date of Phoenix's final payment to the heirs.

174

We accordingly remand for entry of judgment in recordable form, declaring Denise and Phoenix have no interest in any of these seven Properties, which shall be particularly described based on the plottings performed by the State's survey expert, Barry Jones, in this matter, upon the State's tender of payment for Property VI, and adjudging the State the owner of each parcel in fee simple; the judgment to be prepared by the State. We do not retain jurisdiction.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2823-16